**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| TED ANTHONY PREVATTE, | : | PRISONER HABEAS CORPUS |
| | : | 28 U.S.C. § 2254 |
| Petitioner, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:02-CV-1709-RWS |
| JAMES FRENCH, Warden; | : | |
| THURBERT E. BAKER, Attorney | : | |
| General, | : | |
| | : | |
| Respondents. | : | |

## <u>ORDER</u>

This cause is before the Court on Petitioner Ted Anthony Prevatte's

Petition for Habeas Corpus filed pursuant to 28 U.S.C. § 2254 [1];

Respondent's Answer-Response to the Petition [8-2] and Brief in Support

thereof [8-3]; and Petitioner's Memorandum in Support of Petition for Writ of

Habeas Corpus and in Opposition to Respondent's Answer-Response [11].  It

comes to this Court on consideration of the Report and Recommendation of

United States Magistrate Judge Joel M. Feldman [30], and Petitioner's

Objections thereto [33].  After considering the entire record, including the oral

argument of counsel, the Court enters the following Order.

**Background**

**I.      Procedural History**

      **A.      Petitioner's Convictions**

On March 12, 1974, the grand jury in Gwinnett County, Georgia jointly

indicted Petitioner and William Jordan for the March 6, 1974 murder and armed

robbery of James Rouse, Jr.  (Respondent's Ex. [ ("R. Ex.") 7 at 755; R. Ex. 8 at

890.)  On May 23, 1974, while incarcerated in North Carolina where Petitioner

was apprehended, Petitioner filed a *pro se* demand for speedy trial.   The trial

court then appointed Mr. E.L. Owens on May 28, 1974 to represent both

Petitioner and his co-defendant.  On May 31, 1974, Mr. Fred Bishop was

appointed to represent Petitioner and to assist Mr. Owens.  From June 10, 1974

through June 14, 1974, Petitioner's case was tried individually to a jury.

Petitioner was found guilty of malice murder and armed robbery and sentenced

to death on both convictions.

On direct appeal, the Georgia Supreme Court consolidated Petitioner's

appeal with that of his co-defendant, and summarized the evidence presented at

2

Petitioner's trial as follows:

> Appellants were charged in two counts with the March 6, 1974, armed robbery and murder of James Addison Rouse, Jr. At separate trials, both were convicted and sentenced to death on each count.

> The victim, Rouse, was an assistant principal of East Atlanta High School. On the day of the murder, Wednesday, March 6, he drove to work in his 1973 blue Toyota station wagon, wearing a wristwatch and carrying a grey briefcase. Though he telephoned his wife at about 8:00 p.m. that evening, he was last seen alive at about 7:30 p.m. at the Holiday Inn Motel located at the Suwanee exit from interstate highway I-85. He was identified by the bar manager of the Inn, who testified that Rouse left the bar near the time appellants entered. Appellants were also identified by the bar manager, who recognized Jordan by his 'teased hair' and Prevatte by the mole on his face.

> Appellants were arrested together on Thursday afternoon, March 7, by sheriff's deputies in Anson County, North Carolina, after a high speed chase during which appellants fired upon the deputies and threw a sawed-off shotgun from their vehicle. They were driving Rouse's blue Toyota and in the car was Rouse's briefcase, a polaroid camera, two polaroid pictures (one of each appellant holding the sawed-off shotgun and a pistol in front of Rouse's automobile), two black bags and other shotgun shells. Jordan was wearing Rouse's watch. Appellants explained the photographs as 'just clowning around' and as a 'souvenir.'

3

AO 72A
(Rev.8/82)

> Rouse's body was discovered on the following
> Saturday afternoon, March 9, 1974, at a lake in
> Gwinnett County, Georgia, about one and one-half
> miles from the Holiday Inn. An autopsy revealed 'a
> close range shotgun wound to the back of the head
> which completely disintegrated the head,' causing his
> death at a time approximately between 9:00 and 10:00
> p.m., March 6th. A shotgun shell, found 14 feet from
> the body, was identified as having been fired from the
> sawed-off shotgun earlier found in the possession of
> Prevatte and Jordan.
>
> Each testified for the other at his trial, both testifying
> that they knew nothing of the killing and had merely
> found Rouse's automobile abandoned in Atlanta,
> stolen it, and driven to North Carolina where they
> were apprehended.

Prevatte v. State, 214 S.E.2d 365, 365-66 (Ga. 1975).  The Georgia Supreme

Court affirmed Petitioner's convictions for murder and armed robbery, but

reversed his death sentence based upon certain prejudicial statements made by

the prosecution during the sentencing phase, and remanded Petitioner's case for

re-sentencing.  See id. at 367-68.  On December 6, 1979, Petitioner was re-

sentenced on the murder count to life in prison.  On December 19, 1983,

Petitioner was re-sentenced on the armed robbery count to life in prison to run

concurrently with the life sentence imposed on the murder conviction.

Petitioner served his sentence and did not seek state habeas corpus relief, or

4

otherwise challenge his 1974 Gwinnett County convictions for murder and armed robbery.

On October 18, 1991, Petitioner was paroled by the State of Georgia. Shortly thereafter, and while he was still on parole, Petitioner was arrested, tried, and convicted in the State of North Carolina on charges of kidnapping and murder.  After having his initial convictions reversed on appeal, see State v. Prevatte, 484 S.E.2d 377, 379 (N.C. 1997), Petitioner was re-tried and the jury again found Petitioner guilty of first-degree murder and two counts of second-degree kidnapping.  The jury recommended, and the trial judge imposed, a sentence of death for the murder conviction and consecutive terms of imprisonment of thirty years each for the two kidnapping convictions.  State v. Prevatte, 570 S.E.2d 440, 448-49 (N.C. 2002).  Petitioner's Georgia conviction for murder was presented as a "prior violent felony" statutory aggravating circumstance, and was one of four found by the jury to support its recommendation that Petitioner be sentenced to death.  Id. at 483, 494. Petitioner's conviction and death sentence were affirmed by the North Carolina Supreme Court, and he remains incarcerated in North Carolina awaiting execution.

AO 72A
(Rev.8/82)

### B.    Petitioner's Collateral Proceedings

In February 1996, apparently while his first North Carolina conviction was pending on appeal, Petitioner filed a *pro se* petition for writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254, seeking to set aside his 1974 Gwinnett County convictions. (See Prevatte v. French, et al., Civil Action No. 1:96-CV-518-FMH (N.D. Ga. filed Feb. 28, 1996).)  That petition was dismissed without prejudice on July 15, 1996 for failure to exhaust state remedies.  (See Order of July 15, 1996 [7], Prevatte v. French, et al., Civil Action No. 1:96-CV-518-FMH (N.D. Ga. 1996).)

On July 19, 1996, Petitioner filed a *pro se* habeas corpus petition pursuant to O.C.G.A. § 9-14-41 et seq. in the Superior Court of Gwinnett County, Georgia.  That petition was initially dismissed on venue grounds, as Petitioner was then incarcerated in North Carolina.  However, the Georgia Supreme Court later reinstated the petition and remanded the case for further proceedings. (R. Ex. 2 at 3.)  Petitioner, through counsel, then filed two amendments to his initial petition.  In that petition, as amended, Petitioner raised the following grounds for relief:

6

1.      Petitioner was effectively denied the right to counsel due to counsel being appointed on May 28 and 31, 1974, and Petitioner's death penalty trial starting on June 10, 1974;

2.      Petitioner's attorneys had a conflict of interest as a result of representing Jordan and failed to advocate vigorously;

3.      Petitioner was denied his right to remain silent as a result of extensive testimony and argument concerning his request for a lawyer and refusal to make a statement to police;

4.      Petitioner was denied his right to a fair trial as a result of several instances of prosecutorial misconduct;

5.      Petitioner was denied his right to a fair and impartial jury drawn from a fair cross-section of the community as African-Americans were excluded from the venire from which the jury was chosen;

6.      Petitioner was denied a fair trial as a result of the trial court admitting certain State exhibits for which a proper chain of custody was not established;

7.      Petitioner was denied a fair trial as result of highly prejudicial and inflammatory photographs being introduced at trial;

8.      Petitioner was denied a fair trial as a result of the trial court permitting a witness to speculate as to the value of the victim's car and by failing to first qualify the witness as an expert on motor vehicle valuations;

9.      Petitioner was denied a fair trial as a result of jury instructions that impermissibly shifted the burden of proof to the defense;

10.     Petitioner was denied the right to effective assistance of trial and appellate counsel as a result of;

AO 72A
(Rev.8/82)

a.    trial counsel's failure to seek a continuance;

b.    trial counsel's continued representation despite a conflict of interest created by the joint representation of both Petitioner and Jordan;

c.    trial counsel's failure to conduct a sufficient and useful factual investigation of Petitioner's case;

d.    trial counsel's failure to consult with Petitioner;

e.    trial counsel's failure to make an opening statement and failure to consult with Petitioner prior to waiving his opening statement;

f.    trial counsel's failure to investigate the case adequately and failure to investigate alternate defenses;

g.    trial counsel's failure to object to improper jury charges;

h.    trial counsel's failure to object to the unconstitutional jury venire;

i.    trial counsel's failure to object to the prosecution's continued reference to Petitioner's post-arrest assertion of his right to remain silent and his request for counsel;

j.    appellate counsel's failure to challenge on direct appeal the trial court's unconstitutional jury charge;

k.    appellate counsel's failure to challenge on direct appeal the unconstitutional jury venire;

l.    appellate counsel's failure to challenge on direct appeal the district attorney's unconstitutional closing argument;

8

      m.     appellate counsel's failure to challenge on direct appeal the prosecution's continued reference to Petitioner's post-arrest assertion of his right to remain silent and his request for counsel;

      n.     trial counsel's cross-examination of state's witness Linda Hamrick during which she stated for the first time that she saw Petitioner at the Holiday Inn near the time she saw the victim;

11.    Petitioner was denied a fair trial as a result of the prosecution's failure to disclose exculpatory evidence prior to trial, a note threatening to kill the victim written by someone connected to the school, discovered by his secretary the day before the victim was murdered; and

12.    Petitioner was denied effective assistance of trial and appellate counsel:  by trial counsel's  failure to investigate, discover, and present at trial exculpatory evidence; and appellate counsel by said counsel failing to raise on appeal the prosecution's failure to disclose exculpatory evidence.

(R. Ex. 2 at 4-17; R. Ex. 4 at 4-5).

On November 23, 1999, the state habeas court held an evidentiary hearing during which it heard testimony and received various affidavits into evidence.  In August 2000, the state habeas court denied relief.  On October 2, 2001, the Georgia Supreme Court denied Petitioner a certificate of probable cause to appeal the denial of his state habeas petition.  Petitioner then sought

9

certiorari review in the Supreme Court of the United States, but on February 25, 2002, the Supreme Court declined to review Petitioner's case.

## II.     The Instant Petition

Petitioner here contends that he was convicted in violation of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and urges this Court to set aside his Gwinnett County, Georgia conviction.  In this regard, Petitioner asserts the following grounds for relief: (1) the alleged systematic exclusion of women and African-Americans from the jury; (2) denial of counsel; (3) ineffective assistance of both trial and appellate counsel; (4) prosecutorial misconduct including Brady violations and improper statements by the prosecutor; and (5) impermissible jury instructions which shifted the burden of proof to the defendant.  In particular, the grounds raised in the instant Petition are as follows:

1.     The Systematic exclusion of women and African-Americans from the jury pool deprived Petitioner of a jury drawn from a fair cross-section of the community;

2.     Petitioner was denied the right to counsel based upon:

(a)     a conflict of interest based on the joint representation of Petitioner and co-defendant Jordan on the same capital murder charge;

10

        (b)    an inadequate time to prepare for the trial of Petitioner's case;

    3.    Petitioner received ineffective assistance of counsel based upon:

        (a)    the unreasonable pretrial investigation conducted by Petitioner's trial counsel;

        (b)    trial counsel's professionally unreasonable and prejudicial performance at trial;

        (c)    appellate counsel's professionally unreasonable and prejudicial performance, which included the failure to raise challenges to:

            i)    certain jury instructions which Petitioner contends impermissibly shifted the burden of proof;

            ii)    the systematic exclusion of women and minorities from the master jury list and jury venire; and

            iii)    repeated references by the prosecution to Petitioner's post-arrest silence and request for counsel;

    4.    Petitioner was denied his right to a fair trial based upon prosecutorial misconduct, including <u>Brady</u> violations, references to Petitioner's right to remain silent, as well as other prejudicial comments.

The Court addresses each ground for relief in turn.

AO 72A
(Rev.8/82)

## Discussion

### I.   Standard of Review Under 28 U.S.C. § 2254

Section 2254 grants the federal courts power to issue a writ of habeas corpus on behalf of a person being held in custody pursuant to a judgment of a state court where that person is held in custody in violation of his rights under federal law.  28 U.S.C. § 2254(a).  But, with respect to those grounds for relief presented to the state courts and adjudicated on the merits, Congress has substantially limited the power of federal courts to grant habeas relief to an individual in custody pursuant to a state court judgment by " 'establish[ing] a highly deferential standard for reviewing state court judgments.' " <u>LeCroy v. Sec'y, Fla. Dept. of Corr.</u>, 21 F.3d 1237, 1259 (11th Cir. 2005) (quoting <u>Parker v. Sec'y for Dep't of Corr.</u>, 331 F.3d 764, 768 (11th Cir. 2003)).  Specifically, § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996,  Pub. L. No. 104-132, 110 Stat. 1214 (1996) (the "AEDPA"), provides that a federal court may not grant habeas relief with respect to any claim that was "adjudicated on the merits in State court proceedings" unless that adjudication:

12

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Moreover, "a state court's factual findings are presumed correct, unless rebutted by the petitioner with clear and convincing evidence." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001); see 28 U.S.C. § 2254(e)(1).

"The 'contrary to' and 'unreasonable application' clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions." Putman, 268 F.3d at 1241.  A state court decision is "contrary to" clearly established federal law where either "the state court applied a rule that contradicts the governing law set forth by Supreme Court case law," or "when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case." Putman, 268 F.3d at 1241; see also Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) ("A state-court decision will certainly be contrary to our clearly

13

established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .  A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.").

Under the "unreasonable application" prong of § 2254(d)(1), a federal court may grant a writ of habeas corpus "if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts" of the petitioner's case.  Williams, 529 U.S. at 413.  Additionally, "[a]n unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context."  Putman, 268 F.3d at 1241.  Whether the state court's application of clearly established federal law was unreasonable is to be evaluated under an objective standard.  See Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527; 156 L. Ed. 2d 471 (2003) ("In order for a federal court to find a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. [cit]  The state court's application must have been 'objectively

14

unreasonable.' "); <u>Williams</u>, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.").

Finally, the statutory phrase "clearly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 529 U.S. at 412 (O'Connor, J. for the Court); <u>see also</u> <u>Putman</u>, 268 F.3d at 1241 ("Clearly established federal law is not the case law of the lower federal courts, including this Court.  Instead, in the habeas context, clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." (internal quotations omitted)).

## III.   Petitioner's Asserted Grounds for Relief

### A.   Systematic Exclusion of Women and Minorities Deprived Petitioner of a Jury Drawn from a Pool Representing a Fair Cross-section of the Community

Petitioner, in his first and second grounds for relief, asserts that the systematic exclusion of women and minorities from the jury pool deprived him of his right to a trial by a jury drawn from a pool comprising a fair cross-section

15

of the community.  Petitioner contends that, under the rule established in <u>Taylor v. Louisiana</u>, 419 U.S. 522, 528-30, 95 S. Ct. 692, 697, 42 L. Ed. 2d 690 (1975) (per curiam), this systematic exclusion violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

These claims were raised before the state habeas court which denied relief, concluding that Petitioner's <u>Taylor</u> fair cross-section claims were procedurally defaulted.  (<u>See</u> Order on Petitioner's Application for Habeas Corpus, <u>Prevatte v. French</u>, No. 96-A-04483-1 (Super. Ct., Gwinnett Co., Aug. 25, 2000), R. Ex. 13 at 18-19.)

Before this Court, Respondent presents three arguments in response to Petitioner's fair cross-section claims.  First, Respondent contends that Petitioner's claim, insofar as it relies on the systematic exclusion of women from the jury pool, is barred from retroactive application to Petitioner's 1974 jury trial by <u>Teague v. Lane</u>, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), and <u>Daniel v. Louisiana</u>, 420 U.S. 31, 95 S. Ct. 704, 42 L. Ed. 2d 790 (1975).  (<u>See</u> Ans.-Resp. ¶ 7(a); Br. in Supp. of Ans.-Resp. [8-3] at 6.)  Second, Respondent argues that Petitioner failed to make a sufficient evidentiary showing *vis-a-vis* his claim that African Americans were excluded from the jury

16

pool.  (See Br. in Supp. of Ans.-Resp. at 6-7.)  Third, Respondent contends that

Teague also bars any claim by Petitioner directed at the racial and/or gender

composition of the actual jury venire from which Petitioner's jury was selected,

or that the under-representation of women violated equal protection.

Respondent expressly does not address the whether the state habeas court's

conclusion that Petitioner's fair cross-section claims were procedurally

defaulted is correct.  (See id. at 6.)

> 1.  Petitioner's jury composition claims are not procedurally defaulted

The Supreme Court has held that the "independent and adequate state

ground" doctrine, while not jurisdictional in the habeas corpus context, "applies

to bar consideration on federal habeas of federal claims that have been defaulted

under state law." Lambrix v. Singletary, 520 U.S. 518, 523, 117 S. Ct. 1517,

137 L. Ed. 2d 771 (1997) (citing Coleman v. Thompson, 501 U.S. 722, 729-

730, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)).  As the Supreme Court

has explained, application of the "independent and adequate state ground"

doctrine to federal habeas review " 'ensures that the States' interest in

correcting their own mistakes is respected in all federal habeas cases.' "

17

Lambrix, 520 U.S. 523 (quoting Coleman, 501 U.S. at 732).  " '[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.' " Id. (quoting Coleman, 501 U.S. at 730-31.)  Moreover, out of a recognition that state procedural rules "are of vital importance to the orderly administration of its criminal courts," and their evasion "undermines the criminal justice system," the Supreme Court has instructed the lower courts that procedural bar issues should ordinarily be resolved first.  Id. at 525.  Accordingly, the Court addresses first the state habeas court's conclusion that Petitioner's fair cross-section claims were procedurally defaulted.[1]

In this case, it is undisputed that Petitioner failed to object to the jury selection procedures or the composition of the jury venire at the time of his trial in 1974.  It is similarly undisputed that Petitioner did not present his fair cross-

---

[1] Respondent does not rely on the state habeas court's conclusion, but neither does he expressly abandon it.  (See Br. in Supp. of Ans.-Resp. at 8-9 (acknowledging state habeas court conclusion and stating, "Pretermitting the question of whether the state habeas court's ruling was correct, Respondent submits that this ground still provides no basis for relief.").)  Moreover, the Magistrate recommended that Petitioner's fair cross-section claim be denied, at least in part, on grounds that it was procedurally defaulted. Accordingly, the Court addresses this issue first.

18

section claims on direct appeal.  Petitioner did, however, raise his fair cross-

section claim before the state habeas court, which summarily rejected this claim

for relief on procedural grounds.  In concluding that Petitioner's fair cross-

section claims were procedurally defaulted, the state habeas court stated:

> No challenge was raised by the defense at the trial and prior to jury selection.  This appears to be part of the defendant's personal strategy - that he wanted a speedy trial, that he wanted it immediately, that he did not want a continuance for any reason, and that his attorney should not ask for a continuance or take any action other than to proceed to jury trial.
>
> Failure to timely raise the issue of jury composition results in a forfeiture of this claim.
>
> The Georgia statute governing habeas corpus proceedings provides in O.C.G.A. § 9-14-42 as follows:
>
> "(b) The right to object to the composition of the grand or trial jury will be deemed waived under this code section unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence have otherwise become final."
>
> This same provision was in effect in 1974 at the time of this trial codified as [Ga. Code. Ann.] § 50-127.
>
> Under the facts and circumstances of this case and the insistence by this defendant on a speedy trial at virtually all costs, contrary to the recommendation of his counsel, this Court finds no sufficient cause has been shown and that petitioner's claim at this time is

> procedurally barred, whether it might have had merit
> or not.

(R. Ex. 13 at 18-19.)

Under Georgia law, a party that fails to raise a challenge to the jury array at or before the time the jury array is seated and *voir dire* commences is precluded from raising that challenge on direct appeal. <u>See, e.g.</u>, <u>Guest v. State</u>, 367 S.E.2d 105 (Ga. Ct. App. 1988) ("Under Georgia law, a criminal defendant must raise a challenge to the jury array at or before the time the jury panel is first 'put upon' him (unless he has been prevented from doing so); if he does not object at that time, he waives his right to raise such a claim later at trial or on direct appeal."); <u>Spencer v. Kemp</u>, 781 F.2d 1458, 1463 (11th Cir. 1986) (examining Georgia law of waiver and concluding that "in order to avoid waiving any right to challenge the composition of a traverse jury on appeal, a defendant must raise such a challenge prior to the commencement of *voir dire*."); <u>cf.</u> <u>Cobb v. State</u>, 126 S.E.2d 231, 239 (Ga. 1962) (holding that objection to traverse jury "put upon" accused in criminal case must be raised by challenge to array at earliest opportunity defendant has to avail himself of that right).

Whether that party may raise a challenge to the jury array during state habeas corpus review, however, is governed by the state's habeas corpus statute.  At the time of Petitioner's trial, the version of Ga. Code. Ann. § 50-127 (now codified at O.C.G.A. § 9-14-42) then in effect provided:

> Rights conferred or secured by the Constitution of the United States shall not be deemed waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege which relinquishment or abandonment was participated in by the party and was done voluntarily, knowingly, and intelligently.

1967 Ga. L. 836, 836, codified at Ga. Code. Ann. § 50-127 (1967).  In 1975, after Petitioner's trial was concluded, that section was amended to provide:

> Except for objections relating to the composition of a grand or traverse jury, rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege which relinquishment or abandonment was participated in by the party and was done voluntarily, knowingly and intelligently. The right to object to the composition of the grand or traverse jury will be deemed waived under this section, unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence has [sic] otherwise become final.

21

1975 Ga. L. 1143, 1143-44, codified at O.C.G.A. § 9-14-42.

In <u>Spencer v. Kemp</u>, 781 F.2d 1458 (11th Cir. 1986) (en banc), the

Eleventh Circuit was presented with facts virtually indistinguishable from the

instant case.  In that case, the petitioner, who was tried prior to the 1975

amendment to the Georgia habeas corpus statute, failed to object to the

composition of the jury at trial.  The state habeas court rejected the petitioner's

challenge, retroactively applying the 1975 amendment to the Georgia habeas

corpus statute.  On federal habeas review, the district court denied relief on the

ground that the state habeas court's decision was an independent and adequate

state law ground sufficient to preclude federal habeas corpus review.  The

Eleventh Circuit reversed, holding that

> [t]he element of unfair surprise that renders novel or
> sporadically applied state procedural grounds
> inadequate to preclude federal review of federal
> constitutional claims is present in this case as well.
> The 1975 amendment, as applied in this case, operated
> retroactively to render Spencer's failure to raise a
> timely challenge to the composition of the jury array a
> waiver after the fact of his right to do so, affording
> him no opportunity to attempt to comply with the new
> provision before suffering the deprivation it imposed.
> We cannot find such an interpretation of Georgia
> procedural law to be an independent and adequate

22

> state ground sufficient to preclude federal court
> consideration of the merits of Spencer's claim.

Id. at 1470-71.

In this case, the state habeas court incorrectly concluded that the 1975 amendment was in effect at the time of Petitioner's trial.  As Spencer makes clear, that amendment may not be applied retroactively to Petitioner.  Therefore, the 1967 Georgia habeas corpus statute governs Petitioner's case, and the state habeas court's conclusion that Petitioner's jury composition claims were procedurally defaulted under the new version of that statute does not constitute an independent and adequate state law ground which will preclude federal habeas corpus relief.

Under the 1967 Georgia habeas corpus statute, Petitioner's jury composition claims could only be waived if Petitioner participated in the decision to waive the right to raise those claims in his state habeas proceeding, and Petitioner's decision to waive those claims was made "voluntarily, knowingly, and intelligently."  Having reviewed the record in this case, the Court finds nothing that clearly indicates that Petitioner knowingly, voluntarily,

and intelligently waived his right to challenge the jury's composition.[2]  As such,

the Court concludes that Petitioner's jury composition claims are not

procedurally defaulted, and these claims may, if established, serve as the basis

for federal habeas corpus relief.

_____

[2] In Spencer, the court left open the possibility that a state habeas petitioner "convicted while the 1967 statute was in effect, [and] whose failure to challenge the composition of his grand or traverse jury continued long past his trial or well beyond the enactment of the 1975 amendment," may not be able to seek refuge in the 1967 statute. 781 F.2d at 1471 n.24.  In this regard, the Spencer Court noted that "[a] voluntary and intelligent waiver of such a claim in accordance with the terms of the 1967 statute may be found under a wide variety of circumstances, and we do not with this decision intend to limit or restrict the ability of the courts of this Circuit to find such a waiver in future cases involving the 1967 Georgia habeas corpus statute."  Id.

Without question, by waiting until 1996 to challenge the composition of the 1974 array from which his jury was chosen, Petitioner's failure to raise these challenges "continued long past his trial [and] well beyond the enactment of the 1975 amendment." The State, however, does not raise this issue.  Moreover, the Court has found no case finding the passage of time, in and of itself, sufficient to establish a *knowing and voluntary waiver* under the 1967 Geogia habeas corpus statute.  Cf. Freytag v. Comm'r., 501 U.S. 868, 894 n.2, 111 S. Ct. 2631, 115 L. Ed. 2d 764 (1991) (Scalia, J., concurring in part and concurring in judgment) ("The Court uses the term 'waive' instead of 'forfeit,' [cit.] The two are really not the same, although our cases have so often used them interchangeably that it may be too late to introduce precision.  Waiver, the 'intentional relinquishment or abandonment of a known right or privilege,' [cit.] is merely one means by which a forfeiture may occur.  Some rights may be forfeited by means short of waiver, [cits.] but others may not, [cits.].  A right that cannot be waived cannot be forfeited by other means (at least in the same proceeding), but the converse is not true."). Accordingly, the Court declines to conclude that Petitioner's delay in bringing this action constitutes a knowing and voluntary waiver, and will consider whether he is otherwise entitled to habeas relief on this ground.

24

2.      Petitioner is not entitled to the benefit of Taylor

As explained above, Petitioner was tried and convicted of malice murder

and armed robbery in June of 1974.  Petitioner directly appealed those

convictions, and the Georgia Supreme Court rendered its decision on

Petitioner's direct appeal on February 25, 1975.  After Petitioner's trial, but

while his direct appeal was still pending, the Supreme Court issued its decision

in Taylor v. Louisiana.  In that case, the Supreme Court held that the systematic

exclusion of women from jury service violated the principle, which it found

implicit in the right to jury trial guaranteed by the Sixth Amendment, "that petit

juries must be drawn from a source fairly representative of the community."

Taylor, 419 U.S. at 538.

In Daniel v. Louisiana, 420 U.S. 31, 95 S. Ct. 704, 42 L. Ed. 2d 790

(1975), decided one week later, the Supreme Court held "that Taylor is not to be

applied retroactively, as a matter of federal law, to convictions obtained by

juries empaneled prior to the date of that decision."  Id. at 32.  Applying the

three-factor test for retroactivity initially adopted in Linkletter v. Walker, 381

25

U.S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965),[3] the Daniel Court considered

" '(a) the purpose to be served by the new standards, (b) the extent of the

reliance by law enforcement authorities on the old standards, and (c) the effect

on the administration of justice of a retroactive application of the new

standards,' " Daniel, 420 U.S. at 32 (quoting Stovall v. Denno, 388 U.S. 293,

297, 87 S. Ct. 1967, 1970, 18 L. Ed. 2d 1199 (1967)), and concluded that each

factor weighed in favor of giving Taylor only prospective effect.[4] Id. at 32-33.

_____

[3] In Linkletter, the Supreme Court, in considering whether its decision in Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1864, 6 L. Ed. 2d 1081 (1961) should be applied retroactively, explained that whether a given rule should be applied retroactively must be decided on a case-by-case basis. See Linkletter, 381 U.S. at 629. In that case, the Court considered "the purpose of the Mapp rule; the reliance placed upon the [] doctrine; and the effect on the administration of justice of a retroactive application of Mapp," id. at 636, and concluded that, based upon those factors, the Mapp decision would not be applied retroactively to a state conviction that had become final before Mapp was decided. Id. at 640.

[4] The Court reasoned that, first, the Court in Taylor was more concerned with the general function that the jury plays in our system of criminal justice, rather than "the premise that every criminal trial, or any particular trial, was necessarily unfair because it was not conducted in accordance with what we determined to be the requirements of the Sixth Amendment." Daniel, 420 U.S. at 32   Second, the Court explained that "the reliance of law enforcement officials and state legislatures on prior decisions of this Court" was clear. Id. at 32-33. Finally, the Court explained that "the requirement of retrying a significant number of persons were Taylor to be held retroactive would do little, if anything, to vindicate the Sixth Amendment interest at stake and would have a substantial impact on the administration of criminal justice in . . . States whose past procedures have not produced jury venires that comport with the requirement enunciated in Taylor." Id. at 33. Thus, in view of each of these factors, the Court concluded that Taylor should be applied only prospectively, that is, to cases where the jury was

Twelve years after <u>Daniel</u> was decided, the Supreme Court, in the case of <u>Griffith v. Kentucky</u>, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987), significantly altered the legal landscape of retroactivity.[5]  In that case, the Court soundly rejected the particularized, case-by-case approach to retroactivity adopted in <u>Linkletter</u> and applied in <u>Daniel</u>.  Reasoning that such an approach "violates basic norms of constitutional adjudication," <u>id.</u> at 322, the Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final."  <u>Id.</u> at 328.  The Court provided two principal reasons for its decision.  First, the Court explained that, because it could only establish new rules in specific cases, and because, as a practical matter, the Court cannot hear each case pending on direct review when it establishes a new rule, the Court "fulfill[s] [its] judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final."  <u>Id.</u> at 323.  Second, the Court

_____

empaneled after the Court's decision in <u>Taylor</u>.

    [5] Though, to be sure, the Court's decision in <u>Griffith</u> was substantially foreshadowed by the Court's decision in <u>United States v. Johnson</u>, 457 U.S. 537, 562, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982) (adopting in large part Justice Harlan's view of retroactivity and concluding that "subject to [certain exceptions], a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered.").

explained that the "selective application of new rules violates the principle of treating similarly situated defendants the same," emphasizing " 'the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary' of a new rule." Id. (quoting United States v. Johnson,  457 U.S. 537, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982)).

Petitioner contends that he should receive the benefit of the fair cross-section requirement of Taylor because the decision was announced before his conviction became final.  In support of his position, Petitioner raises two primary arguments.  First, Petitioner contends that Griffith effectively overruled Daniel, and as such, Daniel is no longer good law.  Thus, Petitioner argues that under the retroactivity principle adopted in Griffith, he is entitled to the benefit of the Taylor decision because that decision was rendered during the pendency of his direct appeal.  Second, Petitioner contends that the Supreme Court, as well as the Eleventh Circuit, have applied Griffith's rule of retroactivity to convictions which became final prior to the date Griffith was decided.  Or, stated another way, the retroactivity principle of Griffith itself is applied retroactively.  For the reasons that follow, however, the Court concludes that Petitioner is not entitled to relief on this ground.

(a)     Griffith did not overrule Daniel

Petitioner contends that this Court should not apply the Supreme Court's decision in Daniel because it was overruled by Griffith.  From even a cursory review of Griffith, there can be little doubt that the Supreme Court in that case disapproved of the three factor Linkletter retroactivity test which was applied in Daniel to find the fair cross section requirement of Taylor inapplicable to cases in which the jury was empaneled prior to the date Taylor was decided.  Indeed, Griffith cites Daniel as an example of a case applying the Linkletter approach with the result that a new rule of criminal procedure was held not to apply to cases either on direct appeal or on collateral review.  See Griffith, 479 U.S. at 321.

But, as the Fifth Circuit explained in Wilkerson v. Whitley, 28 F.3d 498 (5th Cir. 1994) (en banc), a case addressing an identical claim to that raised by Petitioner here, " 'absent clear indications from the Supreme Court itself, lower courts should not lightly assume that a prior decision has been overruled sub silentio merely because its reasoning and result appear inconsistent with later cases.' " Id. at 504 (quoting Williams v. Whitley, 994 F.2d 226, 235 (5th Cir. 1993) (Higginbotham, J.)).  Indeed, as the Supreme Court has repeatedly

29

admonished the lower courts: "If a precedent of this Court has direct application

in a case, yet appears to rest on reasons rejected in some other line of decisions,

the [lower courts] should follow the case which directly controls, leaving to this

Court the prerogative of overruling its own decisions." Rodriguez de Quijas v.

Shearson/American Exp., Inc.,  490 U.S. 477, 483-84, 109 S. Ct. 1917, 104 L.

Ed. 2d 526 (1989); see also Tenet v. Doe, 544 U.S. 1, 11, 125 S. Ct. 1230, 161

L. Ed. 2d 82 (2005) (same);  Hohn v. United States, 524 U.S. 236, 252-53, 118

S. Ct. 1969, 141 L. Ed. 2d 242 (1998) ("Our decisions remain binding

precedent until we see fit to reconsider them, regardless of whether subsequent

cases have raised doubts about their continuing vitality."); Agostini v. Felton,

521 U.S. 203, 237, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997) ("We do not

acknowledge, and we do not hold, that other courts should conclude our more

recent cases have, by implication, overruled an earlier precedent."); Brisentine

v. Stone & Webster Eng'g Corp., 117 F.3d 519, 525 (11th Cir. 1997) ("It may

be that the Supreme Court has cut [a prior decision] back so far that it will not

survive.  Perhaps, but we are not convinced we are authorized to sing the dirge

of [that prior decision].  We will leave that to the Supreme Court. . . ."); Fla.

League of Prof'l Lobbyists v. Meggs, 87 F.3d 457, 462 (11th Cir. 1996)

AO 72A
(Rev.8/82)

(explaining that lower courts "are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court.").

Applying this well-established principle, the <u>Wilkerson</u> Court reasoned:

> <u>Griffith</u> overruled <u>Linkletter</u>'s retroactivity test (as clarified by <u>Johnson v. New Jersey</u>, <u>Stovall</u>, and <u>Desist [v. United States</u>, 394 U.S. 244, 89 S. Ct. 1030, 22 L. Ed. 2d 248 (1969)]) by creating a bright-line rule that applies new rules to all cases not yet final. This line of cases had established the test for how to apply new constitutional decisions. On the other hand, cases such as <u>Daniel</u> merely applied the test to particular new constitutional rules. Thus, while <u>Griffith</u> changed the methodology for determining retroactivity, it did not abrogate the results of the prior retroactivity test. In the absence of explicit language overruling cases such as <u>Daniel</u>, we must assume that these results are still valid as to those new rules for which retroactive application was rejected.

<u>Wilkerson</u>, 28 F.3d at 505.[6]

_____

[6] Additionally, this Court notes, as did the <u>Wilkerson</u> Court, that the Supreme Court in <u>Teague</u> cited <u>Daniel</u> with apparent approval. <u>See Teague</u>, 489 U.S. at 314 (reasoning that "as we stated in <u>Daniel</u> . . ., which held that <u>Taylor</u> was not to be given retroactive effect, the fair cross section requirement does not rest on the premise that every criminal trial, or any particular trial, is necessarily unfair because it is not conducted in accordance with what we determined to be the requirements of the Sixth Amendment," and concluding that rule extending fair cross section requirement to petit jury would not be "bedrock procedural element" retroactively applied under second <u>Teague</u> exception (internal quotations and alterations omitted)). This fact adds additional support to the conclusion that <u>Griffith</u> did not overrule <u>Daniel</u>.

31

This Court agrees with the Fifth Circuit's reasoning in <u>Wilkerson</u>.  <u>Daniel</u> clearly and unequivocally holds that <u>Taylor</u> is not to be applied retroactively to cases in which the jury was empaneled prior to the date <u>Taylor</u> was decided, and no Supreme Court case has expressly overruled that decision. Therefore, <u>Daniel</u> controls the issue of whether Petitioner is entitled to the benefit of <u>Taylor</u>.  Because Petitioner's jury was empaneled prior to the date <u>Taylor</u> was decided, the Court holds that under <u>Daniel</u>, Petitioner is not entitled to the benefit of that decision.

         (b)    <u>Teague bars application of Griffith to Petitioner's fair cross-section claims</u>

Even assuming that Petitioner were correct in his assertion that "<u>Griffith</u> effectively overruled <u>Daniel</u> and <u>Daniel</u> is no longer good law," (Br. in Supp. of Pet. at 20), the Court would find habeas relief under <u>Taylor</u> inappropriate. Petitioner's case is before this Court on collateral review.  "Under <u>Teague</u>, a new rule of criminal procedure generally may not be applied in a federal habeas proceeding where the judgment in question became final before the rule was announced."  <u>Schwab v. Crosby</u>, 451 F.3d 1308, 1323 (11th Cir. 2006). Therefore, the Court must assess at the outset whether the relief he seeks would

32

require the application of a new rule.  See Teague, 489 U.S. at 300

("Retroactivity is properly treated as a threshold question, for, once a new rule

is applied to the defendant in the case announcing the rule, evenhanded justice

requires that it be applied retroactively to all who are similarly situated.");

accord O'Dell v. Netherland, 521 U.S. 151, 156, 117 S. Ct.  1969, 138 L. Ed. 2d

351 (1997) ("Before a state prisoner may upset his state conviction or sentence

on federal collateral review, he must demonstrate as a threshold matter that the

court-made rule of which he seeks the benefit is not 'new.' ").

　　　　"A holding constitutes a 'new rule' within the meaning of Teague if it

'breaks new ground,' 'imposes a new obligation on the States or the Federal

Government,' or was not 'dictated by precedent existing at the time the

defendant's conviction became final.' " Graham v. Collins, 506 U.S. 461, 467,

113 S. Ct. 892, 122 L. Ed. 2d 260 (1993) (quoting Teague, 489 U.S. at 301).

Without question, the explicit overruling of a prior Supreme Court case creates

a new rule.  Saffle v. Parks, 494 U.S. 484, 488, 110 S. Ct. 1257, 108 L. Ed. 2d

415 (1990); Graham, 506 U.S. at 467.  When a decision of the Supreme Court

extends the reasoning of prior cases, however, determining whether a new rule

has been announced becomes more difficult.  Saffle, 494 U.S. at 488.  Where

that is the case, the Court must apply a "functional view of what constitutes a new rule" and resolve the question "by reference to the underlying purposes of the habeas writ.  Foremost among these is ensuring that state courts conduct criminal proceedings in accordance with the Constitution as interpreted at the time of the proceedings."  Id.; see also Teague, 489 U.S. at 306 (" '[T]he threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards.  In order to perform this deterrence function, . . . the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place.' " (quoting Desist, 394 U.S. at 262-263 (Harlan, J., dissenting))).

Thus, the Teague inquiry proceeds in three steps.

> First, the date on which the defendant's conviction became final is determined. [cit.]  Next, the habeas court considers whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution. [cits.] If not, then the rule is new.  If the rule is determined to be new, the final step in the Teague analysis requires the court to determine whether the rule nonetheless falls within one of the two narrow exceptions to the Teague doctrine. [cit.]

AO 72A
(Rev.8/82)

> The first, limited exception is for new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. [cit.]  The second, even more circumscribed, exception permits retroactive application of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. [cits.]  Whatever the precise scope of this second exception, it is clearly meant to apply only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty. [cit.]

O'Dell, 521 U.S. at 156-57 (internal quotations and citations omitted).

Petitioner's conviction became final on February 25, 1975.  The governing law at the time his conviction became final was comprised of Taylor and Daniel, which squarely held that Taylor was not to be applied in cases where the jury was empaneled prior to the date Taylor was decided.  Petitioner urges that Griffith, a case decided some twelve years after Petitioner's conviction became final, impliedly overruled Daniel and requires that Taylor be retroactively applied to all convictions not yet final when Taylor was decided.  If "there can be no dispute that a decision announces a new rule if it expressly overrules a prior decision," Graham, 506 U.S. at 467; Saffle, 494 U.S. at 488 (same), the Court sees no reason that a decision which impliedly overruled a

prior decision should not establish a new rule within the meaning of <u>Teague</u> as well.  Thus, reading <u>Griffith</u> as impliedly overruling <u>Daniel</u> to require the retroactive application of <u>Taylor</u> to Petitioner's claim constitutes a new rule under <u>Teague</u>.

Having concluded that Petitioner seeks habeas relief in this Court based upon the application of a new rule, the Court must consider whether that rule falls within one of the two narrow exceptions to <u>Teague</u>'s general rule of non-retroactivity.  The Court concludes that it does not.

First, reading <u>Griffith</u> as Petitioner requests certainly does not forbid criminal punishment of certain primary conduct or prohibit a certain category of punishment for a class of defendants because of their status or offense.  Rather, Petitioner merely seeks to obtain a new trial based upon the application of the fair cross section requirement announced in <u>Taylor</u>.  <u>Compare</u> <u>Roper v. Simmons</u>, 43 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (granting habeas relief under new rule that Eighth and Fourteenth Amendments forbid imposition of death penalty on offenders who were under age of 18 when their crimes were committed).  Nothing about Petitioner's claim indicates that application of the first <u>Teague</u> exception would be appropriate.

36

Second, the Court finds a rule requiring that <u>Griffith</u> be retroactively applied to allow Petitioner the benefit of <u>Taylor</u> does not fall within the second <u>Teague</u> exception.  In light of the Supreme Court's reasoning in <u>Taylor</u>, <u>Daniel</u> and <u>Teague</u> that the fair cross-section requirement did not render any particular trial unfair, certainly a rule which requires the retroactive application of <u>Taylor</u> cannot be said to be a " 'watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceedings,' " <u>O'Dell</u>, 521 U.S. at 157 (quoting <u>Graham</u>, 506 U.S. at 478); <u>see also</u> <u>Teague</u>, 489 U.S. at 314 (refusing to extend fair cross section requirement to petit jury based upon rationale of <u>Taylor</u> and <u>Daniel</u> that fair cross section requirement does not rest on premise that every criminal trial, or any particular trial, is necessarily unfair because it was not conducted in accordance with that requirement).

Accordingly, the Court concludes that the application of <u>Griffith</u>, which was decided after his conviction became final, to require Petitioner to be able to assert a claim under <u>Taylor</u> in this habeas proceeding is barred by <u>Teague</u>.

(c)   <u>Neither Penry nor Pitts require a different result</u>

Petitioner contends that the Supreme Court in <u>Penry v. Lynaugh</u>, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), the Eleventh Circuit in

AO 72A
(Rev.8/82)

Pitts v. Cook, 923 F.2d 1568 (11th Cir. 1991), as well as other circuit courts have applied Griffith retroactively to decisions which became final before Griffith itself was announced.  As an initial matter, this Court is bound to follow only the decisions of the United States Supreme Court and the Court of Appeals for the Eleventh Circuit.  Insofar as other circuit courts may appear to have applied Griffith retroactively, none has supplied any reasoning for that decision, and as such, this Court finds those decisions unpersuasive.  That said, the Court now considers whether Penry or Pitts require a different result.  The Court concludes that they do not.

First, with respect to Penry, the Court recognizes that the Supreme Court, at first blush, appeared to apply Griffith retroactively.  In that case, a habeas petitioner whose trial occurred in 1980 sought to attack his death sentence, in part, on the ground that the special jury questions utilized by the Texas courts precluded the jury from considering certain mitigating evidence.  The Supreme Court stated: "This Court's decisions in Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978) and Eddings v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) were rendered before his conviction became

AO 72A
(Rev.8/82)

final.  Under the retroactivity principles adopted in <u>Griffith</u> . . . , Penry is

entitled to the benefit of those decisions."  <u>Penry</u>, 492 U.S. at 314-15.

But, the Supreme Court in <u>Penry</u> did not hold that <u>Griffith</u> should be

applied retroactively.  Indeed, a careful reading of <u>Penry</u> reveals that <u>Griffith</u>'s

retroactivity was not at issue.  First, whether the petitioner could claim the

benefit of <u>Lockett</u> and <u>Eddings</u> was not at issue because the Court's decision in

that case was dictated by its decision in <u>Jurek v. Texas</u>, 428 U.S. 262, 96 S. Ct.

2950, 49 L. Ed. 2d 929 (1976).  <u>See</u> <u>Penry</u>, 492 U.S. at 315 ("In our view, the

relief Penry seeks does not 'impos[e] a new obligation' on the State of Texas.

Rather, Penry simply asks the State to fulfill the assurance upon which <u>Jurek</u>

was based: namely, that the special issues would be interpreted broadly enough

to permit the sentencer to consider all of the relevant mitigating evidence a

defendant might present in imposing sentence."); <u>Saffle</u>, 494 U.S. at 491

("Penry's claim . . . did not ask us to apply the reasoning of <u>Lockett</u> and

<u>Eddings</u> so much as it required us to apply our decision in <u>Jurek</u>."); <u>id.</u> at 492

("The <u>Penry</u> Court's conclusion that <u>Lockett</u> and <u>Eddings</u> dictated the rule

sought by <u>Penry</u> must be understood in terms of the Court's ruling in <u>Jurek</u>, and

its application in later cases.  We did not view <u>Lockett</u> and <u>Eddings</u> as creating

39

a rule different from that relied upon in <u>Jurek</u>; rather, we indicated that <u>Lockett</u> and <u>Eddings</u> reaffirmed the reasoning in <u>Jurek</u> and confirmed the necessity of its application to Penry's claim." (citations omitted)).  As <u>Jurek</u> was decided prior to the petitioner's trial, there could be no doubt that he was entitled to its benefit, as well as any decisions dictated by it, both on direct review, as well as in collateral proceedings.  Therefore, the Court's statement in <u>Penry</u> that under <u>Griffith</u> the petitioner was entitled to the benefit of <u>Lockett</u> and <u>Eddings</u> was not necessary to its decision.

Second, and more importantly, no Supreme Court case had held that either <u>Lockett</u> or <u>Eddings</u> should not be applied retroactively.  Thus, the Court in <u>Penry</u> was not faced with a Supreme Court decision directly controlling their retroactivity, and as such, the Court was not faced with the task of determining first, whether <u>Griffith</u> effectively overruled those decisions, and second, whether that "new rule" should be applied to cases on collateral review.  Thus, the <u>Penry</u> Court's citation of <u>Griffith</u> for the proposition that the petitioner there was entitled to the benefit of <u>Lockett</u> and <u>Eddings</u> does not indicate that <u>Griffith</u> should be applied retroactively in the face of prior Supreme Court precedent expressly limiting the retroactive application of a previously adopted rule.  As

such, that citation does not mandate that this Court apply <u>Griffith</u> to allow

Petitioner the benefit of <u>Taylor</u> while avoiding the direct holding of <u>Daniel</u>.

Having concluded that <u>Penry</u> does not require the result Petitioner seeks,

the Court now turns to consider whether the Eleventh Circuit's decision in <u>Pitts</u>

requires relief.  In <u>Pitts</u>, a habeas petitioner whose conviction became final after

the Supreme Court's decision in <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct.

1712, 90 L. Ed. 2d 69 (1986), but prior to the Court's decision in <u>Griffith</u>,

sought relief under <u>Batson</u> in his collateral proceeding.  The panel, without

explanation, stated:

> Pitts had been convicted when <u>Batson</u> was decided,
> but his direct appeal was still pending.  Although
> <u>Batson</u> is not generally retroactively applied to habeas
> petitions, <u>Allen v. Hardy</u>, 478 U.S. 255, 106 S. Ct.
> 2878, 92 L. Ed. 199 (1986), it does apply retroactively
> to cases--such as Pitts'--pending on direct review
> when the <u>Batson</u> judgment was rendered, [<u>Griffith</u>].

<u>Pitts</u>, 923 F.2d at 1571 n.3.

Petitioner contends that this footnote, which relies on <u>Griffith</u> to apply

<u>Batson</u> retroactively to a conviction which was not yet final when <u>Batson</u> was

announced, requires that this Court grant him relief.  Again, the Court disagrees.

The Supreme Court in <u>Allen</u> held that "<u>Batson</u> should not be applied

41

retroactively on collateral review of convictions that became final before our opinion was announced."  478 U.S. at 258.  Unlike the situation here, however, the Allen Court "express[ed] no view on the question whether our decision in Batson should be applied to cases that were pending on direct appeal at the time our decision was announced," and instead cited Griffith which was currently pending before it.  Id. at 258 n.1.  Thus, while the Pitts Court granted the petitioner the benefit of Batson under the retroactivity principle announced in Griffith, it did so in a situation where no Supreme Court case had expressly limited the retroactivity of the Batson decision.  It did not, however, face the situation presented here—specifically, where application of Griffith's retroactivity rule would be directly contrary to prior Supreme Court precedent. As such, nothing in the Pitts decision requires this Court to read Griffith as overruling sub silentio the Supreme Court's decision in Daniel—a practice long condemned by the Supreme Court and the Eleventh Circuit itself.  In view of this critical distinction, the Court concludes that Pitts does not require this Court to apply Griffith retroactively in this case.[7]  Accordingly, Daniel, and not

---

[7] What is more, because Pitts did not hold that Griffith overruled a prior Supreme Court decision, there was no need for the Eleventh Circuit in that case to consider whether the application of Griffith in such a situation would constitute a new rule within

<u>Griffith</u>, controls the retroactivity of <u>Taylor</u>.  Under <u>Daniel</u>, Petitioner is not entitled to the benefit of that decision.

> (d)  <u>Allowing Petitioner to benefit from Taylor would be contrary to rationale of Griffith itself</u>

Finally, the Court notes that the result Petitioner seeks here—the ability to collaterally attack his 1974 conviction under <u>Taylor</u>—would be directly contrary to the rationale of <u>Griffith</u> itself.  There, the Court concluded that selectively applying new rules runs contrary to the principle of treating like defendants alike, explaining  that it would no longer "tolerate" the "actual inequity" resulting from the Court's selective application of new rules to certain "chance beneficiaries," while other similarly situated defendants are denied the benefit of those decisions.  <u>Griffith</u>, 479 U.S. at 323.

Here, Petitioner seeks the result that <u>Griffith</u> sought to avoid.  The simple fact is that defendants similarly situated to Petitioner who sought to attack their convictions on fair cross-section grounds but whose juries were empaneled prior to <u>Taylor</u> were invariably denied relief based upon <u>Daniel</u>.  For this Court to conclude that Petitioner is entitled to relief, merely by virtue of the

───────────────

the meaning of <u>Teague</u>.

43

jurisprudential evolution occurring in the approximately twenty-two years between his conviction and collateral proceedings—when virtually every other defendant who promptly sought relief after <u>Taylor</u> was denied the same based upon <u>Daniel</u>—surely "violates the principle of treating similarly situated defendants the same." <u>Id.</u>  In essence, Petitioner asks this Court to "fish[ his] case from the stream" of cases seeking the benefit of <u>Taylor</u>, notwithstanding the fact that all other such cases have previously "flow[ed] by unaffected by that new rule." <u>Id.</u> at 323 (quoting <u>Mackey v. United States</u>, 401 U.S. 667, 679, 91 S. Ct. 1160, 28 L. Ed. 2d 404 (1971) (Harlan, J., concurring in judgment)). This the Court declines to do.

In sum, as the Supreme Court recognized in <u>Teague</u>, the "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system."  489 U.S. at 308-09.  A state court applying the constitutional rules existing at the time Petitioner's conviction became final would have rightly denied him the benefit of <u>Taylor</u>.  Allowing him that benefit now, on habeas review, both runs contrary to the interests of comity and finality that are critical in determining the proper scope of habeas review, and imposes

44

significant costs on the states by "<u>continually</u> forc[ing] the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then existing constitutional standards."  <u>Id.</u> at 309 (emphasis in original).  Accordingly, Petitioner is not entitled to relief on this claim under <u>Teague</u>.

**B.      Ineffective Assistance of Counsel**

<u>1.</u>      <u>General standard applicable to ineffective assistance claims</u>

The Sixth Amendment provides that a criminal defendant shall have the right to "the Assistance of Counsel for his defence."  U.S. Const. amend. VI. "The right to counsel prevents states from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance."  <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980).  "This right has been accorded, . . . 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.' " <u>Mickens v. Taylor</u>, 535 U.S. 162, 166, 122 S. Ct. 1237, 152  L. Ed. 2d 291 (2002) (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 658, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).  Where the assistance of counsel is inadequate to preserve the fairness of the proceedings, the Sixth Amendment's mandate has

not been satisfied.  Id.; Sullivan, 466 U.S. at 344 ("Our decisions make clear that inadequate assistance does not satisfy the Sixth Amendment right to counsel. . . .").

The Court examines claims of ineffective assistance of counsel under the Sixth Amendment by applying the two-part analysis set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  "Under this test, the petitioner must first show that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed . . . by the Sixth Amendment.' " Brownlee v. Haley, 306 F.3d 1043, 1059 (11th Cir. 2002) (quoting Strickland, 466 U.S. at 687).  "If this substantial showing is made, the petitioner must then demonstrate that 'the deficient performance prejudiced the defense,' which 'requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' " Id. (quoting Strickland, 466 U.S. at 687).  "The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a Strickland claim, and both prongs must be proved to prevail." Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001); see also Strickland, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the

conviction resulted from a breakdown in the adversary process that renders the result unreliable.").

To establish ineffective performance, a "petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' " Darden v. Wainwright, 477 U.S. 168, 184, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quoting Strickland, 466 U.S. at 668). In this respect, "[c]ourts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.' " Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc) (quoting Strickland, 466 U.S. at 689-90)). In light of this "strong presumption in favor of competence," the Eleventh Circuit has held that in order to prove deficient performance, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Id. at 1315.

In order to meet the prejudice prong of the Strickland test, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Instead, the defendant must show that there is a reasonable probability that the outcome of

47

the proceeding would have been different.  See id. at 694.  This does not mean

that the defendant must show " 'that counsel's deficient conduct more likely

than not altered the outcome in the case.' " Brownlee, 306 F.3d at 1060

(quoting Strickland, 466 U.S. at 693)).  Rather, he must show only "a

probability sufficient to undermine confidence in the outcome." Strickland, 466

U.S. at 694.

2.     Conflict of interest claim

As stated above, Petitioner and co-defendant Jordan were jointly

represented at their respective trials by two attorneys, Mr. E.L. Owens and Mr.

Fred Bishop.  Petitioner contends that a conflict of interest prevented his trial

counsel from providing adequate legal assistance as required by the Sixth

Amendment.  Specifically, Petitioner alleges that his attorney, Mr. Owens,

labored under an actual conflict of interest because he was aware that Petitioner

and Jordan had each accused the other of committing the murder.  Additionally,

Petitioner argues that this conflict adversely affected his representation because

Mr. Owens was ethically precluded from (1) investigating, developing, or

arguing the theory that Jordan had killed Mr. Rouse, (2) informing Petitioner

that Jordan had implicated him in the killing, and (3) discussing the possibility

48

of testifying against Jordan in exchange for a lighter sentence or reduced

charge.  (Br. in Supp. of Petition [11-3] at 29-30.)

(a)    Standard applicable to ineffective assistance claims<br>predicated on conflict of interest

As explained above, a criminal defendant alleging a Sixth Amendment

violation based upon the ineffective assistance of counsel must generally

establish that he suffered prejudice as a result of his counsel's conduct.  Thus,

in order to warrant relief the defendant must demonstrate "a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."  Strickland, 466 U.S. at 694.  An

exception to the general rule that a defendant is required to prove prejudice

exists, however, where defense counsel's allegedly deficient performance

resulted from a conflict of interest.  See, e.g., Cuyler v. Sullivan, 446 U.S. 335,

100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980); Holloway v. Arkansas, 435 U.S. 475,

98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978).  Where defense counsel is forced to

represent co-defendants over a timely objection, reversal is automatic unless the

trial court made a reasonable inquiry and determined that no conflict existed.

Mickens, 535 U.S. at168;  Holloway, 435 U.S. at 488 (explaining that

49

"whenever a trial court improperly requires joint representation over timely objection reversal is automatic").  Where no timely objection to the representation is made, however, a reviewing court "cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel[,]" as "[s]uch a presumption would preclude multiple representation even in cases where a common defense . . . gives strength against a common attack." Sullivan, 466 U.S. at 348 (internal quotations omitted).  Thus, in order to establish a violation of the Sixth Amendment, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected the his lawyer's performance." Id.; see also Mickens, 535 U.S. at 173 ("Since this was not a case in which (as in Holloway) counsel protested his inability simultaneously to represent multiple defendants[,] . . . it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance."); Strickland, 466 U.S. at 691 ("Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " (quoting Sullivan, 446 U.S. at 348)).

50

Previously, the Eleventh Circuit has characterized the <u>Sullivan</u> inquiry in terms of two questions: (1) whether there was an actual conflict of interest, as opposed to a merely potential or hypothetical conflict, and (2) whether the actual conflict adversely affected counsel's representation.  <u>See, e.g.</u>, <u>Freund v. Butterworth</u>, 165 F.3d 839, 859-69 (11th Cir. 1999) (en banc) (engaging in two-part <u>Sullivan</u> analysis and concluding that habeas petitioner established neither an "actual conflict" nor an "adverse effect" on his representation); <u>United States v. Novaton</u>, 271 F.3d 968, 1010-12 (11th Cir. 2001) (en banc) (similarly applying two-part <u>Sullivan</u> inquiry).  In <u>Mickens</u>, the Supreme Court clarified that "the <u>Sullivan</u> standard is not properly understood as requiring inquiry into actual conflict as something separate and apart from adverse effect. [Rather, a]n actual conflict for Sixth Amendment purposes is a conflict of interest that adversely affects counsel's performance."  <u>Mickens</u>, 535 U.S. at 1244 n.5. "Regardless of this clarification of terminology, [however,] the relevant questions remain the same, and the [Court] must ask whether [counsel] labored under a conflict of interest, which was not merely hypothetical, and whether that conflict adversely affected the representation (<i>i.e.</i>, whether it was an actual conflict)."  <u>United States v. Infante</u>, 404 F.3d 376, 392 (5th Cir. 2005); <u>see also</u>

51

McFarland v. Yunkins, 356 F.3d 688, 705-06 (6th Cir. 2004) ("Mickens

changed the terminology, but not the substance of the [Sullivan] test).

In this Circuit, a habeas petitioner claiming entitlement to relief on

grounds that a conflict of interest adversely affected his representation must

satisfy each element of a multi-part test.  First, the petitioner " 'must make a

factual showing of inconsistent interests' or point to 'specific instances in the

record' to suggest an actual impairment of his or her interests." Quince v.

Crosby, 360 F.3d 1254, 1264 (11th Cir. 2004) (quoting Smith v. White, 815

F.2d 1401, 1404 (11th Cir. 1987)).  Second, " '[t]o prove adverse effect, a

defendant needs to demonstrate: (a) that the defense attorney could have

pursued a plausible alternative strategy, (b) that this alternative strategy was

reasonable, and (c) that the alternative strategy was not followed because it

conflicted with the attorney's external loyalties.' " Quince, 360 F.3d at 1264-65

(11th Cir. 2004) (quoting Reynolds v. Chapman, 253 F.3d 1337, 1343 (11th

Cir. 2001)).

(b)     State habeas court's adjudication of Petitioner's claim

Petitioner raised his Sixth Amendment conflict of interest claim before

the state habeas court.  The state habeas court held an evidentiary hearing at

which, among others, Mr. Owens and Mr. Bishop were called to testify by

Respondent.  After being sworn, Mr. Owens was initially questioned regarding

a debilitating stroke he suffered approximately nine years prior to the hearing

and which had significantly affected his memory and capacity for speech.  In

response to the state's questions about his health problems and their effects on

his memory of the events in question, Mr. Owens testified:

> Q:   [by Ms. Jaeger, counsel for Respondent]: And
> you at one time indicated that you had some
> health problems fairly recently.  Would you tell
> the Court what health problems you've had
> recently?
>
> A:   [by Mr. Owens]: In [1987] I had triple by-pass.
> And in [1990] I had a stroke which had taken
> all my memory and speech, ability to write.
> And they got me to where I could talk in about
> six months.
> . . .
>
> Q:   Okay.  Now is it fair to say with respect to your
> memory, sir, that you do remember some things
> but not others?
>
> A:   Right.

(R. Ex. 5 at 19-20.)  The impairment of Mr. Owens's memory was clearly

evident in his testimony, and on numerous occasions he stated that he could not

53

recollect certain events.  That said, when Mr. Owens could not recall the

answers to specific questions, he clearly and unequivocally said so.  (Id. at 20,

21, 22, 24, 25, 26.)

      Mr. Owens testified at the state habeas hearing that, during his initial

interviews with Petitioner and Jordan, each implicated the other in the murder.

Specifically, Mr. Owens testified:

> Q:    [by Ms. Jaeger, counsel for Respondent]: Okay.
> Do you remember when you were first–When
> you were first appointed to represent Mr.
> Prevatte, what did you do when you first
> received the appointment?
>
> A:    [by Mr. Owens] I went to the county jail and
> interviewed him and Jordan separate.
>
> Q:    Now, you were appointed to represent both Mr.
> Prevatte and Mr. Jordan?
>
> A:    Right.
>
> Q:    And they were being held separately out there?
>
> A:    Yeah.
>
> Q:    And upon interviewing them, what did you do
> then?
>
> A:    Well, I represented them as best I could
> according to the law.

. . .

Q:   Do you recall whether or not you were able to review the State's evidence, the physical evidence, that was presented at trial?

A:   I don't remember about that.  I remember some–You want me to tell what I remember about the trial?

Q:   Yes, sir.

A:   I remember them gruesome pictures.  And I interviewed the two defendants separately at the county jail.  And I determined in my mind that they were guilty.  And they wouldn't tell me who–each one of them accused the other one of pulling the trigger.

Q:   Each one of them accused the other during the course of your interview?

A:   Right. . . .

Q:   Okay.  Now you said that they had both pointed the finger at the other as far as pulling the trigger?

A:   Yeah.

Q:   Did they admit to you that they were involved then?

A:   Yeah.

55

Q:      And did that–Knowing that though, that did not
        stop you from putting up a defense for them?

A:      To the best of my ability.

Q:      Do you think that based on the practice at the
        time was it common to have one or two
        attorneys representing both a defendant and his
        codefendant?

A:      I don't have any idea.

Q:      Okay.  Did you perceive of any conflict of
        interest between you and the other?

A:      Oh, no.

(R. Ex. 5 at 22-23.)  Despite Mr. Owens's recollection with respect to the

defendants' initial statements implicating the other, neither Petitioner nor Mr.

Owens alerted the trial court to the possible conflict of interest, or objected to

the continued representation of Petitioner and Jordan on conflict of interest

grounds.

        In addition to failing to inform the trial court of the defendants'

statements, Mr. Owens likewise failed to inform co-counsel, Mr. Bishop.

Indeed, Mr. Bishop remained wholly unaware of any potential conflict of

interest between the two defendants.  (Id. at 70, 74-75, 80.)  Despite the fact that

56

Mr. Bishop conducted numerous interviews with Petitioner and Jordan, sometimes independently of each other as well as independently of his co-counsel, Mr. Owens, at no time did either Petitioner or Jordan implicate the other in the killing in a statement to Mr. Bishop.  Rather, in their discussions with Mr. Bishop, Petitioner and Jordan maintained entirely consistent accounts of what had happened—namely, that they had stolen Mr. Rouse's vehicle and were in no way involved with his death.  (See id. at 70, 80.)  According to Mr. Bishop, their respective accounts were "entirely consistent from start to finish. There was never any conflict between them personally and there was never any conflict between any statement they made about the events."  (Id. at 71, see also id. at 75, 80.)  In his words, their statements were "identical[; y]ou could take one [and] lay it over the other."  (Id. at 70.)

The state habeas court did not make express factual findings as to the facts underlying Petitioner's Sixth Amendment conflict of interest claim. However, the state habeas court, in a section of its order resolving each of Petitioner's numerous ineffective assistance of counsel claims and without citation to authority, did summarily deny Petitioner's conflict of interest claim. The habeas court stated:

> There is a strong presumption that trial counsel's conduct falls within the broad range of reasonable professional assistance.  The burden of showing that counsel's performance was deficient and that such deficient performance prejudiced the defense are upon the petitioner.  Ineffective assistance of counsel claims are reviewed in light of the facts of the particular case and the law as of the time of counsel's conduct.
>
> A review of the total evidence presented convinces this Court that there was no conflict of interest existing at the time this matter was presented to these attorneys to develop trial strategy and to conduct a trial in behalf of defendant Prevatte on a charge of murder and armed robbery, with the principal defense as presented by the defendants' story being "alibi."

( R. Ex. 13 at 20.)

> (c)   <u>The state habeas court's adjudication is entitled to deference, and its explicit and implicit factual findings are presumed correct</u>

Before turning to the merits of Petitioner's claim, the Court makes clear that, despite the summary nature of the state habeas court's ruling, its resolution of this claim qualifies as an adjudication on the merits under § 2254(d).  As such, assuming that the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law, it is entitled to

AO 72A
(Rev.8/82)

deference.  As the Eleventh Circuit has repeatedly stated, "§ 2254(d) requires

only that the federal claim have been 'adjudicated on the merits in State court

proceedings' and 'resulted in a decision' that is neither contrary to nor involves

an unreasonable application of Supreme Court precedent."  <u>Wright v. Sec'y for</u>

<u>Dept. of Corr.</u>, 278 F.3d 1245, 1254 (11th Cir. 2002) (quoting 28 U.S.C. §

2254(d)); <u>Isaac v. Head</u>, 300 F.3d 1232, 1259 (11th Cir. 2002) (same).  As

explained in <u>Wright</u> and reiterated in <u>Isaac</u>, " '[t]he statutory language [of §

2254(d)] focuses on the result, not on the reasoning that led to the result, and

nothing in that language requires the state court adjudication that has resulted in

a decision to be accompanied by an opinion that explains the state court's

rationale.' " <u>Isaac</u>, 300 F.3d at 1260 (quoting <u>Wright</u>, 278 F.3d at 1255).

Accordingly, " 'the summary nature of a state court's decision does not lessen

the deference that it is due.' " <u>Id.</u> at 1259 (quoting <u>Wright</u>, 278 F.3d at 1254).

Because Petitioner's claim for relief based upon the alleged conflict of interest

of his counsel was squarely presented to, and rejected by, the state habeas court,

this Court may only grant relief on this ground if that decision is either contrary

to, or an unreasonable application of, the holdings of Supreme Court precedent,

28 U.S.C. § 2254(d)(1); <u>Williams</u>, 529 U.S. at 412 (O'Connor, J., majority

opinion), or if it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

(d)    <u>Petitioner's asserted bases for relief</u>

Petitioner contends that, notwithstanding the state habeas court's resolution of this claim, he is entitled to relief on three grounds: first, the state court's determination that there was no conflict of interest is unreasonable in light of the evidence presented at the state habeas hearing—specifically, the testimony of Mr. Owens that Petitioner and Jordan accused each other of committing the murder (Br. in Supp. of Petition at 32-37); second, the state habeas court's legal conclusion that no conflict of interest existed is contrary to the Supreme Court's decision in <u>Sullivan</u> (<u>id.</u> at 37-40); and third, assuming that the state habeas court correctly identified <u>Sullivan</u> as the governing federal law and applied that decision, the state court's conclusion that relief was unwarranted is based upon an unreasonable application of <u>Sullivan</u> to this case. (<u>Id.</u> at 40-48.)  The Court addresses each of Petitioner's contentions in turn.

<blockquote>(i)    <u>The state habeas court's determination of the facts was not unreasonable in light of the evidence presented</u></blockquote>

60

Petitioner argues that the state habeas court's decision was based upon an unreasonable determination of the facts in light of the evidence presented the state court proceeding.  Specifically, Petitioner contends that in light of Mr. Owens's testimony at the state habeas hearing, the state habeas court's determination that there was no conflict of interest is objectively unreasonable and thus due no deference from this Court.

Whether counsel labored under a conflict of interest which adversely affected the representation so as to violate the Sixth Amendment is a mixed question of law and fact.  Brownlee, 306 F.3d at 1058; Reynolds v. Chapman, 253 F.3d 1337, 1342 (11th Cir. 2001); Freund, 165 F.3d at 861-63.  A state court's conclusion on the ultimate issue of whether a conflict of interest deprived a criminal defendant of the effective assistance of counsel is not entitled to a presumption of correctness.  See Parker v. Head, 244 F.3d 831, 836 (11th Cir. 2001) ("[T]he statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact.").  That said, while the resolution of the ultimate question in a conflict of interest claim rests with the federal courts, subject only to the limitations imposed by § 2254(d), the state court's findings of historical facts which are

necessary to the ultimate conclusion are subject to the presumption of correctness afforded by § 2254(e)(1).  See Collier v. Turpin, 177 F.3d 1184, 1198 (11th Cir. 1999) ("[S]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness."); Hardwick v. Crosby, 20 F.3d 1127, 1160 n.142 (11th Cir. 2003) (applying pre-AEDPA standard of review and noting "we accord a presumption of correctness to the trial court's findings of historical facts underlying [an ineffective assistance of counsel] claim."); Freund, 165 F.3d at 862 (explaining that the historical facts underlying conflict of interest conclusion are subject to the presumption of correctness).

In this case, the state habeas court did not make any express findings of historical fact relating to the conflict of interest issue.  That, however, does not mean that the state habeas court made no factual findings.  To the contrary, the Supreme Court has instructed that in habeas proceedings, "if no express findings of fact have been made by the state court, the District Court must initially determine whether the state court has impliedly found material facts." Townsend v. Sain, 372 U.S. 293, 314, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), overruled on other grounds, Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S. Ct.

1715, 118 L. Ed. 2d 318 (1992); see also, e.g., Marshall v. Lonberger, 459 U.S.

422, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983) (discussing Supreme Court's

decision in Lavallee v. Delle Rose, 410 U.S. 690, 93 S. Ct. 1203, 35 L. Ed. 2d

637 (1973), and explaining that "because it was clear under the applicable

federal law that the trial court would have granted the relief sought by the

defendant had it believed the defendant's testimony, its failure to grant relief

was tantamount to an express finding against the credibility of the defendant.");

Green v. Zant, 715 F.2d 551, 557 (11th Cir. 1983) ("State court findings of

primary historical fact may be express or implied.  While express findings are

of course preferable, they are not necessary. '[I]f no express findings of fact

have been made by the state court, the District Court must initially determine

whether the state court has impliedly found material facts.' " (quoting

Townsend, 372 U.S. at 314)).  What is more, the presumption of correctness

under § 2254(e)(1) applicable to the state court's express factual findings

applies with equal force to factual findings which are implicit in the state

court's decision.  See Valdez v. Cockrell, 274 F.3d 941, 948 n.11 (5th Cir.

2001) ("The presumption of correctness [under § 2254(e)(1)] not only applies to

explicit findings of fact, but it also applies to those unarticulated findings which

are necessary to the state court's conclusions of mixed law and fact."); <u>Weeks v. Snyder</u>, 219 F.3d 245, 258 (3d Cir. 2000) ("[W]e must provide the same presumption of correctness required by § 2254(e)(1) to the state courts' implicit factual findings as we provide to express findings of the state courts.");

<u>Armstrong v. Young</u>, 34 F.3d 421, 426 (7th Cir. 1994) (applying pre-AEDPA standard of review and stating that presumption of correctness applied to state court factual findings "applies not only to the state court's express factual findings, but also to the implicit resolution of a factual dispute that can be fairly inferred from the state court record."); <u>Mackey v. Dutton</u>, 217 F.3d 399, 411-12 (6th Cir. 2000) (applying pre-AEDPA standard of review and explaining "that the presumption of correctness accorded to state court findings only applies to basic, primary facts, and not to mixed questions of law and fact, and it applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility.").

Applying the well-established principle that factual findings may be inferred from the state court's decision, the Court concludes that the state habeas court's decision that "there was no conflict of interest" reflects an implicit factual determination that Mr. Owen's testimony should not be

credited.  At the time of Petitioner's 1974 trial, the joint representation of the

co-defendants was not, in and of itself, constitutionally impermissible.  See,

e.g., Holloway, 435 U.S. at 482 ("Requiring or permitting a single attorney to

represent codefendants, often referred to as joint representation, is not per se

violative of constitutional guarantees of effective assistance of counsel.").[8]

Indeed, as the Supreme Court has recognized, there may situations "where a

common defense . . . gives strength against a common attack."  Sullivan, 466

U.S. at 348 (internal quotations omitted).  At the same time, however, "[t]he

duty of unfettered loyalty to one's clients is among the most central of a

criminal defense attorney's responsibilities," Chapman, 253 F.3d at 1342; see

also MODEL RULES OF PROF'L CONDUCT R. 1.7(b) ("A lawyer shall not

represent a client if the representation of that client may be materially limited

by the lawyer's responsibilities to another client . . . ."), and as such, there can

be little doubt that a defense attorney representing two defendants, each of

whom stated that the other committed the crime in question, would face a stark

---

[8] In Fleming v. State, 270 S.E.2d 185 (Ga. 1980), the Georgia Supreme Court
adopted a mandatory rule that, where the State seeks the death penalty against any one
defendant in a criminal transaction, he and his co-defendants must be provided with
separate and independent counsel.  Id. at 188.

conflict of interest.  Thus, the state habeas court was faced with a situation where the joint representation was not per se improper, but a conflict of interest would necessarily have arisen if that court found credible evidence that the interests of the two defendants had diverged.

In this case, the issue of whether, in light of Mr. Owens's testimony, his continued representation of both defendants created an impermissible conflict of interest could not have been more squarely presented to the state habeas court.  The state habeas court judge conducted the hearing and was present when Mr. Owens testified that during his initial interview with his clients, each defendant implicated the other.  The parties expended approximately 33 pages of their respective briefs to that court presenting argument on the conflict of interest issue.  (See Pet. Br., R. Ex. 10 at 2-14; Resp. Br., R. Ex. 11 at 11-19; Reply Br. in Supp. of Pet., R. Ex. 12 at 1-10.)  In short, were the testimony of Mr. Owens credited, this Court can hardly imagine a more stark conflict of interest, and this Court presumes that, in light of both its own knowledge of the applicable law and the extensive briefing of the parties, the state habeas court recognized this as well.  See Townsend, 372 U.S. at 314-15 (explaining that "the coequal responsibilities of state and federal judges in the administration of

66

federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact applied correct standards of federal law to the facts, in the absence of evidence . . . that there is reason to suspect that an incorrect standard was in fact applied.").  Against this background, the state habeas court denied relief, concluding that "a review of the total evidence presented convinces this Court that there was no conflict of interest existing at the time this matter was presented to these attorneys to develop trial strategy and to conduct a trial in behalf of [Petitioner]."  (R. Ex. 13 at 20.)   Where, as here, one version of operative facts—namely, the crediting of Mr. Owens's testimony—would have necessarily led the state habeas court to find that a conflict of interest existed, the fact that the state court reached a contrary conclusion permits this Court to infer that that version of events was rejected.[9]  See Baldwin v. Johnson, 152

---

[9] The Eleventh Circuit has explained that the question of whether it is appropriate to infer factual findings from a state court decision may arise in three different contexts: "the record may clearly reveal that the state court applied the correct legal standard, or it may reveal that it applied the incorrect legal standard, or it may not reveal the standard applied by the state court. Factual reconstruction may be possible in the first two instances; it is most difficult in the third, unless the relevant legal principle is particularly well settled."  Green, 715 F.3d at 557.  While the state habeas court did not elaborate upon the legal standard applicable to determine whether counsel suffered from a conflict of interest, the Court is confident that the question of whether a lawyer's continued representation of two defendants who each accuse the other of committing the crime is

F.3d 1304, 1320 (11th Cir. 1998) (explaining that " '[w]hen a state court fails to make explicit findings, a state court's denial of the claim 'resolves all conflicts in testimony bearing on that claim against the criminal defendant.' " (quoting Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1998)).  As such, the Court concludes that the state habeas court's rejection of Petitioner's conflict of interest claim constitutes an implicit factual finding that Mr. Owens's testimony should not be credited which is presumed to be correct under § 2254(e)(1).  The Court, therefore, will now consider whether Petitioner has carried his burden of establishing, by clear and convincing evidence, that this finding was erroneous.

Petitioner argues that "there was no reason . . . for the state habeas court to discredit Mr. Owens' testimony," and "[g]iven the unrebutted record evidence to the contrary, this finding was objectively unreasonable."  (Br. in Supp. of Pet. at 36-37.)  Without question, there is evidence in the record which would support Mr. Owens's testimony.  First, as Petitioner points out, that testimony was "unrebutted," at least in the sense that it was not directly contradicted by any other direct evidence.  Second, the Court recognizes that

---

"particularly well settled," and thus, falls into the latter category of cases where factual reconstruction is appropriate.

based upon the cold record, Mr. Owens appeared to testify with great candor. He readily admitted when, as a result of his stroke or otherwise, he could not recall certain events, and from his testimony, the defendants' statements appear to stand out in his mind.  Third, at Petitioner's trial, Mr. Owens presented his testimony related to the co-defendants' joint alibi defense in "narrative form." This fact clearly indicates that he believed, as he would have had Petitioner and his co-defendant in fact confessed to their involvement in the crime, that Petitioner's testimony under oath would be untrue.

But, there was other evidence in the record which would tend to support the state habeas court's apparent decision not to credit Mr. Owens's testimony. First, the only testimony related to these statements came from Mr. Owens, and it is undisputed that he suffered a serious and debilitating stroke prior to revealing, for the first time in a court proceeding occurring more than twenty years after the trial, that the defendants had implicated each other in the killing. While, as the Court recognized above, Mr. Owens appeared to clearly recall these statements, the state habeas court, and not this Court, had an opportunity to observe Mr. Owens on the witness stand, and to judge for itself, based upon his appearance, actions, and demeanor, as well as his words, whether his

AO 72A
(Rev.8/82)

testimony should be credited.  This Court is, as is any other court sitting in

review of the determinations of another, at a significant disadvantage when

asked to assess the credibility of a witness based only upon a transcript, and the

Court considers that disadvantage in determining whether the state court's

factual determination is unreasonable.  See Marshall, 459 U.S. at 434 ("Title 28

U.S.C. § 2254(d) gives federal habeas courts no license to redetermine

credibility of witnesses whose demeanor has been observed by the state trial

court, but not by them.").

　　　　Second, it is undisputed that Mr. Owens never informed either the trial

court or co-counsel, Mr. Bishop, of the defendants' statements.  Of course, were

such statements made, Mr. Owens would have been under an ethical duty—one

which was no less pressing than the same ethical duties which Petitioner now

contends prevented him from providing a constitutionally adequate defense—to

inform the trial court.  See Holloway, 435 U.S. at 486-86 (supporting

conclusion that continued representation over timely objection directed to

conflict of interest constitutes reversible error with recognition by majority of

courts that "defense attorneys have the obligation, upon discovering a conflict

of interests, to advise the court at once of the problem.").  Moreover, if such

70

statements were made, it is almost inconceivable that at some point during the preparation of their case, at a minimum, Mr. Owens would not have informed his co-counsel of these rather remarkable and pertinent statements.  While Petitioner argues that this fact is but more evidence of the stark failings of Petitioner's counsel, and specifically, that it is evidence that Mr. Owens "resolved" the conflict by choosing to ignore the statements of the defendants and present a unified alibi defense, and while perhaps open to Petitioner's interpretation, the failure on the part of Mr. Owens to alert either co-counsel or the trial court could be viewed as evidence that the statements were not in fact made, and that Mr. Owens testimony on this issue should not be credited.

Third, it is apparent that neither defendant ever made a similar statement to co-counsel, Mr. Bishop.  This failure is notable when considered in light of the fact that he interviewed each defendant on multiple occasions individually, and outside the presence of the other.  In this Court's view, the failure of either defendant to make a similar statement to Mr. Bishop, who also was their attorney, constitutes additional evidence which the state habeas court could consider in assessing the credibility of Mr. Owens's testimony.

71

Fourth, there is the fact that both defendants testified at trial regarding their alibi defense, and each provided nearly identical accounts of their actions as they related to the death of Mr. Rouse.  The Court appreciates Petitioner's argument that their consistent trial testimony could be viewed, not as evidence that they in fact never wavered in their efforts to maintain a "unified front" with respect to the charges against them, but rather as evidence that they were compelled to resort to this "second-best" defense because of their attorney's conflict of interest.  However, the fact remains that both Petitioner and Jordan testified under oath at trial as to the specifics of their alibi defense, and that this trial testimony was wholly consistent with every other statement that the defendants had provided to their attorneys.  In the Court's view, this was additional evidence that the state habeas court could consider in assessing whether to credit Mr. Owens's testimony.

Upon consideration of all of the evidence presented to the state habeas court, and especially when considered in light of the § 2254(e)(1) standard, this Court cannot conclude that the state habeas court's decision not to credit Mr. Owens's testimony was unreasonable in light of the evidence presented, and must conclude that Petitioner has failed to rebut the presumption of correctness

to which that finding is entitled by clear and convincing evidence.

Accordingly, the Court defers to the state habeas court's factual determination

that the defendants did not make statements to their attorney, Mr. Owens,

implicating the other in the killing and which would have placed their defenses

in conflict with each other.  As such, Petitioner is not entitled to relief under §

2254(d)(2) on this ground.

> (ii)   <u>The state habeas court's holding that there was
> no conflict of interest was not contrary to, or an
> unreasonable application of, clearly established
> federal law</u>

Petitioner contends that the state habeas court's determination that "there

was no conflict of interest" is both contrary to, and an unreasonable application

of, clearly established federal law.  With regard to Petitioner's "contrary to"

argument, he contends that while it is not entirely clear what legal standard the

state habeas court applied, that court's denial of relief was contrary to <u>Sullivan</u>

insofar as it held that a showing by Petitioner of an actual conflict which

adversely affected the representation is not sufficient to establish a violation of

the Sixth Amendment.  (<u>See</u> Br. in Supp. of Pet. at 38-39.)  With regard to

Petitioner's "unreasonable application" argument, he contends first that Mr.

73

Owens had an actual conflict, which is to say that he "actively represented conflicting interests," <u>Sullivan</u>, 446 U.S. at 35, and second, that this conflict adversely affected the representation because Petitioner's counsel was ethically precluded from pursuing a defense strategy that implicated the co-defendant, and instead "succumbed to the conflict" and presented a unified alibi defense.

As an initial matter, were Mr. Owens's testimony required to be credited, this Court would likely conclude that the state habeas court's decision was contrary to clearly established federal law.  As explained above, "a state court decision is 'contrary to' clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case." <u>Putman</u>, 268 F.3d at 1241.  With regard to claims for relief arising out of representation which is hampered by counsel's impermissible conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected the his lawyer's performance." <u>Sullivan</u>, 466 U.S. at 348.  "[T]he Sullivan standard is not properly read as requiring inquiry into actual conflict as something separate and apart from

adverse effect." <u>Mickens</u>, 535 U.S. at 173 n.5.  Rather, "[a]n 'actual conflict,'

for Sixth Amendment purposes, is a conflict of interest that adversely affects

counsel's performance." <u>Id.</u>  In the Eleventh Circuit, to prove that a conflict of

interest adversely affected the representation, "a defendant needs to

demonstrate: (a) that the defense attorney could have pursued a plausible

alternative strategy, (b) that this alternative strategy was reasonable, and (c) that

the alternative strategy was not followed because it conflicted with the

attorney's external loyalties." <u>Quince</u>, 360 F.3d at 1264 (internal quotations

omitted).

   The state habeas court, did not identify this standard as applicable to

Petitioner's conflict of interest claim.  Rather, the state habeas court only set

forth the two-pronged <u>Strickland</u> test, and proceeded to analyze each of

Petitioner's ineffective assistance of counsel claims, including his claim

predicated on his attorney's purported conflict of interest.  Thus, were the state

habeas court required to assess whether Petitioner's counsel operated under a

conflict of interest violative of the Sixth Amendment, and had the state court

applied the legal standard set forth in the paragraph immediately preceding its

discussion of Petitioner's conflict of interest claim, its decision would be

contrary to clearly established federal law because <u>Strickland</u> requires that a defendant show prejudice, while such a showing is not required under <u>Sullivan</u>.

But, the state habeas court was not required to evaluate whether any conflict of interest was impermissible under <u>Sullivan</u> because the only evidence presented to that court which could have arguably given rise to a conflict of interest came from Mr. Owens's testimony regarding the defendants' statements that the other "pulled the trigger."  Having found that evidence not to be credible, the state habeas court had no cause to speculate as to whether a conflict of interest existed, and whether that conflict had an adverse effect on the representation.[10]  In short, the state court's conclusion that there was "no conflict of interest," to which this Court affords deference, is sufficient to resolve any Sixth Amendment claim necessarily predicated on that conflict.

For the same reasons, this Court need not address Petitioner's numerous contentions that the state habeas court's decision was either contrary to, or an

---

[10] This would similarly explain why the state habeas court provided no additional statement of the law applicable to ineffective assistance claims based upon conflicts of interest.  That is to say, having found that nothing about the representation gave rise to a conflict of interest, the state habeas court could proceed directly to Petitioner's numerous other claims for relief which would be properly analyzed under the <u>Strickland</u> standard.

unreasonable application of, clearly established federal law.  Because "joint

representation is not *per se* violative of constitutional guarantees of effective

assistance of counsel," <u>Holloway</u>, 435 U.S. at 482, and because this Court

defers to the state habeas court conclusion that Mr. Owens's testimony on the

conflict of interest issue was not credible, and because Petitioner produced no

other evidence sufficient to establish that his trial attorney operated under an

impermissible conflict of interest, the Court need not consider whether his

attorney labored under an "actual conflict" for purposes of the Sixth

Amendment.[11]

---

[11] To be sure, the Court recognizes that, as the Supreme Court has repeatedly warned, "in a case of joint representation of conflicting interests the evil . . .is in what the advocate finds himself compelled to <u>refrain</u> from doing, not only at trial but also as to possible pretrial plea negotiations."   <u>Holloway</u>, 435 U.S. at 489-90 (emphasis in original).  Moreover, the Court would be inclined to agree with Petitioner that, had Petitioner and his co-defendant in fact accused each other of committing the murder as Mr. Owens testified, the inability to pursue a defense strategy that the co-defendant was the killer, or advise Petitioner to consider testifying against his co-defendant in exchange for a reduced sentence, as well as the decision to present a "half-hearted," united alibi defense, would be sufficient to support a conclusion that the representation was adversely affected by the conflict.  <u>See</u> <u>Griffin v. McVicar</u>, 84 F.3d 880, 887-88 (7th Cir. 1996) (finding adverse effect on the representation under <u>Sullivan</u> where counsel representing co-defendants was precluded from shifting blame from one client to another, and instead opted to present a joint alibi defense).  The Court notes, however, that Mr. Owens also testified that he did not recognize that his continued representation, even in light of the defendants' statements about which he also testified, presented a conflict of interest. In <u>Hunter v. Secretary, Department of Corrections</u>, the Eleventh Circuit rejected a claim by a state habeas petitioner that he could show an adverse effect on the representation based

AO 72A
(Rev.8/82)

3. Per se ineffective assistance of counsel

As explained above, ineffective assistance of counsel claims are generally analyzed under the two-prong test established in Strickland.  However, in the companion case to Strickland, United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), the Supreme Court carved out a narrow exception to the two-prong Strickland test.  In Cronic, the Supreme Court recognized that there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658.  In such circumstances, prejudice will be presumed and the defendant need not make the specific showing of prejudice required by Strickland.  Id. at 659.  Cronic identifies three situations where prejudice should

---

upon a conflict of interest " 'if the alternative defense was inherently in conflict with' the attorney's other loyalties and interests, even if the attorney was unaware of the conflict." 395 F.3d 1196, 1201 (11th Cir. 2005); cf. also Quince, 360 F.3d at 1259 (reiterating standard to be applied to adverse effect inquiry that petitioner must establish that "that the alternative strategy was not followed *because* it conflicted with the attorney's external loyalties"and refusing to find adverse effect on the representation where there was "simply no causal relation between any of the actions by [counsel]" and the alleged conflict of interest (emphasis added)).  As Mr. Owens did not recognize the conflict, it would appear that he did not fail to take any action because of that conflict.  Thus, Hunter and Quince might indicate that Petitioner cannot show an adverse effect on the representation.  However, in view of the Court's determination, supra, that the state habeas court did not credit Mr. Owens's testimony about the statements in the first instance, it need not reach this issue.

be presumed: (1) where there has been a "complete denial of counsel" such as where the accused is denied the presence of counsel at "a critical stage"; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and  (3) where circumstances are so prejudiced against the defendant that competent counsel could not render effective assistance.  See id. at 659-62; Bell v. Cone, 535 U.S. 685, 695, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (discussing Cronic decision).

As an initial matter, it is somewhat unclear which presumptively prejudicial circumstance or circumstances Petitioner contends occurred so as to warrant relief under Cronic.  For example, Petitioner contends that his claim fits within the second Cronic exception because "[t]here was no meaningful adversarial testing" of the prosecution's case, arguing that counsel completely abdicated their responsibility by failing to seek a continuance, challenge the state's forensic evidence, and interview certain witnesses. (Br. in Supp. of Pet. at 50.)  Then, however, Petitioner goes on to note that Petitioner's case bears many similarities to Powell v. Alabama, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158 (1932), apparently invoking the third Cronic exception.  (Id.)

79

After reviewing the record from the state proceedings, and considering Petitioner's asserted bases for relief, the Court concludes that neither the second nor third Cronic exception is applicable to Petitioner's case, and thus, a presumption of prejudice would be inappropriate.[12]  First, with respect to Petitioner's claim that prejudice should be presumed under Cronic because "[t]here was no meaningful adversarial testing" of the prosecution's case, it is clear that Petitioner takes issue with specific failings of defense counsel.  But, the Supreme Court made clear in Bell v. Cone that for this Cronic exception to apply, "the attorney's failure must be complete."  535 U.S. at 697; see also Cronic, 466 U.S. at 659 (explaining that prejudice may be presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." (emphasis added)); Conklin v. Schofield, 366 F.3d 1191, 1202 (11th Cir. 2004) (explaining that "the Supreme Court has ruled that an attorney's failure to combat the prosecution must be 'complete' in order to avoid the

---

[12] The state habeas court did not expressly address Petitioner's claim under Cronic. Because this Court, proceeding de novo would  conclude that a presumption of prejudice under Cronic is not appropriate, the Court need not decide whether this claim was adjudicated on the merits in the state habeas action, such that § 2254(d) applies, or whether it was not, such that this Court would exercise de novo review of this claim for relief.

AO 72A
(Rev.8/82)

prejudice requirement" and that in capital sentencing context, "if the attorney presents any mitigating evidence, then actual prejudice must be shown").

Here, Petitioner's trial counsel did not completely fail to oppose the prosecution's case. For example, Petitioner contends that counsel "failed to challenge the state's forensic evidence." (Br. in Supp. of Pet. at 50.) But, the trial record shows that counsel did not fail to challenge that evidence as Petitioner asserts. Rather, Petitioner's trial counsel cross-examined the state's expert, Roger Perrin, at length about his relatively limited experience (he had been qualified to individually render an opinion as to firearms identification for approximately fourteen months); the possibility that the shotgun shell recovered at the scene and which the expert opined was fired from the weapon seized from Petitioner had been reloaded and fired from multiple weapons; the possibility that the striations on the brass casing resulted from the manufacturing process and not from its use in the firearm; his inability to confirm that the pellets removed from the victim were actually fired from Petitioner's gun; as well as the possibility that out of the "millions" of 12 gauge shotguns in the United States, two different guns could leave marks sufficiently similar to render his opinion unreliable. (See R. Ex. 6 at 257-266.) Thus, while Petitioner may take

issue with the manner in which that opposition was mounted, there was

opposition, and that is all that is required to render <u>Cronic</u> inapplicable.

Accordingly, the Court will analyze Petitioner's claims under the <u>Strickland</u>

standard.[13]

Second, Petitioner contends that the short period between the

appointment of counsel and trial rendered the proceedings so unfair that no

competent counsel could render effective assistance, and thus, prejudice should

be presumed under the third <u>Cronic</u> exception.  The Court disagrees.  "Not

every restriction on counsel's time or opportunity to investigate or to consult

with his client or otherwise to prepare for trial violates a defendant's Sixth

Amendment right to counsel," <u>Morris v. Slappy</u>, 461 U.S. 1, 11, 103 S. Ct.

1610, 75 L. Ed. 2d 610 (1983), and the Supreme Court has expressly refused

---

[13] Petitioner places much emphasis on the testimony of Mr. Owens in the state habeas proceedings.  Specifically, Petitioner points to Mr. Owens's statements that "there wasn't much preparing to do" and that "he just left it up to the district attorney to have his way," arguing that this "is tantamount to an admission of a <u>Cronic</u> violation."  (Br. in Supp. of Pet. at 50.)  The Court, however, does not base its decision as to whether prejudice should be presumed on the testimony of one of two attorneys appointed to represent Petitioner offered more than twenty years after Petitioner's conviction.  Rather, the Court looks at the trial record to determine whether counsel's failure to adversarily test the prosecution's case was total and complete.  If so, prejudice will be presumed.  If not, the Court will assess whether counsel performed ineffectively under the <u>Strickland</u> standard.

"to fashion a per se rule requiring reversal of every conviction following tardy appointment of counsel." Chambers v. Maroney, 399 U.S. 42, 54, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970). Accordingly, numerous cases have held that a short period of time to prepare, in and of itself, is not per se prejudicial. See, e.g., Cronic, 466 U.S. at 649, 666 & n.41 (no presumption of prejudice when counsel had twenty-five days to prepare to defend complex mail fraud charges); Avery v. Alabama, 308 U.S. 444, 60 S. Ct. 321, 84 L. Ed. 377 (1940) (counsel was not per se ineffective where appointment in a capital case occurred only three days before trial, and trial court denied counsel's request for additional time to prepare); Conklin, 366 F.3d at 1202 (no presumption of prejudice where defense counsel had thirty-seven days to prepare for capital case); Glover v. Miro, 262 F.3d 268, 271-72, 278-79 (4th Cir. 2001) (no presumption of prejudice when counsel received defendant's file only two days before trial); United States v. Lacy, 446 F.2d 511, 512 (5th Cir. 1971) (defendant was not denied effective assistance where counsel was appointed seven days before the beginning of his trial, and counsel did not seek a continuance in order to have more time to prepare for trial).

Of course, just as the Court does not hold that allowing counsel thirteen days to prepare for a capital case is per se unconstitutional, neither does it hold that such a time period "may never trigger a presumption of ineffective assistance." Conklin, 366 F.3d at 1213 (Barkett, J., dissenting).  Rather, the Court must look to the record—to the circumstances surrounding the representation—to determine if prejudice should be presumed.  In this case, the Court concludes that it should not.

There can be little doubt that allowing counsel thirteen days to prepare for a capital case does not constitute the ideal, and such a schedule deviates significantly from that which this Court would impose if it were trying the case in the first instance.[14]  But, the Constitution does not require what this Court deems the ideal.  Rather, it requires that circumstances not be so prejudiced against the defendant that effective assistance simply cannot be provided.  In the Court's view, the minimal constitutional standards were met in this case.

---

[14] It bears mentioning, however, that given the appointment of co-counsel, there were in actuality twenty-three attorney days between appointment and trial.  While the Court recognizes that there were also two defendants, the similarities of their cases and defenses meant that preparation for one, was in essence, preparation for the other.  Thus, to say that there were only thirteen days perhaps understates, at least in part, the time provided to prepare.

84

First and foremost, the prosecution maintained an "open file," and defense

counsel were well-aware of what the evidence against Petitioner would be.[15]

Because counsel was afforded an opportunity to see the prosecution's case

against their client and to determine how best to meet that evidence, Petitioner's

was not a case where additional time to investigate was a necessity, because all

of the state's possible theories of the case and possible defenses thereto must be

explored prior to going to trial.  This fact weighs heavily in favor of finding the

circumstances surrounding the representation satisfied constitutional

requirements.  Second, there is no indication in the record that actions were

specifically not undertaken, or aspects of Petitioner's case were not

investigated, because of the limited time to prepare.[16]  While a showing of

---

[15] The Court recognizes that Petitioner here contends that certain exculpatory evidence was not provided to defense counsel.  While the Court addresses that claim infra, it is undisputed that counsel was aware of what the evidence actually presented at trial would be.  Although it is possible that with additional time to investigate, counsel could have independently discovered the evidence in question, the Court declines to find Petitioner's trial per se unconstitutional based upon this possibility.

[16] Petitioner does allege that the short time precluded Mr. Bishop from raising a challenge to the master jury list because such a challenge was inherently "time intensive."  Mr. Bishop testified at the state habeas hearing, however, that he attended a seminar discussing the possibility of raising a fair cross section challenge after Petitioner's trial and appeal were concluded.  In fact, he began work on such a challenge to be used when Petitioner's case was remanded for re-sentencing.  (See R. Ex. 5 at 88-91.)  Thus, while Mr. Bishop testified as to the possibility of raising such a challenge, the record is clear

85

prejudice—that is, that there is a reasonable probability that the outcome of the trial would have been different—is not required under <u>Cronic</u>, the fact that Petitioner can point to no specific action that his attorneys either elected not to take, or were precluded from taking, on the basis of the limited time to prepare counsels against finding that the circumstances of the representation were such that effective assistance was an impossibility.  Finally, as is discussed in more detail below, Mr. Bishop did investigate Petitioner's case, and made significant efforts to seek out witnesses who would support Petitioner's alibi defense. Again, the fact that such an investigation was conducted militates in favor of finding the short time to prepare was not per se prejudicial.  In sum, while Petitioner's claims that more could have been done had additional time been provided are undoubtedly true (for in preparing for trial there is always more that can be done), the Court concludes that the circumstances of Petitioner's trial were not such that reasonably competent counsel could not provide effective assistance, and as such, a presumption of prejudice under the third <u>Cronic</u> exception is not appropriate.  Accordingly, Petitioner's claims based on

---

that he did not refrain from raising the challenge in Petitioner's case because of the short time to prepare.

ineffective assistance must be analyzed under the <u>Strickland</u> standard, and

Petitioner must show that he was prejudiced by his counsel's alleged failings.

4.      <u>General ineffective assistance of trial counsel</u>

(a)      <u>Unreasonable pretrial investigation and trial<br>performance</u>

Petitioner contends that his trial counsel rendered ineffective assistance

by failing to adequately investigate his case, and points to several instances in

which he claims this inadequate investigation prejudiced his defense.

Specifically, Petitioner argues that he suffered prejudice as a result of counsel's

professionally unreasonable failure to (1) interview Ms. Linda Hamrick, a

witness for the state who offered testimony damaging to Petitioner's case

during cross-examination; (2) learn of and present evidence to the effect that the

victim had spent evenings in the vicinity of that part of Peachtree Street where

Petitioner claimed to have stolen his car; and (3) investigate and present any

challenge to the composition of the master jury list.

Additionally, Petitioner contends that trial counsel performed

ineffectively throughout his trial itself.  In this regard, Petitioner argues that

counsel performed unreasonably by (4) electing to waive opening argument; (5)

87

eliciting incriminating evidence from Ms. Hamrick on cross-examination; (6)

directing Petitioner to offer his testimony on direct in the defense's case in chief

in "narrative form"; (7) failing to present the testimony of an independent

ballistics expert to counter the testimony offered by the state's expert; (8)

failing to object to the prosecution's references to Petitioner's post-arrest

silence and his request for counsel; and (9) failing to object to improper jury

instructions.

The state habeas court rejected Petitioner's claims for relief based upon

ineffective assistance of counsel, stating:

> This defendant created an uncomfortable
> situation for his attorneys by his filing of a pro se
> demand for speedy trial and his intractable insistence
> that the matter go to trial immediately and that there
> be no continuances.  A review of the facts in this case
> indicates that counsel did a surprisingly thorough job
> of investigation of the defendants' story and checking
> out the evidence to be presented by the state.  How
> one can reconstruct, twenty-five years later the precise
> details of what was done and when it was done and by
> whom it was done is almost impossible.  But the
> overall evaluation of the evidence presented
> convinces this Court that the attorneys involved, E.L.
> Owens and Fred Bishop, did perform reasonably,
> competently, and effectively on behalf of this
> defendant.

> . . . Both attorneys conducted extensive
> conferences with the defendant and the co-defendant,
> and conducted extensive investigation.  Both
> attorney's had a thorough knowledge of what the
> state's evidence was, with the exception of witness
> Hamrick, who identified [Petitioner] himself . . . .
> The contention that a different firearms expert would
> have testified differently is not likely, since the
> testimony of the firearms expert presented by the state
> was on a general broad basis relating the shell found
> on the ground near the victim's body to the shotgun
> shown to have been in the possession of the
> defendant.  The decision as to whether or not to obtain
> an additional firearms expert appears to have been a
> reasonable and responsible decision by counsel based
> on their knowledge of what the evidence was going to
> be at trial.

( R. Ex. 13 at 20-21.)

In analyzing Petitioner's ineffective assistance claims, the state habeas

court appears to have set forth and applied the Strickland standard.  (See R. Ex.

13 at 20.)  "If a state court has already rejected an ineffective-assistance claim, a

federal court may grant habeas relief if the decision was 'contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States.' " Yarborough v.

Gentry, 540 U.S. 1, 5, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003) (quoting 28 U.S.C. §

2254(d)(1)).  "Where, as here, the state court's application of governing federal

AO 72A
(Rev.8/82)

law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." Id.

(i)    Grounds 1 through 3

Before turning to the merits of Petitioner's above-enumerated challenges to counsel's pre-trial investigation, the Court takes this opportunity to clarify one important issue.  Specifically, the Court notes that the precise bases for Petitioner's ineffective assistance of counsel claims as they relate to counsel's investigation are not entirely clear.  For example, it is not clear whether Petitioner challenges his attorney's failure to seek a continuance as the professionally unreasonable conduct, and relies on the above aspects of his trial as a means by which to show prejudice, or whether he raises the above alleged failings as prejudicial, professionally unreasonable conduct in and of themselves.  (See Br. in Supp. of Pet. at 55-62.)  That said, insofar as Petitioner challenges the failure to seek a continuance, the Court disagrees that this was professionally unreasonable.

> [A] defendant's Sixth Amendment rights are his
> alone, and . . . trial counsel, while held to a standard
> of "reasonable effectiveness," is still only an assistant
> to the defendant and not the master of the defense.
> Our criminal system allows a defendant the choice of

90

> whether he wants to be represented by counsel at trial.
> Because we recognize that a defendant must have this
> broad power to dictate the manner in which he is tried,
> it follows that, in evaluating strategic choices of trial
> counsel, we must give great deference to choices
> which are made under the explicit direction of the
> client.

Mulligan v. Kemp, 771 F.2d 1436, 1443 (11th Cir. 1985).

In this case, Petitioner filed a pro se speedy trial demand while

incarcerated in North Carolina.  (R. Ex. 7 at 749-50.)  The demand was filed

prior to the appointment of counsel, and the trial court sought to give it effect.

Mr. Bishop testified that, while he could not remember the specifics of his

discussions with Petitioner (a far from remarkable fact given that Petitioner

initially filed his challenge some 20 years after his trial), counsel discussed the

possibility of seeking a continuance with Petitioner and that Petitioner flatly

rejected this proposition.  Instead, Petitioner was adamant that his trial not be

delayed based on his belief that the state's case was weak and that a speedy trial

would be to his advantage.  (R. Ex. 5 at 61-62.)  Where the potential benefits of

seeking a continuance are discussed with a defendant, and the defendant

adamantly opposes such a continuance and directs his attorneys to proceed to

trial quickly, even against the advice of counsel, the Court cannot say that the

decision to abide by the client's wishes deprived the client of the effective assistance of counsel.  To be sure, a different result might obtain if counsel failed to consult the client, instead allowing a case to go to trial quickly without advising their client of both the possibility and potential benefits of obtaining a continuance to allow additional time to prepare.  But where, as here, the prospect of obtaining a continuance was discussed and rejected out of hand by the client, the Court will not hear the client complain—literally decades after his trial—that counsel's decision to abide by his wishes was professionally unreasonable.  Accordingly, insofar as Petitioner seeks relief under Strickland based on counsel's failure to seek a continuance, that relief is not warranted.  With that issue resolved, the Court takes up Petitioner's challenges to counsel's pre-trial investigation.

Without question, it is incumbent upon counsel to conduct an adequate pre-trial investigation, and the failure to do so can constitute ineffective assistance of counsel.  See, e.g., Wiggins, 539 U.S. at 521-22 (explaining that counsel has duty to make reasonable investigations or to make reasonable decision that makes particular investigations unnecessary).  " 'In any ineffectiveness case, a particular decision not to investigate must be directly

assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' " Id. (quoting Strickland, 466 U.S. at 690-91).

Under the deferential standard of review applicable to Petitioner's claims, the Court concludes that Petitioner is not entitled to relief based upon counsel's failure to interview Ms. Hamrick, to discover and present evidence that the victim had recently stayed at a motel in the area where Petitioner claimed to have stolen the victim's car, and to challenge the composition of the master jury list.  The state habeas court denied Petitioner's ineffective assistance claims directed at counsel's inadequate pretrial investigation, concluding that "counsel did a surprisingly thorough job of investigation of the defendants' story and checking out the evidence to be presented by the state," that "[b]oth attorneys conducted extensive conferences with the defendant and the co-defendant, and conducted extensive investigation[, and] . . . had a thorough knowledge of what the state's evidence was, with the exception of witness Hamrick. . . ."  While, on the record before it, this Court might not characterize the investigation by both attorneys as "extensive," it cannot say that the state habeas court was

93

objectively unreasonable in concluding that counsel's failings, to the extent

there were any, did not rise to the constitutional level.

                a.       <u>Failure to interview Witness Hamrick</u>

First, with respect to Ms. Hamrick, the Court cannot say that counsel's

failure to interview her was objectively unreasonable, or that this failure

prejudiced the defense within the meaning of <u>Strickland</u>.  The district attorney

maintained an open file, and advised defense attorneys as to the precise manner

in which his case would be presented at trial.  This included what witnesses

would be called to testify on behalf of the state, what their testimony would be,

and what exhibits would be introduced through each witness.  There is no

indication that the district attorney did not live up to his word, and indeed, Mr.

Bishop testified at the state habeas hearing that "[t]he trial went precisely as he

said it was going to be."  (R. Ex. 5 at 64-65.)  While ideally each and every

witness for the state would be interviewed to the fullest extent possible prior to

their taking the stand, attorneys must make the best use of their time and

prepare their case in the manner that they deem most effective.  When the

attorneys reasonably believe that they know what a witness will testify to at

trial, and when that proffered testimony does not significantly damage their

case, it is reasonable to forego interviewing that witness in favor of taking up other, more beneficial aspects of the defense.  On these facts, the Court cannot say that the decision not to interview Ms. Hamrick prior to her testifying was objectively unreasonable.[17]  See Mulligan, 771 F.2d at 1442-44 (explaining that although it "would have been wiser" to interview each of state's witnesses, counsel did not perform ineffectively by failing to conduct interviews where defense counsel assumed from discussions with prosecutor that he knew substance of their testimony).

b.    Failure to discover evidence

Second, the Court finds similarly unavailing Petitioner's claim that counsel performed ineffectively by failing to discover and present evidence showing that the victim had previously stayed in motels in the area where Petitioner claimed to have stolen his car.  During Mr. Bishop's interviews with the defendants, both told him that they had been "drinking beer and eating pizza at the Lighthouse Inn until about midnight," and that as they were walking

---

[17] The Court assumes that Ms. Hamrick would have agreed to speak with defense counsel, that reasonably competent counsel would have attempted to elicit this information, and that she would, in fact, have volunteered this information in that meeting.

down the sidewalk they discovered the victim's car with the keys in it, so they took it and drove to North Carolina.  (Id. at 70.)  Mr. Bishop made at least one trip, and perhaps more, to the area in an effort to find witnesses to support Petitioner's alibi defense.  He obtained photographs of Petitioner and Jordan, went to the location where Petitioner claimed to have been during the period in question, interviewed the manager of the establishment, waitresses, regular customers, as well as street vendors, store proprietors, and even two "beat cops," asking each if they had ever seen either defendant.  None had.  (Id.)  In view of these investigatory efforts, which were guided in large part by the facts provided by his client, that he did not seek out, discover, and present evidence related to the victim's presence at certain motels in the area can hardly be said to constitute a constitutionally deficient investigation.  See Strickland, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").  As such, the state habeas court's conclusion is not objectively unreasonable.

                    c.      Failure to investigate/challenge jury list

     Third, Petitioner contends that counsel unreasonably failed to investigate and raise a challenge to the composition of the master jury list.  While the state

habeas court's order does not expressly address this issue, it was raised before

that court and rejected.  Accordingly, the Court assumes that the state habeas

court resolved this issue against Petitioner, and the Court agrees with that

determination.  At the time of Petitioner's trial, neither Taylor nor Duren had

been decided.  While these decisions were perhaps foreseeable, this Court's

inquiry is not whether some other attorney may have recognized this as a

possible issue, but rather whether counsel who fails to do so performs in a

constitutionally deficient manner.  " '[B]ecause law is not an exact science, an

ordinary, reasonable lawyer may fail to recognize or to raise an issue, even

when the issue is available, yet still provide constitutionally

effective assistance.' "  Pitts, 923 F.2d at 1573-74 (quoting Pelmer v. White,

877 F.2d 1518, 1523 (11th Cir. 1989)); see also United States v. Ardley, 273

F.3d 991, 993 (11th Cir. 2001) (stating that "[i]n this circuit, we have a wall of

binding precedent that shuts out any contention that an attorney's failure to

anticipate a change in the law constitutes ineffective assistance of counsel" and

collecting cases).  Nothing in the record indicates that counsel acted

unreasonably in failing investigate the composition of the master jury list and to

raise a Taylor or Duren challenge before those cases were decided,

notwithstanding that the jury venire reflected an under-representation of certain identifiable groups.[18]  As such, the state habeas court's rejection of Petitioner's claim on this issue was not objectively unreasonable.

(ii)     Grounds 4 through 9

a.     Waiver of opening argument

In Ground 4, Petitioner contends that counsel performed unreasonably by electing to waive opening argument.  This contention is without merit.  The decision to waive opening argument is one of reasonable trial strategy.  See Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000) ("While opening and closing statements are not to be lightly waived in a capital case, it is well-settled that the decision to waive an opening or closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of

---

[18] It appears from Mr. Bishop's testimony that, at the time of Petitioner's trial, the composition of the master jury list in Gwinnett County had never previously been challenged.  In fact, Mr. Bishop testified that he went on to file the first such challenge approximately one year after Petitioner's trial.  Thus, Petitioner's contention that counsel acted unreasonably in failing to investigate and challenge the master jury list because certain groups were under-represented on the jury venire, would mean that each and every attorney trying a case prior to Petitioner's also acted in a professionally unreasonable manner.  The measure for ineffective assistance claims are the prevailing norms existing at the time of the challenged conduct.  Certainly, where no other attorney has seen fit to raise such a challenge, the Court cannot say that counsel's failure to do so in this case was unreasonable when considered in light of the then-prevailing professional norms.

counsel."); <u>Jones v. Smith</u>, 772 F.2d 668, 674 (11th Cir. 1985) ("The attorneys'

decision to waive opening argument at the guilty phase was one of reasonable

trial strategy.  It left the defense uncommitted to a particular position and thus

free to develop any defense that might materialize as the State presented its

case."); <u>United States v. Salovitz</u>, 701 F.2d 17, 20-21 (2d Cir. 1983) (noting that

trial counsel's decision to waive an opening statement is often a matter of trial

strategy "and ordinarily will not form the basis for a claim of ineffective

assistance of counsel"); <u>see also</u> <u>Polk v. State</u>, 620 S.E.2d 857, 860 (Ga. Ct.

App. 2005) (" 'The mere waiver of an opening statement can be characterized

as a trial tactic which cannot be equated to ineffective assistance of counsel.' "

(quoting <u>Futch v. State</u>, 260 S.E.2d 520 (Ga. Ct. App. 1979)).  Moreover,

Petitioner has not shown how he suffered prejudice as a result of such a waiver.

Accordingly, the state habeas court's decision to deny Petitioner relief on this

ground is not objectively unreasonable.

           b.      <u>Questioning of Witness Hamrick</u>

In Ground 5, Petitioner contends that counsel performed ineffectively by

eliciting incriminating evidence from Ms. Hamrick on cross-examination.  The

state habeas court did not expressly address this contention, except to

AO 72A
(Rev.8/82)

acknowledge that counsel was unaware that she would offer the testimony that she did, but denied relief on this claim nonetheless.  Without question, the decision to ask Ms. Hamrick whether she had ever seen Petitioner was, in hindsight, unfortunate for the defense.  Her testimony on direct, while not entirely benign as it placed the victim far from the area where Petitioner claimed to have stolen his car, had also not been exceptionally harmful to Petitioner's case.  That, of course, changed when counsel for Petitioner asked, at Petitioner's insistence, whether Ms. Hamrick had ever seen Petitioner before.  She then proceeded to provide a very accurate description of Petitioner, and to testify that he had been in the same bar as the victim on the night he was killed.

Petitioner's argument in favor of relief on this issue is as follows:

> No reasonable lawyer would have asked the question knowing what the answer would be.  A reasonable lawyer, if he had interviewed Ms. Hamrick, would not have asked the question, regardless of what [Petitioner] requested, and that lawyer would certainly have had the authority to refuse to ask the question. [cit.] On the other hand, if counsel did not know the answer to the question, then he was ineffective for failing to conduct an adequate investigation.  Either way, asking the question violated [Petitioner's] right to effective assistance of counsel.

100

(Pet.'s Objs. to Rep. & Recommend. [33] at 38.)  The Court finds this argument unpersuasive.

Petitioner, in essence, asks this Court to conclude that any time an attorney elicits unexpected and damaging testimony from a witness which might have been discovered through a pretrial interview, that attorney's assistance is constitutionally infirm.  In the Court's view, this is not the law.  Rather, the Court must determine first whether the decision not to interview the witness was professionally unreasonable.  If it was not, then the Court must proceed to a second, separate question—namely, whether the decision to ask a given question in the absence of affirmative knowledge as to what the witness's answer would be was itself professionally unreasonable.  As discussed above, the state habeas court was not objectively unreasonable in concluding that, in light of their access to the state's evidence, counsel did not perform ineffectively by electing not to interview Ms. Hamrick.  Thus, the Court turns to the question of whether the state habeas court's decision not to grant relief based upon counsel's questioning of Ms. Hamrick at trial was objectively unreasonable.  The Court concludes that it was not.

Certainly, good lawyers understand that it is generally ill-advised to ask a question at trial to which you do not know the answer.  But, doing so does not render the assistance per se ineffective.  Rather, the Court must evaluate the challenged conduct from counsel's perspective and in view of the circumstances as they existed at the time, making "every effort . . . to eliminate the distorting effects of hindsight," and "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  Applying this standard, the Court cannot say that the state habeas court's decision to deny relief was objectively unreasonable. First, counsel had access to the state's file, was well aware of what Ms. Hamrick's testimony at trial would be, and her testimony was entirely consistent with the prosecution's representations in that regard.  Second, a reasonable defense attorney could expect that the state would have elicited this damaging testimony during her direct examination.  As it did not, that omission might lead counsel to reasonably believe that such an answer was unlikely.[19]

---

[19] Of course, a different result might obtain if defense counsel was aware that the witness would offer particularly damaging testimony, and the state, by error or omission, simply failed to elicit that testimony during the direct examination.  Here, however, the record provides no such indication.  Indeed, the fact that her testimony placing Petitioner at the scene was not reflected in the prosecution's file, and was not elicited on direct

Third, counsel asked Ms. Hamrick the question only after Petitioner repeatedly

insisted that the question be asked.  While, as Petitioner repeatedly points out,

an attorney must not "blindly follow" the requests of the client in all

circumstances, see Blanco v. Singletary, 943 F.2d 1477, 1501-02 (11th Cir.

1991) (finding counsel performed ineffectively at sentencing phase of capital

case where "morose and irrational" defendant whose mental condition was in

question instructed counsel not to present mitigating evidence, and counsel

simply acquiesced in that request), what is reasonable "may be determined or

substantially influenced by the defendant's own statements or actions."

Strickland, 466 U.S. at 691.  Where, as here, the defendant is adamant that

counsel ask a witness for the state if she has ever seen him before, and where

there is no indication either in the state's file or from her direct testimony that

she had, counsel might reasonably assume that, in fact, she had not, and

consider the question safe (or at least safer), despite not knowing beforehand

what the precise response would be.  Finally, had Ms. Hamrick testified that

she, in fact, had never seen Petitioner before, that testimony would have offered

_____

might indicate that the state, despite their previous interviews with Ms. Hamrick, was
unaware that she could identify Petitioner.

103

significant support to Petitioner's alibi defense, and thus, a reasonable attorney might deem asking the question to be "worth the risk."  In view of these facts, it was not professionally unreasonable for counsel to ask the question.

In sum, "[w]hile counsel's questions to the witnesses may illustrate a classic example of the first rule of cross-examination; don't ask a question unless you know what the answer will be, the only issue for the Court is whether counsel's conduct in asking the question fell below an objective standard of reasonableness."  Campbell v. United States, 364 F.3d 727, 735 (6th Cir. 2004).  On the record before it, the Court cannot say that either the decision to ask Ms. Hamrick the question was unreasonable under then-prevailing professional norms, or that the state habeas court's decision denying Petitioner relief was objectively unreasonable under Strickland.  As such, Petitioner was not denied the effective assistance of counsel based upon this questioning.

c.    Narrative form testimony

In Ground 6, Petitioner contends that counsel performed ineffectively by directing Petitioner to offer his testimony in "narrative form."  Petitioner does not, however, offer any argument on this point in his accompanying brief.  In view of this failing, the Court concludes that the state habeas court's conclusion

104

that counsel did not perform ineffectively, which encompassed this claim, was not objectively unreasonable.

                    d.      <u>Failure to present expert testimony</u>

In Ground 7, Petitioner contends that counsel performed ineffectively by failing to present the testimony of an independent ballistics expert to counter the testimony offered by the state's expert.  In support of his position, Petitioner offered the affidavit of a firearms expert, Carl Majeskey, at the state habeas hearing.  According to Petitioner, Mr. Majeskey

> reviewed relevant portions of [Petitioner's] trial
> transcript and identified a number of serious flaws in
> the methodology employed by the State's examiner.
> These include the failure to describe the length of the
> shotgun or its condition, the failure to specify whether
> the pellets removed from the victim were number 4
> birdshot or buckshot, the failure to recover and/or test
> the wad that served as the seal between the
> gunpowder and the shot, the failure to conduct test
> patterns regarding the rate at which the shot dispersed
> after it left the shotgun, and the failure to conduct any
> test to determine whether the shell found near Mr.
> Rouse's body had been reloaded.

(Br. in Supp. of Pet. at 63 (citing R. Ex. 8 at 1006-11).)  This testimony, according to Petitioner, would have allowed him to "show[] just how unreliable" the state expert's testimony was.  (<u>Id.</u> (citing R. Ex. 8 at 1009).)

As set forth above, the state habeas court rejected this claim, stating:

> The contention that a different firearms expert would
> have testified differently is not likely, since the
> testimony of the firearms expert presented by the state
> was on a general broad basis relating the shell found
> on the ground near the victim's body to the shotgun
> shown to have been in the possession of the
> defendant.  The decision as to whether or not to obtain
> an additional firearms expert appears to have been a
> reasonable and responsible decision by counsel based
> on their knowledge of what the evidence was going to
> be at trial.

(R. Ex. 13 at 21.)

Petitioner appears to urge that this Court need not defer to the state

court's decision for two reasons: first, because it was "based on apparent

misunderstanding of the importance of the ballistics evidence at trial" insofar as

the state expert's testimony was not "on a general broad basis," and second,

because the decision not to introduce expert testimony was not a trial strategy

but rather the product of a complete failure to investigate.  (Br. in Supp. of Pet.

at 64.)

Pretermitting the question of whether the state habeas court's conclusion

that the "decision" not to obtain an additional firearms expert was "reasonable

and responsible" such that it is entitled to deference, the Court concludes that

106

Petitioner has failed to show prejudice as a result.[20]  "[T]o prove prejudice by failure to investigate and failure to produce a certain kind of expert witness, a habeas petitioner must demonstrate a reasonable likelihood that an ordinarily competent attorney conducting a reasonable investigation would have found an expert similar to the one eventually produced.  In the absence of such a probability, the petitioner is not injured by the failure to investigate."  Horsley v. State of Ala., 45 F.3d 1486, 1495 (11th Cir. 1995) (internal citation omitted); see also Fugate v. Head, 261 F.3d 1206, 1221-22 (11th Cir. 2001) (discussing required showing for ineffective assistance predicated upon failure to present expert testimony at sentencing phase of trial and stating: "petitioner must show: (a) that it was professionally unreasonable for counsel not to investigate; (b)

---

[20] The record fails to demonstrate what kind and how much investigation a reasonable lawyer would have made in the circumstances of this case.  However, assuming that a reasonably competent attorney in Georgia in 1974 would have sought out such testimony (and this is far from clear on the present record), this Court would have great difficulty concluding, as the state habeas court's decision appears to imply, that counsels' failure to seek out and present expert testimony to rebut the state's expert was the result of a reasonable tactical decision.  Mr. Bishop testified that he did not seek out a ballistics expert because he "was just sort of leaving that kind of thing to [Mr. Owens]" and because he "didn't have any reason to think that the [State's] expert was not telling the truth or did not do a valid test," (R. Ex. 5 at 77-78), and there is simply no indication in the record that Mr. Owens made a tactical decision not to seek out expert testimony on this issue.  However, because Petitioner has failed to show that he suffered any prejudice as a result of this failing, the Court need not decide this issue.

what kind of, and how much, investigation an ordinary, reasonable lawyer would have undertaken; (c) that it is reasonably probable that a reasonable investigation would have turned up an expert who would have presented testimony similar to that which was eventually adduced; and (d) that it is reasonably probable that this testimony would have affected the sentence eventually imposed.  Failure to meet any of these steps defeats the ineffectiveness claim.") (quoting Elledge v. Dugger, 823 F.2d 1439, 1446 n.15 (11th Cir.) (per curiam), withdrawn in part on other grounds, 833 F.2d 250 (11th Cir. 1987)).

From its review of the record, the Court concludes that Petitioner has failed to demonstrate that it was reasonably probable that an ordinary, reasonable lawyer rendering assistance under the circumstances of Petitioner's 1974 trial and using reasonable diligence would have discovered a firearms expert who would have testified as Mr. Majeskey did.  The record simply does not establish that a firearms expert who would testify favorably to Petitioner was available at the time of Petitioner's trial, or that a reasonable attorney

would have discovered that expert.[21]  See id. (rejecting claim of ineffectiveness

on similar grounds, stating: "That experts were found who would testify

favorably almost twenty years later is irrelevant."); Daugherty v. Dugger, 839

F.2d 1426, 1432 (11th Cir. 1988) (mere fact that an expert who would give

favorable testimony was discovered five years after sentencing proceedings is

not sufficient to prove that a reasonable investigation at the time of sentencing

would have produced same expert or another expert willing to give the same

testimony).  What is more, the record does not show that the specific tests

which Mr. Majeskey avers should have been performed were commonly

_____

[21] The Eleventh Circuit has explained that to make such a showing a petitioner
could present testimony from

> (a) members of the bar relating to the amount of
> investigation that is reasonable in such a situation and the
> ease or difficulty in finding such experts at that time, (b) . .
> . other experts . . . relating to how widely the proposed
> theory was accepted at the time . . . and the ease an attorney
> would have had in getting such experts, and (c) any other
> relevant testimony that would tend to demonstrate it was
> reasonably probable that reasonable diligence would uncover
> an expert similar to the one eventually located.

Horsely, 45 F.3d at 1495 n.18 (quoting Elledge, 823 F.2d at 1447 n.17).

performed at the time of Petitioner's trial in 1974.[22]  Finally, the Court notes

that despite lacking the assistance of an expert, Mr. Bishop conducted a

thorough cross-examination of the state's firearms expert, eliciting multiple

concessions including that the state firearms expert had not attempted to

determine whether the shell found at the scene had been reloaded; that he could

not determine whether the pellets recovered from the victim's body were

actually fired from the shotgun in the possession of Petitioner; and that the

marks left on the shell casing discovered at the scene could have been made by

any one of the thousands, or even millions, of 12 gauge shotguns in this

country.  (R. Ex. 6 at 256-66.)  In view of these evidentiary failings, as well as

the cross-examination counsel performed, Petitioner has failed to demonstrate

that he suffered any prejudice as a result of counsel's failure to seek out and

present testimony from an additional firearms expert at trial.

---

[22] Neither does Mr. Majeskey aver that the test results would have been favorable
to Petitioner had they been performed.  Of course, he could not possibly provide such
testimony because the evidence from Petitioner's trial had been destroyed by the time he
was retained.

110

d.      Failure to object to post-arrest silence

In Ground 8, Petitioner contends that counsel was ineffective for failing to object to the prosecution's repeated references to his post-arrest silence and request for counsel.  The state habeas court did not directly address this issue, at least in the ineffective assistance of counsel context.  However, as is discussed infra, the state habeas court did conclude both that the references to Petitioner's post-arrest silence were not improper under the law in effect at the time of Petitioner's trial, and that his trial counsel did not perform in a professionally unreasonable manner.  From this, the Court concludes that the state habeas court resolved this claim against Petitioner.  Accordingly, this Court may grant relief on this claim only if that conclusion is objectively unreasonable.

Today, there can be no doubt that "[i]neffective assistance of counsel may be established where a defense counsel fails to object to the prosecutor's 'very serious instances of prosecutorial misconduct' which include 'the initial introduction of [the defendant's] silence,' 'cross-examination of [the defendant] about his post-arrest silence,' and 'argument which invited the jury to consider constitutionally protected silence as evidence of [the defendant's] guilt.' " Fugate, 261 F.3d at 1223 (11th Cir. 2001) (quoting Gravley v. Mills, 87 F.3d

111

779, 785 (6th Cir. 1996)).  The question for the Court, however, is not whether

such conduct would constitute ineffective assistance of counsel today, but rather

whether it did so in Petitioner's case.  To resolve this issue, the Court must

address two separate questions: first, whether the failure to raise such objections

at the time of Petitioner's trial in 1974 was professionally unreasonable, and

second, whether that failure, to the extent it was professionally unreasonable,

was prejudicial to Petitioner.

Georgia law at the time of Petitioner's trial was clear that "[e]vidence as

to silence on the part of the defendant at the time of his arrest should be

excluded when objected to, for he is then entitled to remain silent, and the

prosecution may not use against him the fact that he stood mute or claimed his

privilege." Reid v. State, 200 S.E.2d 456, 461 (Ga. Ct. App. 1973); see also

Jacobs v. State, 224 S.E.2d 462, 464 (Ga. Ct. App. 1976) ("The law prohibits

improper comment upon the exercise of the right to silence or any other

invocation of the right against self-incrimination.  What is proscribed are

attempts by the state to infer or encourage the jury to infer guilt from that

exercise.  Thus, the state may not use against an accused the fact that he stood

mute or claimed his privilege.").  As is discussed below, while some evidence

112

of Petitioner's post-arrest silence was properly admissible for impeachment purposes, other evidence of silence was presented by the state for the purpose of establishing Petitioner's guilt.  This latter category of evidence was improper at the time of Petitioner's trial.  While the Court recognizes that defense counsel may not have wished to highlight Petitioner's silence by objecting and requesting a jury instruction, the Court believes that, in view of the significant discussion of Petitioner's decision to invoke his right to silence,  it would have been incumbent upon a reasonably competent attorney to raise an objection.

Nevertheless, even assuming that the state habeas court's decision that Petitioner's counsel did not perform in a professionally unreasonable manner is not entitled to deference, Petitioner cannot show that he suffered prejudice as a result of counsel's failure to object.  As is discussed in detail below, the introduction of evidence of Petitioner's post-arrest silence as substantive evidence of guilt amounted to harmless error.  Accordingly, Petitioner is not entitled to relief on this ground.[23]

---

[23] Petitioner asserts in his papers that had an objection been raised, the trial court would have been required to declare a mistrial.  (See Br. in Supp. of Pet. at 65.) Petitioner fails, however, to provide any support for that assertion.  Indeed, the law in Georgia at the time of Petitioner's trial appears to be otherwise.  In <u>Smith v. State</u>, 231 S.E.2d 83, 85 (Ga. Ct. App. 1976), the Georgia Court of Appeals rejected "an iron-clad

e.      Failure to object to jury instructions

In Ground 9, Petitioner contends that counsel was ineffective for failing to object to improper jury instructions which had the effect of shifting the burden of proof to Petitioner.  As discussed in Part E, infra, the jury instructions to which Petitioner claims counsel should have objected were permissible under the law as it existed at the time of Petitioner's trial.  As such, trial counsel's failure to object to these instructions was not professionally unreasonable.  Moreover, even if the failure to object were professionally unreasonable, in view of the defense raised by Petitioner, the giving of this instruction was harmless error and as such, Petitioner cannot show that he suffered any prejudice resulting from the failure to object.

---

rule that any reference (even unwitting or harmless) to an accused's silence at time of arrest requires the grant of a new trial." Rather, the Smith Court concluded that while the presentation of evidence of post-arrest silence was improper in that case, the erroneous evidence was of minimal effect and had no adverse impact on the defendant's right to fair and impartial trial where defense counsel raised a timely objection and the court promptly gave a curative instruction.  Id.  Thus, contrary to Petitioner's assertion, there is no indication that an objection by defense counsel to the improper evidence of Petitioner's silence would have necessarily resulted in a mistrial.  Indeed, Petitioner may have been entitled to nothing more than a curative instruction.

114

5.      Ineffective assistance of appellate counsel

Petitioner contends that his appellate counsel rendered ineffective assistance by neglecting to raise on appeal claims of error relating to (1) improper jury instructions, (2) the composition of the jury list and venire, and (3) the prosecution's improper closing argument, including his references to Petitioner's post-arrest silence and request for counsel.

In assessing the performance of counsel, the Court applies the same standard irrespective of whether the alleged ineffective assistance occurred at trial or on appeal.  Eagle v. Linahan, 279 F.3d 926, 938 (11th Cir. 2001) ("The same standard applies whether we are examining the performance of counsel at the trial or appellate level.").  With respect to Petitioner's contention that appellate counsel was ineffective for failing to challenge both the jury instructions and the composition of the master jury list, these claims are without merit for the same reasons set forth above.  Specifically, the grounds upon which these challenges were predicated had not yet been established, and as such, the failure to anticipate these changes in the law cannot be said to constitute ineffective assistance of counsel.

115

As to Petitioner's claim that appellate counsel was ineffective for failing to raise the prosecution's allegedly improper closing argument, including his references to Petitioner's post-arrest silence and request for counsel, the Court similarly concludes that Petitioner is not entitled to relief.  As set forth above, the law of Georgia at the time of Petitioner's trial was that evidence of post-arrest silence, <u>if objected to</u>, should be excluded.  Petitioner has pointed the Court to no Georgia case excusing the failure to raise a timely objection to improper evidence of silence, or concluding that reversal on appeal is warranted in the absence of such an objection.  Thus, there is no indication that the outcome of his appeal would have been different.  <u>Contrast</u> <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1439 (11th Cir. 1987) (finding failure to raise <u>Griffin</u> challenge on appeal prejudicial where "[i]n light of the then Florida rules of per se reversal, there was a near certainty that Matire's conviction would have been reversed.").

What is more, the Georgia Supreme Court expressly limited the retroactive application of <u>Doyle</u> to cases where the issue was raised in the trial court and the appeal was not completed as of the date of the <u>Doyle</u> decision. <u>Clark v. State</u>, 230 S.E.2d 277, 278 (Ga. 1976).  No objection to Petitioner's

116

silence was raised at trial, and his appeal had been concluded at the time <u>Doyle</u>
was announced.  Thus, the failure to raise the prosecutor's references to silence,
even for impeachment purposes, would not have resulted in a different outcome
on appeal.  Accordingly, Petitioner has failed to show how he was prejudiced
by counsel's failure to raise this issue on appeal, and as such, Petitioner is not
entitled to relief on this ground.

### C.    Prosecutorial Misconduct

#### 1.    References to Petitioner's invocation of Miranda rights

##### (a)    Alleged Doyle violations

Petitioner contends that the prosecution's repeated references to his
invocation of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct.
1602, 16 L. Ed. 2d 694 (1966), violated his due process rights under the
Fourteenth Amendment.  (<u>See</u> Br. in Supp. of Pet. at 75 ("It is hard to imagine a
violation of <u>Doyle</u> that could be more explicit than the prosecutor's repeated
comments on [Petitioner's] invocation of his rights."); <u>see also, e.g.</u>,  Pet. at 36-
41.)  In this regard, Petitioner takes issue with five instances in which the jury
heard testimony or argument related to the invocation of his <u>Miranda</u> rights.
Specifically, Petitioner challenges (1) the testimony of Detective Bishop during

the state's case in chief; (2) the prosecutor's cross-examination of Petitioner; (3) the rebuttal testimony of Detective Bishop; (4) the testimony of Assistant District Attorney Davis; and (5) the prosecutor's closing argument.  (See Br. in Supp. of Pet. at 72.)

First, Petitioner challenges the testimony of Detective Bishop, offered during the state's case in chief, relating to Petitioner's invocation of his rights under Miranda.  In concluding a relatively extensive direct examination discussing the specifics of the investigation, the following exchange occurred:[24]

> Q.    Thereafter, did you go to Ansen County or the city of Wadesboro, North Carolina?
>
> A.    Yes, sir, I did.
>
> Q.    All right, sir.  Did you see the defendant Ted Anthony Prevatt there?
>
> A.    Yes, sir, I did.
>
> Q.    All right, sir.  Did you have a warrant for his arrest?
>
> A.    Yes, sir, I did.

---

[24] The record contains numerous typographical and spelling errors.  The Court has endeavored to reproduce the transcript accurately, and for ease of reading, will not separately identify each such error.

AO 72A
(Rev.8/82)

> Q.    All right, sir.  Did you talk to him?
>
> A.    Yes, sir, we got there, and we asked for an interview with Mr. Prevatt, and he agreed, and when he came on up, I advised him of his rights under the Miranda decision.
>
> Q.    All right, that's all right.  Now, did you advise him of his rights?
>
> A.    Yes, sir, I did.
>
> Q.    All right.  Was there any further conversation at that time?
>
> A.    No, sir, he declined to give any statement.
>
> Q.    That's fine.  Mr. Bishop - that's fine, [tender the witness].

(R. Ex. 6 at 307-08.)

Second, after Petitioner testified on direct as to his alibi defense, the prosecutor engaged in the following questioning during his cross-examination of Petitioner:

> Q.    All right. Now when these officers from Gwinnett County came up there and said, Prevatt, we want to talk to you about the murder of James Addison Rouse, they told you that it was Mr. Rouses automobile, didn't they?

A.      Ah – at the time sir, when were brought into the investigating room, they presented us with their I.D., I thought it was for the theft of the automobile, they didn't right away tell us anything except that they wanted to kn[o]w where we got the car.  After I told them where we required the car, they put a – two warrants in front of me, which I overlooked lightly, thinking that they were car theft warrants, upon looking at them lightly it was brought to my attention more closely I seen murder warrants on one of them.

Q.      All right.  And the officers – the Gwinnett County Officers were still there when you saw the murder warrant didn't you?

A.      Ah – ; if I remember right, sir, there were two in the room, yes sir.  I did not saw the murder warrant.

Q.      All right.  You didn[']t say to them, like Hey Man, I may have gotten this cats automobile but I ain't got no part in killing him, you didn't say anything like that?

A.      Ah – no, sir, I didn't.

Q.      You didn't say anything like that, did you?

A.      Ah – no, sir.

Q.      You just didn't tell them nothing, did you.  No, wait a minute, you got me wrong, let me tell you wh[a]t happened, so you can verify it, I got

120

his car, but I didn't kill him, you didn't tell these officers that did you?

A.   – ah – no, sir, upo[]n being questioned, they asked me where I got the car before they even showed me a murder warrant at that time, I told them on Peachtree Street, then they showed me the murder warrant and I was looking at the murder warrant and I refused to answer any more questions without a lawyer.  I admit I was very harrassed and that was one of the reasons I didn't answer.

Q.   Prevatt. [D]o you remember telling this Officer Bishop when he came back and talked to you again he says, don't you want to tell us anything about it, do you recall telling Officer Bishop;

. . .

A.   – they told –p

Q.   –wait just a minute, don't you remember telling him you says words to the effect of, ain't no need me telling you anything, you got me pinned anyhow, do you remember something, words to that effect?

A.   . . . I don't even remember Officer Bishop. . . .
. . .

Q.   All right.  Do you recall the statement, ain't no need in me saying anything, you got me pinned anyhow?

A.     Ah – no, sir, ah – after I refused to answer questions without the attorney – ah – one detective, said, okay, and them two walked out and two more come in, the assistant d.a., was one and – ah – I thought – you know, I told them I refused to answer without a lawyer and they said all right and they went out and sent two more detectives in and I was questioned further, but I don't remember giving a statement like that, no, sir.

Q.     All right.  You didn't say you all got me pinned any how?

A.     Ah p– no, sir, I didn't talk to them hardly at all on account of the way I was being treated and – ah on the condition of the case, the charge that I was charged with.

Q.     I don't have anything further.

(R. Ex. 6 at 415-17.)

Third, immediately after Petitioner testified during cross-examination that he had not in fact made the incriminating statement that the investigating officers "had him pinned anyhow," the defense rested.  The state then called Detective Bishop in rebuttal, who testified as follows:

Q.     . . . Were you present on the night Prevatt was arrested in Ansen County, at the jail all during the interview, do recall a conversation you had

122

with him in regard to the question I just asked him?

A.    Yes, sir, I did.

Q.    Where was that at?

A.    That was at – ah – Tommy Allens office at the Wadesboro County Jail.

Q.    What was said to him and what wa[s] his reply?

A.    We advised Mr. Prevatt of his rights, some preliminary questions and we asked him about the automobile and – he mentioned that he had found it some where off Peachtree Street and from there, we talked, I can't recall the specific questions and we were not making any headway in the interview and so we showed Mr. Prevatt the warrants, and once he saw those warrants, he refused to say anything more without the advise of counsel, we agreed that was his right.  His right, we got up and we left, we went out – in the outer room, he said another detective or two came in, that may have been possible, but that was the end of the questioning.  Mr. Prevatt, I believe, was placed in his cell down stairs or somewhere, I don't know, he was brought back upstairs for photographing purposes, for our files, and it was at this time, again we offered Mr. Prevatt to give himself a statement if he preferred to ah – concerning any involvement in this case, proving the car or what have you, he refused to and he made that statement.

123

> Q.    What statement was that?
>
> A.    He said, there is no need for me to say
>        anything, you all got me pinned anyho[]w.
>
> . . .
>
> Q.    That's all.

(R. Ex.6 at 418.)

Fourth, following Detective Bishop's rebuttal testimony, the defense

called Petitioner for purposes of sur-rebuttal.  During this testimony, Petitioner

offered a lengthy narrative regarding his reasons for refusing to make any

statements to the investigating officers, and testified at length regarding the

conduct and content of the questioning by an assistant prosecutor, Mr. Davis.[25]

---

[25] Specifically, Petitioner testified as follows:

> Q.    Mr. Prevatt, tell the jury, anything you wish to.
>
> A.    Ah - yes, sir, I was brought from my cell and taken
>        upstairs at the Ansen County Jail, which, upon, I was
>        introduced to these two detectives and the sheriff of
>        Ansen County in a room.  The sheriff left, and I was
>        left alone with these detectives, at one time, they
>        were all in there, three - two or three of them and - ah
>        they showed me their I.D., and like I said, I thought
>        they were there for the car, and they dropped the
>        murder warrants in my lap and - ah - then the
>        seriousness of it, I refused to answer questions,
>        without counsel ah - because I hadn't been charged
>        with murder or anything, I wouldn't know what to

124

On re-cross, the prosecution inquired as to whether the only reason that Mr.

---

> say, or anything, and I felt that I needed guidance, and upon doing so I was then - time after time after time, asked questions, at one time, a detective that is not here I think he is the sargeant, Mr. Bishops partner he spoke up he looked at me and he pointed to an officer at the desk and he said, you heard of the good guy and the bad guy, he's the good guy, he can help you[], I am the bad guy I want to see you burn. And harassment like this sorta got my temper up, I refused to say anything there too, cause I could see these people had already been persuaded and in their minds, I had committed the crime and I knew there was nothing I could say that would help me anyway without counsel - ah - there were two detectives there at the time and I required to see counsel and they said yes, okay, they walked out and they came in and the assistant D.A. decided - sitting there by Mr. Huff, and with another detective, and the assistant D.A. sat down at the desk and he got to questioning me, I refused to answer his questions and he asked me did I know what the penalty was - what the penal institutions in Georgia was like and I said no, sir, and he said you will / be taking a shower with a bunch of blacks and they w[ill] sexually assault you, but he didn't use the word sexually assault he used a vulgar word.  And he said stuff like this and he said that - ah - why didn't I come across and admit everything and he would try to help me.  I refused to say anything then, but I was - time after time, I was harassed by these detectives, I have no reason to lie.

(R. Ex 7 at 421-23.)

Davis had questioned Petitioner was to determine whether Petitioner would

waive extradition to Georgia.  Petitioner responded as follows:

> A.   Ah - no sir, after all this argument and
>      harassment, he throwed a paper in []in front of
>      me and I asked him what it was and he said it
>      was an extradition paper, and he asked would I
>      sign it, and I said I would.

(Id. at 423.)  After Petitioner's sur-rebuttal testimony was concluded, the state

called Mr. Davis, who testified as follows:

> Q.   Mr. Davis, did you go - accompany the
>      detectives from Gwinnett County  at my
>      direction, to Wadesboro, North Carolina?
>
> A.   I did, sir.
>
> Q.   Did you have occasion to talk to the defendant
>      Prevatt in this case?
>
> A.   I did.
>
> Q.   What was it in regards to?
>
> A.   Waiver of extradition.
>
> Q.   I show you states exhibit thirty eight, did Ted
>      Anthony Prevatt sign the waiver assignment of
>      rights?
>
> A.   No, sir, I did not see him sign the waiver of
>      rights the waiver of rights was signed by Mr.

126

Prevatt, witnessed by Detective Blannott and Detective Bishop, while they were interrogating Mr. Prevatt.  After - after a short interval Detective Blannott and Detective Bishop came out and told Detective Sargeant Robert Morris and myself that Mr. Prevatt did not wish to make a statement that he had requested the presence of a lawyer before making a statement.  It is the policy of the police department, one of the reasons I went along on the trip to see that no constitutional right of the defendant was abridged and then, at that time, Detective Bishop and Detective Blannott ceased questioning him, and Mr. Morris and myself went in and I took the waiver of extradition form, which is the second page here of states exhibit thirty eight, and -

Q.    - all right, sir.  Did you - ah - did you fill out the form part of that, sir?

A.    Yes, sir, . . . and then proceeded to question Mr. Prevatt as to whether or not he would voluntarily waive extradition and sign this form and accompany us back to the state of Georgia.

Q.    Would he sign it?

A.    No, sir.

Q.    [Nothing further.]

(Id. at 425-26.)

Finally, during the state's closing argument, the district attorney returned to the subject of Petitioner's refusal to make a statement.  In this regard, the prosecutor argued:

> I'll tell you something else, don['t] you know that human logical says, and you know - they are already talkin[g] about that testimony that they are thieve but don't you know that a thief and self admitted that go[t] a hold of that car and when the officers said I guess you know that the owner of that car was killed, about the time you got it, and you were in possession of it - he wouldn't have been talking about I want to see a lawyer, he would have been saying, Mr. Officer I don't give a - what about that car, and if I have to make forty years for that car I didn't murder that man, don't you know that he would have said for Gods sake, officer, this is how it happened, and tell us - you know - tell nothing.  Say nothing.  They got that right, but I'm just asking you would a man who had innocently got a car and drove it to North Carolina don't you know, he would have been hollaring, man, I'll take the rap for stealing his car bit I I ain't gonna [t]ake no murder rap, don't you kn[o]w, when I went up there and I said, I am the district attorney, isnt there anythi[ng] that I can do to investigation on your behalf because you are confined and you are going to come to trial - not anything, Mr. Huff.  Tell you nothing.  You heard the testimony, don't tell them anything not at the time not later.
>
> I told him and he knows it, is there anything that you want to tell me that I can help you with, help investigat[e] direct the men to go and search for you.

128

> Tell you nothing, Mr. Huff.  That's okay.  That's fine.
> Doesn't hold water.

(R. Ex. 7 at 456-57.)

Before the state habeas court, Petitioner challenged each of the identified instances where testimony or argument was offered regarding the invocation of his rights under <u>Miranda</u>, contending that this evidence and argument violated his right to remain silent, right to counsel, and right to a fair trial guaranteed by the Fifth, Sixth, and Fourteenth Amendments.  The state habeas court denied relief on this claim, stating:

> At the trial, both [Petitioner] and Jordan testified, giving testimony about the source of the automobile and their alibi, and then were questioned on cross-examination by the district attorney about some of those details.  It developed that the defendant terminated the in-custody interrogation once it turned to knowledge of the Rouse homicide.  The district attorney's cross-examination of [Petitioner] at trial was viable and permissible questioning undertaking to impeach, and his comment in argument was also permissible and proper at the time, though it might not be now.

(R. Ex. 13 at 18.)

Petitioner, relying on <u>Doyle</u>, argues that the state habeas court's conclusion is contrary to clearly established federal law.  (<u>See</u> Br. in Supp. of

129

Pet. at 73 (explaining that "the state court's ruling is clearly contrary to the jurisprudence of the Supreme Court.  See Doyle[ v. Ohio, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)].").)[26]  But, Petitioner's argument on this point is problematic for two reasons.  The first problem with Petitioner's argument is that his conviction became final in February of 1975, more than one year before Doyle was decided.  Thus, Petitioner's argument fails to adequately address the substantial question of whether Doyle applies retroactively to this collateral proceeding.  The second problem with Petitioner's argument is that he argues only Doyle.  As is discussed below, Doyle addressed only whether the use of post-Miranda silence for impeachment purposes violates the guarantee of

_____

[26] The challenge Petitioner raises to the state court's conclusion is, in reality, two-fold.  Petitioner contends that the state habeas court's decision is unclear in that one cannot ascertain whether the state court meant that the prosecutor was attempting to impeach Petitioner's credibility generally, which Petitioner argues would violate Doyle, or whether the questioning was permissible because the prosecutor was attempting to impeach with a prior inconsistent statement, a finding that Petitioner contends is completely unsupported by the record.  It is the view of this Court that the state habeas court's order, fairly read and illuminated by consideration of all the testimony presented at trial, focuses on the former.  That is to say, the Court understands the state habeas court's decision to have rested on the conclusion that the state's cross-examination of Petitioner on the subject of his decision to remain silent did not violate Petitioner's constitutional rights because it was offered to impeach Petitioner's credibility insofar as his silence was inconsistent with his alibi defense at trial.  Accordingly, the Court will address whether, as Petitioner contends, that conclusion was contrary to clearly established federal law.

130

fundamental fairness embodied in the Fourteenth Amendment.  Thus, Petitioner

does not substantively address whether the comments about which he complains

would be otherwise improper in the absence of that decision.[27]  These apparent

deficiencies in Petitioner's argument notwithstanding, the Court will address

the following three questions: first, it will address the threshold question of

whether Petitioner is entitled to the benefit of Doyle in this federal habeas

action; second, it will consider whether, in light of the Court's determination of

the retroactivity question, the state habeas court's conclusion was objectively

unreasonable; and third, if the Court should determine that the state habeas

court's conclusion was objectively unreasonable, and thus, not entitled to

deference under § 2254(d), whether any error was harmless under the Brecht

standard.

> (i)    Doyle established a "new rule" which does not
>        apply retroactively to cases on collateral review

---

[27] Were Petitioner's claim limited to the Fourteenth Amendment Doyle issue itself, there would be no need for the Court to further consider whether the statements regarding his silence may otherwise violate the Constitution.  But, Petitioner's claim is not so limited.  To the contrary, Petitioner challenges these statements as violating his rights under the Fifth, Sixth, and Fourteenth Amendments in his Petition, and as such, the Court will consider whether his rights under these Amendments were violated.

The state does not specifically argue that Teague bars Petitioner's Doyle claims. But, whether a rule applies retroactively is a threshold question, which the Court has discretion to raise sua sponte. Thomas v. Crosby, 371 F.3d 782, 796 (11th Cir. 2004); Housel v. Head, 238 F.3d 1289, 1297 (11th Cir. 2001); see also Caspari v. Bohlen, 510 U.S. 383, 389, 114 S. Ct. 948, 127 L. Ed. 2d 236 (1994) ("[A] federal court may, but need not, decline to apply Teague if the State does not argue it."). In this case, the Court is of the view that the interests of finality and comity warrant its application.

As explained above, "[u]nder Teague a new rule of criminal procedure generally may not be applied in a federal habeas proceeding where the judgment in question became final before the rule was announced." Schwab, 451 F.3d at 1323. "A rule is considered new for Teague purposes unless it is dictated by precedent—mostly Supreme Court precedent, although federal court of appeals decisions are entitled to some respect in the inquiry—at the time the judgment became final." Id. (internal citations omitted). A rule is dictated by prior precedent when a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to

conclude that the rule he seeks was required by the Constitution.  See Caspari,

510 U.S. at 390 (quoting Saffle, 494 U.S. at 488).

Petitioner only implicitly acknowledges the substantial retroactivity

problem Teague presents, arguing that "[a]lthough Doyle was decided just after

[Petitioner's] trial, Doyle was expressly dictated by Miranda and therefore

applies to [Petitioner's] case."  (Id. at 77.)  Petitioner, however, provides no

argument on this issue, other than to parenthetically cite some language from

the Doyle opinion itself and the former Fifth Circuit case of Chapman v. United

States, 547 F.2d 1240, 1244 (5th Cir. 1977)).[28]  Having reviewed the relevant

authorities, and having considered the constitutional pedigrees of the Miranda

---

[28] Indeed, Petitioner offers no argument on this point short of emphasizing the Doyle Court's statement that the "decision in Miranda compels rejection of the State's position" that impeachment by post-arrest silence was allowable given the importance of cross-examination generally, and the Court's decision in Harris.  Id. at 617.  In the Court's view, that emphasis is misplaced.  Today, whether one decision "compelled" another has become somewhat of a term of art in the retroactivity jurisprudence.  That, however, was not the case in 1976 when the Supreme Court chose its words in Doyle, and as such, the use of that term is not particularly instructive.  Moreover, and as discussed below, the position that Doyle was in fact compelled by Miranda—in the sense that a state court considering Petitioner's claim in 1974 would have felt compelled by the result and reasoning of Miranda to conclude that the rule announced in Doyle was required by the Constitution—does not withstand an examination of the constitutional bases for those decisions.

and <u>Doyle</u> decisions, the Court disagrees that <u>Miranda</u> expressly dictated the result in <u>Doyle</u>.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  In <u>Griffin v. California</u>, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965), the Supreme Court struck down a California constitutional provision which permitted a jury to draw an adverse inference with respect to facts which were within a defendant's knowledge, but about which the defendant had declined to testify, holding that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  <u>Id.</u> at 614-15.  In <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court again considered the scope of the Fifth Amendment privilege against self-incrimination, and held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation from the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  <u>Id.</u> at 444.  Citing <u>Griffin</u>, the <u>Miranda</u> Court stated in a footnote to that opinion:

134

> In accord with our decision today, it is impermissible
> to penalize an individual for exercising his Fifth
> Amendment privilege when he is under police
> custodial interrogation.  The prosecution may not,
> therefore, use at trial the fact that he stood mute or
> claimed his privilege in the face of accusation.

Id. at 468 n.37.  While clearly dicta, this passage makes clear the Supreme

Court's understanding that the Fifth Amendment right protected in Griffin

would be similarly transgressed if the prosecution were to place the invocation

of one's rights under that Amendment in evidence for the purpose of

establishing the guilt of the accused.

But, the Fifth Amendment right not to testify at trial belongs to the

defendant.  Where a defendant elects to testify in his own defense at trial, he

waives his Fifth Amendment privilege and may be cross-examined and his

credibility impeached like any other witness on matters made relevant by his

direct testimony.  Brown v. United States, 356 U.S. 148, 154-56, 78 S. Ct. 622,

2 L. Ed. 2d 589 (1958).  In such cases, although a valid constitutional objection

to the admissibility of evidence as part of the prosecution's case in chief would

be sustained, the same objection may not bar the use of that evidence to

impeach a defendant's trial testimony.  See, e.g., Harris v. New York, 401 U.S.

135

222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971) (holding that statement taken in violation of <u>Miranda</u> may be used to impeach defendant's credibility); <u>Walder v. United States</u>, 347 U.S. 62, 65-66, 74 S. Ct. 354, 98 L. Ed. 503 (1954) (holding that defendant's assertion on direct examination in prosecution for unlawful sales of narcotics that he had never possessed any narcotics opened door, solely for purpose of attacking his credibility, to evidence that heroin had been unlawfully seized from him in connection with earlier prosecution). Indeed, the law is clear that where a defendant elects to testify at trial, nothing in the Fifth Amendment prohibits the use of his prior silence for impeachment purposes.  <u>See, e.g.</u>, <u>Raffel v. United States</u>, 271 U.S. 494, 46 S. Ct. 566, 70 L. Ed. 1054 (1926) (holding that defendant who invoked right to remain silent at first trial, but who elected to testify at second trial, could be impeached on cross-examination by silence in first proceeding); <u>Jenkins v. Anderson</u>, 447 U.S. 231, 238, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980) (holding that impeachment by pre-arrest silence does not violate the Fifth Amendment, explaining: "Once a defendant decides to testify, the interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and

limits of the privilege against self-incrimination." (internal citations and quotation omitted)); <u>Tucker v. Francis</u>, 723 F.2d 1504, 1514 (11th Cir. 1984) (holding that defendant who declined to testify during guilt phase of capital trial, but who testified during sentencing phase, may be impeached under Fifth Amendment with guilt-phase silence).  Thus, while the Fifth Amendment guarantees an accused the right to remain silent during his criminal trial and prevents the prosecution from commenting on the silence of a defendant who asserts the right, it does not prevent comment on such silence for impeachment purposes if the defendant elects to take the stand and that silence has been made relevant by evidence or argument previously presented.

In <u>Doyle</u>, the Supreme Court addressed a related, but constitutionally distinct, question: whether a criminal defendant who elected to testify at trial could be impeached by his post-<u>Miranda</u> silence.  The Supreme Court concluded that he could not. But, the basis for its decision was not that impeachment by silence would violate the Fifth Amendment.[29]  Rather, the

---

[29] In <u>Doyle</u>, the petitioners argued that impeachment by post-<u>Miranda</u> silence also violated their rights under the Fifth Amendment.  The <u>Doyle</u> majority did not, however, address the Fifth Amendment claim, but rather based its ruling solely on the Due Process Clause of the Fourteenth Amendment.

Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." Doyle, 426 U.S. at 619. The rationale for this decision is straightforward: because the Miranda warnings contain an implicit assurance that exercising one's rights "will carry no penalty," "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618. That Doyle was a Fourteenth Amendment case, and that the rule it announced "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial,' " has been reiterated by the Supreme Court many times over. Wainwright v. Greenfield, 474 U.S. 284, 291, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986) (quoting South Dakota v. Neville, 459 U.S. 553, 565, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983)); see also Greenfield, 474 U.S. 284, 289-90 (discussing thoroughly rationale of Doyle and holding that for same reason use of post-Miranda silence to prove sanity violates Fourteenth Amendment); Neville, 459 U.S. at 565 (explaining Fourteenth Amendment rationale of Doyle); Jenkins,

447 U.S. at 238-40 (holding that use of pre-arrest silence for impeachment purposes does not violate Fourteenth Amendment because silence was not induced by assurances implicit in <u>Miranda</u> warnings).

As the foregoing makes clear, <u>Griffin</u> and <u>Miranda</u> find constitutional footing in the Fifth Amendment.  In contrast to those cases, however, the Supreme Court's decision in <u>Doyle</u> rested not in the Fifth Amendment privilege against self-incrimination, but rather in the guarantee of fundamental fairness embodied in the Fourteenth Amendment Due Process Clause.  Because <u>Miranda</u> and <u>Doyle</u> derive from entirely different constitutional bases, <u>Doyle</u> cannot be, as Petitioner contends, a necessary extension of the reasoning of <u>Griffin</u> or an application of the Court's dictum in the footnote in <u>Miranda</u>.  (<u>See</u> Br. in Supp. at 67 (arguing that <u>Doyle</u> Court "reiterated" rule established in <u>Miranda</u> which forbids comment on defendant's invocation of rights).)  In view of this fundamental distinction, as well as the Supreme Court's explicit statements that the Fifth Amendment is not violated when a criminal defendant is impeached by silence, the Court cannot agree that <u>Miranda</u> expressly dictated the result in <u>Doyle</u>.  Accordingly, the Court concludes that <u>Doyle</u> constitutes a new rule within the meaning of <u>Teague</u>.

(ii)    Neither Teague exception applies

Petitioner does not argue that either of the Teague exceptions apply. Instead, Petitioner has chosen to rely entirely on his argument that Doyle did not create a new rule because it was expressly dictated by Miranda—a position this Court has rejected, supra.  Nevertheless, the Court, having considered the question, concludes that the rule announced in Doyle does not fall within either exception, and thus, does not apply retroactively to this collateral proceeding.

Certainly, a rule prohibiting impeachment by post-Miranda silence does not fall within the first exception, as it neither forbids punishment of certain primary conduct nor proscribes a category of punishment based upon the defendant's status or offense.  Therefore, if Petitioner is to be entitled to the benefit of Doyle, it must be because the rule announced there falls within the second Teague exception.  Under this exception, "federal courts may retroactively apply new rules of law on collateral review in cases involving 'watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.' "  Nutter v. White, 39 F.3d 1154, 1157 (11th Cir. 1994).  While the Supreme Court authorities perhaps do not provide a clear analytical framework for determining whether a given rule constitutes a

140

bedrock procedural element essential to the fairness of a criminal proceeding, it is clear that this exception is exceedingly narrow, applying "only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." <u>Graham</u>, 506 U.S. at 478 (internal quotations omitted) (ellipsis in original).  To fit within the second exception, it is not enough that a new rule "is aimed at improving the accuracy of trial," <u>Sawyer v. Smith</u>, 497 U.S. 227, 242, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990), or that the new rule promotes "[t]he objectives of fairness and accuracy," <u>Saffle</u>, 494 U.S. at 495.  Rather, the new rule must also be a "watershed rule" that "alter[s] our understanding of the bedrock procedural elements essential to the fairness of a proceeding." <u>Sawyer</u>, 497 U.S. at 241-42; <u>see also</u> <u>Nutter</u>, 39 F.3d at 1157 ("To fall within the exception, the new rule must satisfy a two-pronged test: (1) it must relate to the accuracy of the conviction; and (2) it must alter our understanding of the bedrock procedural elements essential to the fundamental fairness of a proceeding." (internal quotations omitted)).  In other words, it must be a "groundbreaking occurrence," <u>Caspari</u>, 510 U.S. at 396, "a 'sweeping' change that applies to a large swathe of cases rather than a 'narrow right' that

applies only to a 'limited class' of cases."  <u>United States v. Mandanici</u>, 205 F.3d 519, 528 (2d Cir. 2000) (quoting <u>O'Dell</u>, 521 U.S. at 167).

<u>Doyle</u> satisfies the accuracy prong of the analysis.  As <u>Doyle</u> and <u>Hale</u> make clear, a defendant's silence following the invocation of his rights under <u>Miranda</u> is "insolubly ambiguous."  <u>Doyle</u>, 426 U.S. at 617-18; <u>see also</u> <u>United States v. Hale</u>, 422 U.S. 171, 176-79, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975) (explaining that post-<u>Miranda</u> silence is so ambiguous as to be of little probative force, and any value it may have is far outweighed by its prejudicial effect).  Thus, <u>Doyle</u> serves not only to protect a defendant's right to remain silent following arrest, as guaranteed by <u>Miranda</u>, but also to enhance the truth-finding process by eliminating the possibility that a jury would disbelieve a defendant's exculpatory story simply because he did not provide the same story to investigators at the time of his arrest, and instead elected to remain silent. <u>See, e.g.</u>, <u>Phelps v. Duckworth</u>, 757 F.2d 811, 819, <u>rev'd on other grounds</u>, 772 F.2d 1410 (7th Cir. 1985); <u>Hawkins v. LeFevre</u>, 758 F.2d 866, 877 n.14 (2d Cir. 1985) ("The rule of <u>Doyle</u> is intended to protect the fairness and reliability of the fact-finding process by excluding inferences that are without probative value and ensuring that a fundamental constitutional right is not burdened.").

Thus, having concluded that <u>Doyle</u> promotes accuracy in criminal proceedings, the Court turns now to consider whether <u>Doyle</u> satisfies the "watershed rule" prong of the second <u>Teague</u> exception analysis.

As explained above, it is not enough that a rule relate to the accuracy of proceedings to be given retroactive effect under the second <u>Teague</u> exception. Rather, it must also constitute a truly "watershed rule" that "alter[s] our understanding of the bedrock procedural elements essential to the fundamental fairness of a proceeding."  <u>Nutter</u>, 39 F.3d at 1157; <u>see also</u> <u>Graham</u>, 506 U.S. at 478 (explaining that the exception is limited to "a small core of rules," which not only seriously enhance accuracy but also "requir[e] 'observance of those procedures that . . . are implicit in the concept of ordered liberty' ") (quoting <u>Teague</u>, 489 U.S. at 311 (internal quotation marks omitted)).  Without question, the rule as announced in <u>Doyle</u> has its roots in notions of fundamental fairness. <u>See Doyle</u>, 426 U.S. at 618 (explaining that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.").  But, the fact that a rule derives from guarantees of due process, or even overarching protections against fundamental unfairness in criminal trials, is insufficient, in

143

and of itself, to bring that rule within the second <u>Teague</u> exception.  <u>See</u> <u>Tyler</u> <u>v. Cain</u>, 533 U.S. 656, 667 n.7, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001) (noting that it cannot be said that "all new rules relating to due process (or even the 'fundamental requirements of due process') alter such understanding"); <u>id.</u> (noting that Court in <u>Sawyer</u> held that rule in <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), did not fit within second <u>Teague</u> exception even though it "added to an existing guarantee of due process protection against fundamental unfairness"; and that Court in <u>O'Dell</u> held that "the rule in <u>Simmons v. South Carolina</u>, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), which has been described as serving 'one of the hallmarks of due process,' did not fit within the second <u>Teague</u> exception" (citation omitted)).  Indeed, aside from establishing <u>Gideon v. Wainwright</u> as the archetype of a watershed rule, the Supreme Court has yet to identify a single rule which satisfies this requirement.  <u>See</u> <u>Beard v. Banks</u>, 542 U.S. 406, 416-17, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004).[30]

---

[30] As the Second Circuit thoroughly explained in <u>Mandanici</u>, the Supreme Court has underscored the narrowness of this exception in two ways.   First, the Court has "identified the 'sweeping rule' of <u>Gideon v. Wainwright</u>, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), as an example of the type of rule that fits within the exception." <u>Mandanici</u>, 205 F.3d at 258-29 (citing, <u>inter alia</u>, <u>O'Dell</u>, 521 U.S. at 167; <u>Saffle</u>, 494

While the Court in no way seeks to minimize the important protections

Doyle affords, it is the view of this Court that the rule announced there, when

compared to the rule of Gideon, is not sufficiently "sweeping" or

"groundbreaking" so as to fall within the second Teague exception.  Gideon

reversed the Supreme Court's decision in Betts v. Brady, 316 U.S. 455, 62 S.

Ct. 1252, 86 L. Ed. 1595 (1942), holding that the Sixth Amendment applied to

the states through the Fourteenth Amendment.  In so doing, the Supreme Court

established that the Sixth Amendment requires that indigent defendants in state

criminal proceedings be provided with counsel.  Gideon, 372 U.S. at 343-45.

Thus, the Supreme Court established in its own right a sweeping new rule

which fundamentally altered the conduct of state criminal proceedings and our

understanding of the right to counsel enshrined in the Constitution.  The right to

counsel is one of the most basic protections afforded to criminal defendants,

and there can be little doubt that a rule mandating that all persons accused of

serious crimes, regardless of their means, have the assistance of counsel in their

_____

U.S. at 495 (stating that a rule must have "the primacy and centrality of the rule adopted
in Gideon or other rules which may be thought to be within the exception" to qualify
under the second Teague exception)).  Second, the Court has "further underscored the
narrowness of the second Teague exception by its example," considering and refusing to
apply at least twelve new rules retroactively.  Id. at 529 (collecting cases).

AO 72A
(Rev.8/82)

defense constitutes a "new procedure[] without which the likelihood of an accurate conviction is seriously diminished." Teague, 189 U.S. at 313.  In contrast, Doyle announced a rule of great import, yet of somewhat limited scope.  While Doyle prohibits the impeachment of criminal defendants by post-Miranda silence, it has no effect on impeachment by silence generally.  Indeed, it imposes no limit on the impeachment of criminal defendants by silence outside of situations where that silence may have been induced by the implicit guarantees of Miranda.   See Fletcher v. Weir, 455 U.S. 603, 607, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) (per curiam) (concerning post-arrest, pre-Miranda silence); Jenkins, 447 U.S. at 240-41 (Stevens, J., concurring) (concerning pre-arrest silence).

Moreover, as explained above, the second Teague exception is available only if the new rule " 'alter[s] our understanding of the bedrock procedural elements" ' essential to the fairness of a proceeding." Sawyer, 497 U.S. at 242 (quoting Teague, 489 U.S. at 311) (emphasis added).  The denial of counsel at issue in Gideon fits this bill.  As the Supreme Court has repeatedly stated, the denial of counsel constitutes a structural error which necessarily renders the entire proceeding fundamentally unfair.  In Needer v. United States, 527 U.S. 1,

146

119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), the Supreme Court explained that

such structural errors

> "infect the entire trial process," <u>Brecht v.
> Abrahamson</u>, 507 U.S. 619, 630, 113 S. Ct. 1710, 123
> L. Ed. 2d 353 (1993), and "necessarily render a trial
> fundamentally unfair," <u>Rose[ v. Clark</u>, 478 U.S. 570,
> 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)].  Put
> another way, these errors deprive defendants of "basic
> protections" without which "a criminal trial cannot
> reliably serve its function as a vehicle for
> determination of guilt or innocence . . . and no
> criminal punishment may be regarded as
> fundamentally fair."  <u>Id.</u>, at 577-578.

<u>Needer</u>, 527 U.S. at 8-9.

A violation of the rule announced in <u>Doyle</u> simply does not rise to this

level.  Unlike the structural defect inherent in the denial of counsel, <u>Doyle</u> error

is an error in the trial process itself.  <u>Brecht</u>, 507 U.S. at 629.  "Trial error

'occur[s] during the presentation of the case to the jury,' and is amenable to

harmless-error analysis because it 'may . . . be quantitatively assessed in the

context of other evidence presented in order to determine [the effect it had on

the trial].' " <u>Id.</u> (quoting <u>Arizona v. Fulminante</u>, 499 U.S. 279, 307-08, 111 S.

Ct. 1246, 113 L. Ed. 2d 302 (1991)) (alteration in original).  Such errors "do[]

not necessarily render a criminal trial fundamentally unfair or an unreliable

vehicle for determining guilt or innocence." Needer, 527 U.S. at 9. Thus, the rule announced in Doyle does not alter our understanding of the bedrock procedural elements essential to the fairness of the entire proceeding, but rather affects only our understanding of the fairness of presenting certain evidence—leaving the determination of whether that evidence affected the fairness of the proceeding as a whole to another day. In view of that fact, the Court cannot conclude that Doyle constitutes a bedrock procedural element necessary to the fairness of the proceeding.[31]  As such, it does not fall within the second exception and thus, does not apply retroactively to convictions which became final before the decision was announced.

In reaching this conclusion, the Court is cognizant of the fact that virtually all courts that have considered the issue of Doyle's retroactivity have

---

[31] The fact that an error is "structural" may not, in and of itself, require that the rule forming the basis for that error falls within the second Teague exception, see Tyler, 533 U.S. at 667 n.7 ("Classifying an error as structural does not necessarily alter our understanding of these bedrock procedural elements."), and at least one court has reasoned that non-structural defects which are subject to harmless error review can never fall within the second Teague exception. See Brown v. Uphoff, 381 F.3d 1219, 1227 (10th Cir. 2004) (reasoning that rules subject to harmless error review cannot be said to alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding). But see Bockting v. Bayer, 399 F.3d 1010, 1020 (9th Cir. 2005) (rejecting this proposition), cert. granted sub nom Whorton v. Bockting, __ U.S. __, 126 S. Ct. 2017, 164 L. Ed. 2d 778 (May 15, 2006). While the Court need not decide whether this reasoning would apply in every case, it believes that it does here.

either found it to apply retroactively or assumed that it did so.  <u>See, e.g.</u>, <u>Phelps</u>,

757 F.2d at 819 (applying <u>Doyle</u> retroactively under <u>Linkletter</u> approach);

<u>Morgan v. Hall</u>, 569 F.2d 1161, 1166 (1st Cir. 1978) (applying <u>Doyle</u>

retroactively without discussion); <u>Reid v. Riddle</u>, 550 F.2d 1003, 1004 (4th Cir.

1977) (same); <u>Chapman v. United States</u>, 547 F.2d 1240, 1246-47 (5th Cir.

1977) (thoroughly considering whether <u>Doyle</u> applies retroactively to cases on

collateral review under <u>Linkletter</u> approach but declining to reach the issue

because any <u>Doyle</u> error was harmless); <u>see also</u> <u>Matire</u>, 811 F.2d at 1436

(apparently applying <u>Doyle</u> retroactively in context of <u>Wainwright v.

Greenfield</u> but providing no discussion of retroactivity).  But, for the following

reasons, the Court finds these cases are not significantly instructive in assessing

Petitioner's claim.  First, these courts analyzed (if at all) the retroactivity

problem under the now abandoned <u>Linkletter</u> approach.  Under that approach,

rules affecting the accuracy of the criminal proceeding were almost always

given retroactive effect.  <u>See, e.g.</u>, <u>Phelps</u>, 757 F.2d at 819 (explaining that

courts applying <u>Linkletter</u> approach consistently held cases retroactive which go

to the heart of the truth-finding function and which are intended to enhance the

accuracy of criminal trials).  After the Supreme Court's decision in <u>Teague</u>,

149

however, that a rule affects the accuracy of the proceedings is no longer

sufficient, in and of itself, to warrant the retroactive application of a new rule of

criminal procedure.  See Sawyer, 497 U.S. at 242 (explaining that to fit within

the second Teague exception, it is not enough that a new rule "is aimed at

improving the accuracy of trial").  Second, the Supreme Court in Teague drew a

bright line at the date the conviction became final, and in so doing,

fundamentally altered the retroactivity analysis.  Thus, those cases which apply

Doyle retroactively in the context of convictions not yet final when that

decision was announced offer little guidance to this Court in assessing whether

that decision should be applied retroactively under Teague.  See, e.g., Phelps,

757 F.2d at 820 (refusing to decide whether Doyle should be applied to cases

which had become final prior to the date of that decision where petitioner's

conviction was pending on direct review at the time Doyle was announced);

Hawkins, 758 F.2d at 877 n.14 (2d Cir. 1985) (same).  Finally, insofar as the

courts applying Doyle retroactively to cases on collateral review when Doyle

was announced reasoned that the Supreme Court had, to that point, generally

refused to distinguish between final and non-final convictions, the Court

questions whether the rationale of these cases survives Teague.  Compare, e.g.,

150

Teague, 489 U.S. at 310 (stating that new constitutional rules of criminal

procedure will not be applicable to those cases which have become final before

new rules are announced, unless they fall within exception to general rule), with

Chapman, 547 F.2d at 1246 (reasoning that Doyle should apply retroactively to

cases on collateral review, and explaining that Supreme Court "has declined to

adopt for purposes of determining the retroactivity of new rules of criminal

procedure the distinction between cases on direct review and those arising on

collateral attack.").  Thus, while the Court acknowledges the significant weight

of authority applying Doyle retroactively, the Court declines to follow those

authorities in light of the Supreme Court's intervening decision in Teague.  As

such, the Court concludes that Doyle announced a new rule which does not

apply retroactively to cases on collateral review.

> (b)    The state habeas court's decision

Having concluded that Petitioner is not entitled to the benefit of Doyle,

the Court turns now to the question of whether the state habeas court's

conclusion was nevertheless contrary to clearly established federal law.  As set

forth above, the state habeas court rejected Petitioner's claim, concluding that in

response to Petitioner's direct testimony regarding his alibi defense, "[t]he

district attorney's cross-examination of [Petitioner] at trial was viable and permissible questioning undertaking to impeach, and his comment in argument was also permissible and proper at the time, though it might not be now."  (R. Ex. 13 at 18.)  For the reasons that follow, the Court concludes that this decision is not entitled to deference.

As it relates to the cross-examination of Petitioner, the Court cannot say that the state habeas court's decision was objectively unreasonable.  Insofar as the prosecutor questioned Petitioner regarding his post-Miranda statement that the investigating officers "had [him] pinned anyhow," such cross-examination is allowable.  See Anderson v. Charles, 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980) ("Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements", because "[s]uch questioning makes no unfair use of silence" and "a defendant who voluntarily speaks after receiving Miranda warnings had not been induced to remain silent"). Moreover, insofar as the prosecutor cross-examined Petitioner regarding his failure to tell the interrogating officers, as he testified at trial, that he had no part in killing Mr. Rouse, though perhaps inappropriate after Doyle, such questioning was constitutionally permissible at the time of Petitioner's trial in

152

1974.  As <u>Doyle</u> does not apply retroactively to Petitioner's case, the Court

cannot conclude that the state habeas court's decision as it relates to this cross-

examination is objectively unreasonable.

As it relates to the remainder of Petitioner's challenges, however, the

Court cannot reach the same conclusion.  First, Petitioner challenges the

testimony of Detective Bishop offered during the state's case in chief.  The state

habeas court decision does not appear to have addressed this challenge, but

rather, appears limited to the questioning of Petitioner during cross-

examination.  But, even assuming that the state court considered and rejected

this claim on the merits, the Court concludes that the state court's conclusion is

not entitled to deference.

As discussed above, it was permissible at the time of Petitioner's trial to

use post-<u>Miranda</u> silence for impeachment purposes.  Moreover, while this

practice was held unconstitutional under the Fourteenth Amendment in <u>Doyle</u>,

Petitioner is not entitled to the benefit of that decision.  But, that does not mean

that this evidence was permissible, or that its introduction was not error.  To the

contrary, the law was equally clear at the time of Petitioner's 1974 trial that it

AO 72A
(Rev.8/82)

was impermissible under the Fifth Amendment of the Constitution for a

prosecutor in a state criminal proceeding to comment on a defendant's

refusal to testify at trial.  The Supreme Court in <u>Miranda</u> explained in dicta that

it would be equally impermissible for a prosecutor to comment on a defendant's

invocation of his rights.  While no Supreme Court case had explicitly so held, it

would be unreasonable for a state court to decline to extend the rule in <u>Griffin</u>

to cover prosecutorial comment on a defendant's election to remain silent after

arrest given the holding of <u>Griffin</u> and the clear and unambiguous direction

from the Court in <u>Miranda</u>.  Thus, at the time of Petitioner's trial, comment on

post-arrest silence for non-impeachment purposes was improper under the Fifth

Amendment, <u>see</u> <u>Griffin</u>, 380 U.S. at 614-15; <u>Miranda</u>, 384 U.S. at 468 n.37;

<u>Doyle</u>, 426 U.S. at 617 (noting that even "the State does not suggest petitioners'

silence could be used as evidence of guilt," but rather contended only that it was

necessary for cross-examination and impeachment of "petitioners' exculpatory

story"); <u>Douglas v. Cupp</u>, 578 F.2d 266, 267 (9th Cir. 1978) (holding that "the

fact of silence in the face of arrest" could not be used as substantive evidence of

guilt, because that would "act [ ] as an impermissible penalty on the exercise of

the . . . right to remain silent."); <u>Chapman</u>, 547 F.2d at 1244 (explaining that

AO 72A
(Rev.8/82)

regardless of whether evidence of silence was admissible for impeachment

purposes, trial court erred in allowing silence to be used as substantive evidence

of guilt); United States v. Fairchild, 505 F.2d 1378, 1383 (5th Cir. 1975)

("Miranda establishes that the prosecution may not use as a part of its case in

chief a criminal defendant's silence following his arrest and warning."); cf.

Baker v. United States, 357 F.2d 11, 13-14 (5th Cir. 1966) (explaining, after

finding other error mandated reversal and in case where defendant apparently

did not testify, that deliberate presentation of testimony by federal agent that

defendant had requested counsel and refused to make statement would similarly

constitute reversible error, but not applying harmless error review), and a state

court's decision which declines to recognize this fact would be objectively

unreasonable.

To summarize, the Fifth Amendment prohibits a prosecutor from

commenting directly or indirectly on a defendant's refusal to testify or

otherwise make a custodial statement.  Where the defendant elects not to testify

at trial, and does not through cross-examination or argument render his silence

relevant, the Fifth Amendment's prohibition is absolute.  However, where a

defendant elects to testify at trial, he casts aside his Fifth Amendment cloak of

immunity and may be cross-examined as any other witness, including on the subject of his silence, to the extent—and only to the extent—that silence is made relevant by his testimony.

"In this circuit, the definition of such an impermissible comment turns on whether the remark is 'manifestly intended' by the prosecutor or 'would naturally and necessarily be understood by the jury' as a comment on the defendant's silence." <u>Matire</u>, 811 F.2d at 1435 (quoting <u>United States v. Vera</u>, 701 F.2d 1349 (11th Cir. 1983)). "The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury <u>necessarily</u> would have done so." <u>Isaacs v. Head</u>, 300 F.3d 1232, 1270 (11th Cir. 2002) (emphasis in original). "The defendant bears the burden of establishing the existence of one of the two criteria," and this requirement is "strictly enforced." <u>Id.</u> In analyzing a challenged comment, "[t]he comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement." <u>Id.</u>; <u>see also</u> <u>Matire</u>, 811 F.2d at 1435 (explaining that a reviewing court "is to consider the overall trial context of the comment").

In this case, Detective Bishop unambiguously testified that after being advised of his Miranda rights, Petitioner declined to make a statement.  That testimony was offered during the state's case in chief and in direct response to a question by the prosecutor.  There can be little doubt that this testimony was both manifestly intended by the prosecutor and would naturally and necessarily be understood by the jury as a comment on Petitioner's silence.

While Petitioner is not entitled to the benefit of Doyle, and thus, may be impeached by post-Miranda silence, the timing of the prosecutor's questioning clearly indicates that this was offered, not for impeachment purposes, but as substantive evidence of guilt.  Impeachment evidence is ordinarily elicited on cross-examination or in rebuttal.  Yet, when the prosecutor elicited testimony regarding Petitioner's post-Miranda silence during the state's case in chief, Petitioner had not yet testified as to his alibi defense.  Indeed, because Petitioner had an absolute right under the Fifth Amendment to refuse to testify, it was not assured at the time that testimony was elicited that Petitioner would

157

testify and offer his exculpatory story.  Thus, there was no inconsistent

testimony to impeach and no guarantee that such testimony would be offered.[32]

What is more, by waiving his opening statement, the defense had given

no indication that an alibi defense would be forthcoming, and nothing in the

defense's argument or cross-examination, would have rendered this evidence

even arguably admissible at that point.  Compare Doyle, 426 U.S. at 619 n.11

(noting that "evidence of silence following arrest and Miranda warnings can be

used "to contradict a defendant who testifies to an exculpatory version of events

and claims to have told the police the same version upon arrest.  In that situation

the fact of earlier silence would not be used to impeach the exculpatory story,

but rather to challenge the defendant's testimony as to his behavior following

arrest."); United States v. O'Keefe, 461 F.3d 1338, 1348 (11th Cir. 2006)

(stating that "[t]he fact of a post-arrest silence can be used by the prosecutor to

contradict a defendant who testified to an exculpatory version of events and

claims to have told the police the same version upon arrest" and concluding that

---

[32] The fact that Petitioner eventually did testify does not render the evidence proper in the state's case in chief.  See United States v. Hernandez, 948 F.2d 316, 323 (7th Cir. 1991) (stating in case addressing whether comment on silence violated Fifth Amendment: "The fact that [the defendant] later took the stand does not allow the prosecutor to introduce impeaching evidence in its case-in-chief.").

government's inquiries into defendant's post-Miranda silence were for purpose of rebutting defendant's claim that he had intent to cooperate with law enforcement); Fairchild, 505 F.2d at 1383-84 (evidence of silence admissible to rebut impression defendant created with jury that he had fully cooperated with investigators).  In the Court's view, the admission of this testimony regarding Petitioner's silence, which was offered before Petitioner had elected to take the stand and shed his cloak of immunity, violated his rights under the Fifth Amendment and was error.  See, e.g., United States v. Whitehead, 200 F.3d 634, 639 (9th Cir. 2000) (holding that admission of evidence of pre-Miranda silence "plainly infringed" upon defendant's Fifth Amendment privilege against self-incrimination); United States v. Moore, 104 F.3d 377, 385 (D.C. Cir. 1997) (stating that "it is plain from Griffin and Miranda that the prosecution may not use a defendant's silence in its case-in-chief," and explaining that while pre-Miranda silence may be used for impeachment purposes, comment on post-arrest silence in case where defendant did not testify violates Fifth Amendment); United States v. Hernandez, 948 F.2d 316, 323 (7th Cir. 1991) (finding comments during the government's case-in-chief regarding the defendant's refusal to speak with arresting officers violated the defendant's

right to remain silent); United States v. Ramos, 932 F.2d 611, 616 (7th Cir.

1991) ("This court has . . .  held that it is a violation of the Fifth Amendment

privilege against self-incrimination to allow a prosecutor to use as evidence of

guilt a defendant's refusal to talk to the police."); United States v. Caro, 637

F.2d 869, 874-76 (2d Cir. 1981) (Friendly, J.) (explaining that all cases

permitting proof of silence have involved impeachment or rebuttal of

defendant's testimony, that court had found no decision allowing use of silence

in government's case in chief, and concluding that allowing testimony on

silence in prosecution's direct case would violate Fifth Amendment); Chapman,

547 F.2d at 1244.  But cf. United States v. Frazier, 408 F.3d 1102, 1110 (8th

Cir. 2005) (holding that use of pre-Miranda silence does not violate Fifth

Amendment); United States v. Tenorio, 69 F.3d 1103, 1108 (11th Cir. 1995)

(Edmonson, J., concurring) (commenting that in this Circuit evidence of pre-

Miranda silence may be used as substantive evidence in case in chief); United

States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991) (finding no due process

violation when the government comments on pre-Miranda silence, but not

addressing whether use of silence would violate the Fifth Amendment).

Accordingly, the Court concludes that the state habeas court's decision, which

160

does not recognize the introduction of this testimony as error or consider its

effect on Petitioner's trial, is objectively unreasonable.[33]

---

[33] The Court notes that the Circuits are divided on the issue of whether the use of pre-arrest silence in the government's case in chief violates the Fifth Amendment. Compare Combs v. Coyle, 205 F.3d 269, 283 (6th Cir. 2000) (holding that the use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination); United States v. Burson, 952 F.2d 1196, 1201 (10th Cir. 1991) (holding that admission of testimony regarding defendant's pre-arrest failure to respond to questioning violated the Fifth Amendment); Coppola v. Powell, 878 F.2d 1562, 1568 (1st Cir. 1989) (holding that testimony in case in chief regarding defendant's statements that he was not going to confess and would not answer further questions without presence of lawyer violated Fifth Amendment); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1017-18 (7th Cir. 1987) (finding that prosecution's use of defendant's refusal to talk to the police as substantive evidence of guilt in case in chief violates Fifth Amendment), with United States v. Oplinger, 150 F.3d 1061, 1066-67 (9th Cir. 1998) ("[T]he privilege against compulsory self-incrimination is irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak."); United States v. Zanabria, 74 F.3d 590, 593 (5th Cir. 1996) (holding that Fifth Amendment does not protect the defendant's prearrest silence, reasoning: "The fifth amendment protects against compelled self-incrimination but does not, as [defendant] suggests, preclude the proper evidentiary use and prosecutorial comment about every communication or lack thereof by the defendant which may give rise to an incriminating inference."). In the Court's view, however, the reasoning applied in those cases finding that the use of pre-arrest silence does not violate the Fifth Amendment is inapplicable here. Petitioner's decision to remain silent about which the jury heard occurred in the post-arrest context. Whether or not Fifth Amendment protection attaches to pre-arrest silence, it certainly attaches to post-arrest silence during custodial interrogations. See, e.g., Jenkins, 447 U.S. at 243-44 (Stevens, J., concurring) ("When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent.").

161

Second, Petitioner challenges the rebuttal testimony of Detective Bishop. Immediately following Petitioner's denial during cross-examination that he had said "you all got me pinned anyhow," the prosecutor questioned Detective Bishop as to whether he recalled "a conversation [he] had with [Petitioner] in regard to the question [the prosecutor] just asked [Petitioner]."  (R. Ex. 6 at 418.)  Detective Bishop responded that he did in fact recall the conversation in question, and the prosecutor asked him to elaborate upon the substance of that conversation.  According to Detective Bishop, during the interrogation, Petitioner was advised of his rights and initially proceeded to make a statement to the effect that he had discovered the victim's car "somewhere off Peachtree Street."  However, once Petitioner was shown the murder warrants, "he refused to say anything more without the advise [sic] of counsel."  (Id.)  The officers "agreed that was his right" and terminated the interview.  But, when they later encountered Petitioner in the booking area, they again offered the opportunity to make a statement, and Petitioner again declined, and in the course of so doing, stated that "there [was] no need for [him] to say anything" because the police had him "pinned anyhow."  (Id.)

162

Petitioner argues that there was no impeachment value to this testimony, and that it "was presented solely to show that [Petitioner] had been given many opportunities to speak to authorities without the presence of a lawyer and that he had declined each time."  (Br. in Supp. of Pet. at 70.)  The Court, at least in part, disagrees.

Insofar as Detective Bishop clearly testified that Petitioner stated that officers had him "pinned," that testimony was directly contrary to Petitioner's cross-examination testimony, and was properly used to impeach his credibility. See Harris, 401 U.S. at 225-26; United States v. McIntyre, 467 F.2d 274, 276 (8th Cir. 1972) (even if statement by defendant in response to questions asked after defendant said that he did not wish to make a statement was obtained in violation of defendant's rights, statement was admissible for impeachment purposes).  With respect to the testimony regarding Petitioner's decision to remain silent upon being presented with the murder warrants, however, the Court concludes that this testimony was a comment on Petitioner's silence, and its admission was error.[34]  Though it is often difficult to ascertain the intent of

---

[34] This statement was arguably not a comment on petitioner's silence, but rather on his request for counsel.  It appears, however, that the Eleventh Circuit has not distinguished between comments on the invocation of these two separate rights for

the prosecutor from the cold transcript, it appears from the record that this evidence was not intentionally elicited by the prosecutor.  While the prosecutor's question was more broadly phrased then was perhaps necessary, the prosecutor appears to have intended only to ascertain whether Petitioner had in fact stated that the officers "had [him] pinned."  Thus, this evidence was not manifestly intended by the prosecutor to be a comment on Petitioner's silence. But, evidence of silence may also be improper if the testimony would necessarily be understood by the jury to be a comment on the defendant's silence.  It is true that the testimony was contained in a narrative, the clear point of which was not his silence, but rather, his affirmative statement that officers had him pinned.  Nevertheless, the Court believes that such a clear statement that Petitioner invoked his right to remain silent upon being presented with warrants for the murder of Mr. Rouse could not escape the jury's attention.

The question remains, however, as to whether this testimony was improper at the time of Petitioner's trial under the pre-Doyle law—that is to

---

purposes of assessing whether their admission was error.  See Hill v. Turpin, 135 F.3d 1411, 1414 (11th Cir. 1998) (explaining that "although the improper references at issue in Doyle concerned only the defendants' post-Miranda silence, the prohibition extends equally to impeachment use of a defendant's post-Miranda invocation of the right to counsel.").

say, whether it was offered for impeachment purposes or as substantive

evidence of guilt.  For at least three reasons, it is arguable that this testimony

was proper at the time.  When viewed through a pre-Doyle lens, the testimony

tends to show that Petitioner initially provided an explanation as to how he

came into possession of the victim's vehicle, but when it was made clear that

investigators considered him a suspect in the murder, he declined to make a

statement.  It could be argued that this decision to remain silent was inconsistent

with his explanation at trial, at least insofar as courts permitted the jury to

consider the failure to deny allegations which one would expect would elicit

such a denial as bearing on a defendant's credibility.  Cf. Jenkins, 447 U.S. at

239 (concluding that impeachment by pre-Miranda silence does not violate

Fifth or Fourteenth Amendment, stating "Common law traditionally has

allowed witnesses to be impeached by their previous failure to state a fact in

circumstances in which that fact naturally would have been asserted.").

Moreover, it is similarly arguable whether this testimony might be admissible to

rebut Petitioner's testimony.  During cross-examination Petitioner testified that

he refused to answer questions "on account of the way [he] was being treated"

and that he was "very harassed."  He indicated that investigators and the

165

assistant district attorney continued to question him in an intimidating manner

regarding his involvement in the murder despite his repeated refusal to answer

such questions.  Thus, Detective Bishop's testimony that investigators squarely

acknowledged Petitioner's right to remain silent and terminated the interview

could be seen as inconsistent with Petitioner's testimony, and reflect upon his

credibility.  Finally, this testimony might, for the same reason, be proper to

show that Petitioner's subsequent statement that officers had him pinned was

voluntarily given and did not result from coercion.

But, there is also the possibility that the jury would perceive this

testimony, not as being inconsistent with the story offered by Petitioner, but

rather as being inconsistent with his innocence.  While the Court does not

believe that this evidence was intentionally presented by the detective for the

purpose of establishing Petitioner's guilt, in the absence of a jury instruction it

is difficult for the Court to constrain the possible effect that such testimony

might have on the jury.  Thus, the Court assumes that this testimony would be

understood by the jury as evidence of guilt, and as such, the presentation of that

evidence constitutes error.  See, e.g., Doyle, 426 U.S. at 634-35 (Stevens, J.

dissenting) ("Comment on the lack of credibility of the defendant is plainly

proper; it is not proper, however, for the prosecutor to ask the jury to draw a direct inference of guilt from silence-to argue, in effect, that silence is inconsistent with innocence."); O'Keefe, 461 F.3d at 1349 n.14 (noting that while impeachment by silence may be permissible, presenting evidence of silence as proof of guilt is unconstitutional); Kibbe v. DuBois, 269 F.3d 26, 35 (1st Cir. 2001) (" '[W]hile the government may use a defendant's post-arrest silence to impeach testimony about the circumstances of an arrest, the government may not then argue that the defendant's silence was inconsistent with this claim of innocence.' " (quoting United States v. Shue, 766 F.2d 1122, 1130 (7th Cir. 1985)); United States ex rel. Savory v. Lane, 832 F.2d 1011, 1017 (7th Cir. 1987) (same).  While the state habeas court does not appear to have addressed this particular challenge, to the extent that it did, the Court concludes that its decision was objectively unreasonable.

Third, Petitioner challenges the testimony of Assistant District Attorney Davis.  After Petitioner testified at length in sur-rebuttal regarding the alleged use of intimidating and abusive interrogation tactics that induced his invocation of his right to remain silent and regarding his willingness to cooperate with

authorities by waiving extradition to Georgia,[35] the prosecution called Mr.

Davis to the stand.  His testimony directly contradicted that of Petitioner on

both fronts.  First, he testified that neither he nor the other investigators engaged

in intimidating interrogation tactics, but rather terminated the interview as soon

as Petitioner requested the presence of counsel before making a statement.

Second, he testified that, contrary to Petitioner's assertions on the stand,

Petitioner refused to waive extradition.  Given the context of Mr. Davis's

testimony, and in light of the significant testimony offered by Petitioner on

these issues, the Court is of the view that Mr. Davis's testimony did not amount

to an improper comment on Petitioner's silence.  Nevertheless, as is discussed

below, even assuming that this testimony was error, that error was harmless.

Finally, Petitioner challenges the prosecutor's closing argument which

made repeated references to his invocation of his rights under the Fifth

Amendment.  The Court agrees with Petitioner that this argument was wholly

improper.  As is discussed above, while it may be permissible to impeach a

defendant with his silence, it is clearly impermissible to ask the jury to infer

from that silence that he is guilty of the crime charged.  See, e.g., O'Keefe, 461

---

[35] See supra note 24.

F.3d at 1349 n.14.  The prosecutor's argument that an innocent man would not be "asking to see a lawyer" plainly does not focus on any impeachment value Petitioner's silence may have had.  Rather, such argument can only be interpreted as placing Petitioner's silence and request for counsel before the jury for the sole purpose of establishing his guilt.  Because "[t]he state may not use a defendant's exercise of his right to remain silent to obtain his conviction," Jones v. Stotts, 59 F.3d 143, 146 (10th Cir. 1995), this is wholly improper, and clearly violative of Petitioner's constitutional rights.  Accordingly, the Court readily concludes that the state habeas court's decision, which found this argument did not transgress constitutional bounds as established at the time of Petitioner's trial, is objectively unreasonable.

(c)    Harmless Error

Having concluded that error of constitutional magnitude occurred during Petitioner's trial, the Court turns to the question of whether the error at Petitioner's trial was harmless.  The state habeas court did not conduct a harmless error analysis, and the state does not here contend that the harmless error doctrine applies.  But, neither failure precludes this Court from reaching that issue.  Where the state habeas court either fails to conduct a harmless error

169

review, or does so but applies the incorrect legal standard, the Eleventh Circuit has instructed the lower courts to apply the harmless error standard applicable to cases on collateral review.  Ventura v. Attorney General, Fla., 419 F.3d 1269, 1279 n.4 (11th Cir. 2005) (stating that harmless error standard established in "Brecht  continues to apply on habeas review even after AEDPA when a state court either fails to conduct any harmless error review because it unreasonably concludes that no constitutional error has occurred, or conducts harmless error review applying the wrong standard (*i.e.* when the state court's decision is contrary to or an unreasonable application of clearly established federal law).").  What is more, this Court has discretion to overlook the state's failure to raise the harmless error issue and to undertake sua sponte the task of considering whether any error was harmless.  Horsley v. State of Ala., 45 F.3d 1486, 1492 n.10 (11th Cir. 1995).  It elects to do so in this case.[36]

The Supreme Court has identified two types of constitutional errors: structural and trial.  See Arizona v. Fulminante, 499 U.S. 279, 306-10, 111 S.

---

[36] The Court notes that while the state does not raise the harmless error issue, Petitioner argues the issue in his papers.  (See Br. in Supp. of Pet. at 75-76.)  Thus, Petitioner cannot claim surprise at the Court's application of the harmless error doctrine, and the Court's decision to reach the issue here in no way deprives him of the opportunity to fully and fairly present his arguments to the Court.

AO 72A
(Rev.8/82)

Ct. 1246, 113 L. Ed. 2d 302 (1991).  "A structural error is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' "  Ventura, 419 F.3d at 1278 n.5 (quoting Fulminante, 499 U.S. at 310).  Structural  errors require automatic reversal and are not subject to harmless error analysis.  Fulminante, 499 U.S. at 310.  By contrast, trial error is error that "occur[s] during the presentation of the case to the jury."  Id. at 307-08.  Such error "is amenable to harmless-error analysis because it may . . .  be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]."  Brecht v. Abrahamson, 507 U.S. 619, 629, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (alterations in original) (internal quotations omitted).

Error in permitting the prosecutor to comment upon a petitioner's right to silence in violation of the Fifth Amendment is an error of the trial type which is subject to harmless error review.  See Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (applying harmless error analysis to Griffin violation); Pickens v. Gibson, 206 F.3d 988, 999 (10th Cir. 2000) (finding Griffin error harmless); Matire, 811 F.2d at 1436 (applying harmless error rule to Doyle/Griffin violations).  In Brecht, the Supreme Court established the

171

harmless-error standard applicable to cases on collateral review.  Under that standard, a habeas petitioner's conviction may be set aside based upon trial error only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623; California v. Roy, 519 U.S. 2, 5, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996).  The reviewing court must evaluate the error "in the context of the entire trial record, mindful of 'all the ways that error can infect the course of a trial.' " Hill v. Turpin, 135 F.3d 1411, 1416 (11th Cir. 1998) (quoting Brecht, 507 U.S. at 642 (Stevens, J., concurring)).  If the reviewing court is "in grave doubt" about whether an error had a "substantial and injurious effect," id. 135 F.3d at 1416 (quoting O'Neal v. McAninch, 513 U.S. 432, 436, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995)), or if it "cannot say, with fair assurance. . . that the judgment was not substantially swayed by the error," Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946), then the error is not harmless.  In this context, "[g]rave doubt means that, 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.' " De Lisi v. Crosby, 402 F.3d 1294, 1302 (11th Cir. 2005) (quoting O'Neal, 513 U.S. at 435).

172

In applying the harmless error doctrine to improper prosecutorial comment on silence, this Court "must examine the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." Tenorio, 69 F.3d at 1107.  Several guideposts have emerged in the Circuit Court authorities which guide this Court's inquiry. On the one hand, where the challenged comments are "isolated," "unintentional," and not "highlight[ed] . . . either in questioning other witnesses or during closing argument," or where the evidence of the defendant's guilt is otherwise "overwhelming," courts have generally found such error to be harmless.  Hill, 135 F.3d at 1417 (collecting cases).  On the other hand, where the improper use of silence is "egregious and intentional,"or  where the defendant's silence is "the touchstone of the government's case-in-chief," Tenorio, 69 F.3d at 1107, and where the evidence against the defendant is "far from overwhelming," Matire, 811 F.2d at 1436, courts generally have found relief warranted.[37]  In this case, having considered the nature and context of the

---

[37] In conducting its harmless error analysis, Petitioner urges this Court to apply the reasoning of Eleventh Circuit's decisions in Hill v. Turpin, 135 F.3d 1411 (11th Cir. 1998), United States v. Tenorio, 69 F.3d 1103 (11th Cir. 1995), and United States v. Gonzalez, 921 F.2d 1530 (11th Cir. 1991).  (See Br. in Supp. of Pet. at 75-77.)  These cases make clear the modern rule that where the defendant's credibility is central to his

comments, as well as the strength of the evidence against Petitioner, the Court concludes that the prosecutor's comments on Petitioner's silence amounted to harmless error.

Without question, it is troubling that the prosecution introduced the fact that Petitioner invoked his right to remain silent during the state's case in chief. As explained above, Petitioner had not yet testified and it was not certain that he would do so. As such, Detective Bishop's testimony had no impeachment value and the prosecutor clearly overreached. However, as is also explained above, the subject of Petitioner's post-arrest silence was a legitimate ground for

---

defense, and the prosecution deliberately links the implausibility of the defendant's exculpatory story with the ostensibly inconsistent act of remaining silent, then prosecutorial comment on silence is rarely, if ever, harmless. Tenorio, 69 F.3d at 1107; see also Hill, 135 F.3d at 1418 (explaining that the Eleventh Circuit has "declined to find Doyle error harmless in those cases where the prosecutor returned repeatedly to the defendant's post-Miranda silence throughout trial to impeach a plausible exculpatory story offered by the defendant."); Gonzalez, 921 F.2d at 1551 (explaining that comment on silence is particularly damaging to a defendant presenting an alibi defense because it creates an inference both of guilt (i.e., that an innocent person would not elect to remain silent) and recent fabrication (i.e., defendant must have fabricated his alibi between arrest and trial because otherwise he would have told it to the police the first time)). But, because Petitioner is not entitled to the benefit of Doyle, his post-Miranda silence was a legitimate avenue of inquiry and means for impeachment. Thus, it was entirely proper for the prosecution to attempt to undermine Petitioner's credibility by questioning him regarding his post-arrest silence. Accordingly, while these cases provide valuable guidance for this Court, their reasoning, insofar as they emphasize the improper impeachment of a defendant's credibility, simply does not apply here.

inquiry under the law applicable to this case, and the prosecutor availed himself of what the law then allowed.  To that end, the prosecutor legitimately inquired into Petitioner's post-arrest silence during his cross-examination, (See R. Ex. 6 at 415-17), and Petitioner readily acknowledged his election to remain silent, explaining that this decision was "on account of how [he] was being treated" and based upon the severity of the charges against him.  (Id. at 417.)  In view of the fact that Petitioner's post-arrest silence was the subject of legitimate inquiry, Detective Bishop's testimony was, in effect, cumulative of properly admitted evidence.  See Brecht, 507 U.S. at 639 (finding evidence which violated Doyle cumulative of properly admitted evidence of pre-Miranda silence); United States v. Rivera, 944 F.2d 1563, 1567 (11th Cir. 1991) (concluding that, because improper evidence of silence was cumulative of other proper evidence regarding defendant's silence, erroneous introduction of that evidence was not so harmful as to warrant reversal under less onerous Chapman harmless error standard applicable to cases on direct review).  As such, the Court concludes

that any prejudice associated with the introduction of Detective Bishop's testimony during the state's case in chief was minimal.[38]

For the same reason, the Court concludes that Petitioner suffered little prejudice as a result of the rebuttal testimony of Detective Bishop and Mr. Davis.  Prior to their testifying, Petitioner had discussed his decision to invoke his right to remain silent in great detail on the stand.  During the course of that testimony, Petitioner attempted to cast investigators in a negative light for their alleged use of intimidating and offensive interrogation tactics; denied making the statement to Detective Bishop that officers had him pinned; and represented that he had cooperated with investigators by agreeing to waive extradition.  In view of this testimony, Detective Bishop and Mr. Davis's matter-of-fact statements that Petitioner had invoked his right to remain silent—a fact of

---

[38] The Court notes that case-in-chief evidence of silence might be considered fundamentally different from other improper prosecutorial comments.  As the former Fifth Circuit recognized in United States v. Impson, 531 F.2d 274, 277 (5th Cir. 1976), such case-in-chief evidence places the defendant in a dilemma—if the defendant refuses to testify at trial, then he runs the risk that the jury will draw an inference of guilt; if, on the other hand, he elects to testify, then he opens himself up to cross-examination and impeachment.  Whatever merit this reasoning may have, the Supreme Court in Brecht itself considered and rejected a challenge involving case-in-chief evidence of silence without drawing any such distinction.  Accordingly, the Court does not consider this evidence to be "more harmful" for having perhaps presented Petitioner with the Hobson's choice identified in Impson.

176

which the jury was already clearly aware—added nothing new.  What is more, a review of the record makes clear that the focus of their testimony was not to highlight Petitioner's decision to remain silent, but rather to directly contradict Petitioner's testimony regarding his statement to Detective Bishop and the waiver of extradition.  While the Court explained above that it could not say that this testimony was not error in light of the trial court's failure to give a limiting instruction, it can say that it had minimal, if any, prejudicial effect.

The Court is most troubled, however, by the prosecutor's statements during closing argument to the effect that "an innocent man wouldn't be asking to see a lawyer."  This argument is, without question, improper and must be condemned as an affront to the important protections enshrined in our Constitution.  Long ago, the Supreme Court made clear the ethical responsibilities of a prosecutor, explaining that a prosecutor's primary interest in a criminal prosecution is not merely to obtain a conviction, but rather to ensure that "justice shall be done."  Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).  Thus, while the prosecutor "may prosecute with earnestness and vigor," and though the prosecutor "may strike hard blows," he or she "is not at liberty to strike foul ones.  It is as much [the

177

prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Id.  The prosecutor in this case would have done well to abide by this admonition.

But, the fact that Petitioner's constitutional rights were violated does not mean that he is entitled to relief.  Rather, the Court must consider the prejudice resulting to Petitioner juxtaposed against the evidence of Petitioner's guilt. This evidence, while circumstantial, was simply overwhelming.  Petitioner and Jordan were arrested in North Carolina less than 24 hours after the victim was killed.  At the time they were arrested, they were driving the victim's car. During a high-speed police chase leading up to their eventual capture which included an exchange of gunfire with the pursuing officers, a shotgun was tossed from the vehicle.[39]  This was the same type of weapon used to kill the victim.  The shotgun shells found in their possession were of the exact brand and type as that discovered at the scene of the killing, and the state's expert testified that the shell found at the scene had been fired from the shotgun in

---

[39] Notably, Petitioner and Jordan did not see fit to toss at least one other firearm from the vehicle during the chase, but rather elected to use that weapon to fire upon the police.

AO 72A
(Rev.8/82)

Petitioner's possession.  Petitioner and Jordan had in their possession the victim's wallet and briefcase, and Jordan was wearing the victim's watch. There were photographs of Petitioner and Jordan standing in front of the victim's car holding various weapons, including a shotgun, which Petitioner and Jordan explained as "just clowning around" and as a "souvenir."  Finally, there was testimony from Ms. Hamrick placing Petitioner, Jordan, and the victim at a bar which was in close proximity to where the victim was killed, but a significant distance from the location where Petitioner claimed to have discovered and stolen his vehicle.

As the foregoing makes clear, the state presented overwhelming evidence to the jury tending to prove Petitioner's guilt separate and apart from his post-arrest silence.  Thus, the evidence of Petitioner's post-arrest silence, insofar as it may have been considered as evidence of guilt, was of little significance and certainly was not the touchstone of the state's case against Petitioner.  When this overwhelming evidence of guilt and the relatively minor role the evidence of Petitioner's silence played are considered against the prejudice to Petitioner, the Court concludes that the errors resulting from the prosecutor's references to Petitioner's post-arrest silence did not have a "substantial and injurious effect or

influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623.  While the Court in no way seeks to minimize the errors that occurred, the Court is confident that those errors did not operate to sway the jury in favor of a verdict of guilty.  Accordingly, the Court concludes that these errors were harmless, and as such, Petitioner is not entitled to relief on this ground.

2.    <u>Brady violations</u>

In <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id.</u> at 87.  "There are three essential components of a true Brady violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999).  Thus, "[t]o establish that he suffered a Brady violation, [a] defendant must prove that: (1) the government possessed evidence favorable to him; (2) the defendant did not possess the

180

evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material." LeCroy v. Sec'y, Fla. Dept. of Corr., 421 F.3d 1237, 1268 (11th Cir. 2005) (citing United States v. Meros, 866 F.2d 1304, 1308 (11th Cir. 1989). "Suppressed evidence is material when 'there is a reasonable probability that . . . the result of the proceeding would have been different' had the evidence been available to the defense." Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987)); see also Strickler, 527 U.S. at 289-90 ("the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence") (internal quotations and citation omitted).

Petitioner contends that he is entitled to relief based upon the prosecution's failure to provide the defense with (1) certain motel receipts which show that the victim had previously stayed at a motel in the vicinity where Petitioner claims to have stolen his car, and (2) a "threatening" note allegedly discovered in the victim's office just prior to his killing. With respect

181

to the motel receipts, Petitioner argues that this information corroborated Petitioner's trial testimony by showing that Mr. Rouse's vehicle was on the street only a few days before Petitioner claims to have stolen it.  Moreover, Petitioner asserts that had this information been provided to defense counsel, they would have been able to go to the motel, interview staff and guests, and show that the victim was in the area at the time in question.  With respect to the note, Petitioner argues that had he been provided with this information prior to trial, he would have been able to investigate the source of the note in an effort to show that someone other than Petitioner had a motive to kill Mr. Rouse.  Thus, Petitioner argues that the suppression of the note, especially when considered in conjunction with the suppression of the motel receipts, violated Petitioner's right to a fair trial.  (Obs. to Final Rep. & Recomm.  at 53-57.)

As an initial matter, it is far from clear from the state habeas court's decision whether it resolved these claims on the merits, and whether it made findings of fact which this Court must presume to be correct.  For example, after noting that many of the grounds for relief raised by Petitioner were contained in a confusing, handwritten, *pro se* state petition, the state habeas court wrote:

182

This Court has had a difficult time in approaching and analyzing these grounds and allegations.  However, as best as the undersigned judge can understand, a large number of these grounds and allegations are matters as to which either the record (both trial and habeas) is silent; or as to which the record is clearly to the contrary of the allegations; or as to which the petitioner has made no showing whatsoever in these proceedings; or as to which rulings have already been made on the direct appeal; or issues which could have been raised on direct appeal, but were not raised, or were procedural matters subject to the trial judge's discretion in the governance of the trial.  This Court therefore finds no necessity to make further ruling on the said grounds.  They are therefore **DENIED** as follows:

. . .

Ground 65 - failure of the district attorney to disclose material exculpatory evidence.

(R. Ex. 13 at 13-15 (emphasis in original).)  Ground 65, as identified by the

state habeas court, was raised in Petitioner's second amendment to his state

petition.  (Id. at 10.)  In Claim XI of Petitioner's second amendment, Petitioner

alleges that the state suppressed evidence related to "a note threatening to kill

Mr. Rouse," and that this evidence would have "cast doubt on the state's case at

trial."  (R. Ex. 4 ¶¶ 10-12.)  This is the only ground for relief identified by the

state habeas court relating to potential Brady violations, (see id. at 5-10), and

although the issues relating to the motel receipts were raised at the hearing and

183

briefed, there does not appear to be any mention of them in the amended

petition itself.

Later, however, in a section of the order addressing Petitioner's

ineffective assistance of counsel claims, the state habeas court wrote:

> Petitioner presently seeks to make a substantial
> issue over the fact that some twenty years later there
> was found in the prosecution's file a purported
> threatening note to victim Rouse purported to have
> been written by some students, and some hotel
> receipts indicating that at some point the deceased
> Rouse occupied and/or paid for a room at a hotel in
> Atlanta.  There is no showing that any of this evidence
> was known to the district attorney at the time of this
> trial, or that any of it was concealed from the defense
> by the prosecution.  The defense attorneys were
> allowed complete and repeated access to the
> prosecution file prior to and during the trial.  There is
> nothing to indicate that any lack of action by the
> attorneys representing Mr. Prevatte were ineffective
> assistance.

(R. Ex. 13 at 21-22.)

Petitioner relies on the above-quoted passage to make two arguments for

relief.  First, Petitioner argues that the state habeas court made a factual finding

that the evidence was in the prosecution's file, and that this Court must defer to

that factual finding as there is not clear and convincing evidence to the contrary.

Second, Petitioner argues that the state habeas court in this passage denied

Petitioner's <u>Brady</u> claim, and that conclusion was contrary to clearly established

federal law because (1) affirmative concealment of exculpatory evidence by the

state is not required for a <u>Brady</u> violation, <u>see</u> <u>Kyles v. Whitley</u>, 514 U.S. 419,

432, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) (explaining that regardless of

whether evidence was requested, prosecution has affirmative duty to disclose

material exculpatory evidence); <u>Brady</u>, 373 U.S. at 87 (holding that

"suppression by the prosecution of evidence favorable to the accused upon

request violates due process . . . irrespective of the good faith or bad faith of the

prosecution"), and (2) the evidence need only be in the possession of the state,

and need not be in the possession of the prosecutor himself, <u>see</u> <u>Kyles</u>, 514 U.S.

at 437 ("[T]he individual prosecutor has a duty to learn of any favorable

evidence known to the others acting on the government's behalf in the case,

including the police.").

Petitioner is correct insofar as the failure to provide material exculpatory

evidence, as opposed to the affirmative concealment of that evidence, is

sufficient to give rise to a <u>Brady</u> violation.  <u>See</u> <u>Brady</u>, 373 U.S. at 86-87.

Moreover, the Court will assume that Petitioner is similarly correct in that

185

Brady, as it applies to Petitioner's 1974 conviction, imposes no requirement that the prosecution be aware of the existence of that evidence, and as such, material exculpatory evidence in the possession of the police, whether known to the prosecutor or not, must be disclosed.  But see Moore v. Illinois, 408 U.S. 786, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972);[40] compare Clarke v. Burke, 440 F.2d 853, 855 (7th Cir. 1971), cert. denied 404 U.S. 1039, 92 S. Ct. 718, 30 L. Ed. 2d 731 (1972) (upholding denial of habeas relief over Brady challenge where there was no evidence to suggest prosecutor had knowledge of exculpatory evidence and police testimony at habeas hearing did not show that records were given to prosecutor), with Smith v. Florida, 410 F.2d 1349, 1351 (5th Cir. 1969) (explaining that for purposes of the prosecution's duty to

---

[40] In Moore, the Supreme Court,  facing a situation in many ways similar to that the Court faces here, stated:

> The record discloses . . . that the prosecutor at the trial submitted his entire file to the defense.  The prosecutor, however, has no recollection that [a certain potentially exculpatory] statement was in the file.   The statement, therefore, either was in that file and not noted by the defense or it was not in the possession of the prosecution at the trial.
> We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.

408 U.S. at 795.

disclose evidence favorable to defense, prosecutor need not have possessed evidence if it was in the custody of government agents, including police).  The Court, however, disagrees that the state habeas court through this passage incorrectly resolved Petitioner's claim against him.  Rather, this Court, after reviewing the entirety of the state habeas court's decision, concludes that the state habeas court did not resolve that issue at all.  Instead, in the section of its order addressing Petitioner's <u>Brady</u> claims, it merely stated that for one reason or another, those claims were denied and no further factual findings or legal rulings were required.  (<u>See</u> R. Ex. 13 at 13-15; discussed <u>supra</u>.)  Thus, the Court is faced with the question of how that decision by the state court affects this Court's review of Petitioner's <u>Brady</u> claims.

The state habeas court rejected Petitioner's <u>Brady</u> claims after reciting a litany of possible reasons why Petitioner could not prevail on those claims.  Those possible reasons range from the fact that those claims could have been, but were not, raised on direct appeal, to the conclusion that the record is clearly contrary to those allegations.  In short, the state habeas court's order gives no indication whether it considered and rejected these claims, or whether it never passed on the merits of those claims based upon a state procedural rule. From

this, the Court draws two conclusions.  First, because the state habeas court did not "clearly and expressly" state that it relied on state grounds in reaching its decision, the doctrine of procedural default does not apply to bar these claims in this federal habeas action.  See Harris v. Reed, 489 U.S. 255, 263, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989).  Second, because of the various reasons given for the denial of those claims, the Court cannot discern whether the state court actually considered and rejected Petitioner's Brady claims on the merits, so as to constitute an adjudication within the meaning of § 2254, or whether it simply refused to reach the federal issue.  Cf. Romine v. Head, 253 F.3d 1349, 1365 (11th Cir. 2001) ("when there is grave doubt about whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply").  That being the case, this Court will review Petitioner's Brady claims de novo. Id.

As explained above, to establish a Brady violation Petitioner must show that (1) the state possessed favorable evidence, (2) the defense was not in possession of that evidence, and it could not have been discovered with reasonable diligence, (3) the evidence was suppressed, and (4) the evidence was material.  The Court has reviewed the record relating to the motel receipts and

188

note.  While the precise sequence of events surrounding the disclosure of this evidence is far from clear, and while there was some evidence that a police report disclosing the existence of the note was present in the prosecutor's file when it was provided to defense counsel, the Court will assume that Petitioner can establish the first three elements of his <u>Brady</u> claim.  Thus, the Court turns to whether Petitioner has shown that the evidence was material.

Suppressed evidence is material when there is a reasonable probability that the result of the proceeding would have been different had the evidence been available to the defense.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); <u>id.</u> at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").  In order to determine whether evidence is material so as to constitute a <u>Brady</u> violation, the Court must consider the cumulative effect of the suppressed evidence in combination with the inculpatory evidence presented at trial.  <u>Stephens v. Hall</u>, 407 F.3d 1195, 1204-05 (11th Cir. 2005); <u>see also</u> <u>Kyles</u>, 514 U.S. 436 (explaining that materiality of suppressed evidence is to be considered collectively).

189

For the reasons that follow, the Court concludes that Petitioner has failed to establish that the suppressed evidence was material.  First, in the Court's view, the note would have been of marginal value to the defense.  While that note, generously characterized as "threatening," would enable Petitioner to make the argument that another person had killed Mr. Rouse, that argument would be far from convincing in light of the words of the note itself.[41]  The note was discovered at the school where the victim worked in a position of authority.  It does not threaten direct violence in any way, and while it is addressed to the victim, it identifies five different teachers at the school whom its author or

_____

[41] As best the Court can determine, the note in question states:

> Shitty ass Mr. Rouse
>
> You and your teachers can kiss my ass.  We hate you and your teachers Mrs. Morris Mr. Bayel Mrs. Green C. Moores Mr. Gadss and you.  Your crazy thanking we is going to do what you say you are a damn fool.  the four of us are going to take over this damn school.  And you and all these fuckers can kiss our asses dig it and this school is sorry as hell.
>
> You damn fools
>
> Your Best friends
> Loves Birds
> the four Sexy Mommas

(R. Ex. 8 at 1003.)

190

AO 72A
(Rev.8/82)

authors apparently disliked.[42]  Indeed, the note, fairly read, appears to be little more than a prank by a disaffected student or group of students, and not a threat of physical harm.

Second, the motel receipts, while perhaps more helpful to Petitioner, are similarly not significantly exculpatory.  According to Petitioner, these receipts "would have played a vital role in proving that the victim's car was in downtown Atlanta on the very same street as [Petitioner] testified, rather than in Gwinnett County as the State theorized."  (Pet.'s Objs. to Rep. & Recommend. at 55.)  Certainly, Petitioner is correct insofar as these receipts place the victim and his automobile on Peachtree Street—the same street where Petitioner claims to have stolen that vehicle—on several occasions, and most recently, two days prior to his death.  Thus, they would provide some support for his alibi defense.  However, the exculpatory value of that evidence is significantly undermined by the testimony of Ms. Hamrick, who placed both the victim and Petitioner at a bar in Gwinnett County far from Peachtree Street on the very

---

[42] While today, in our post-Columbine world, a statement that students plan to "take over this school" would undoubtedly be a cause for concern, the Court considers the note in the context of the time in which it was written, and does not understand this statement to constitute a threat of violence in 1974.

night of the victim's death.  In view of that testimony, the receipts which show

only that the victim had been on Peachtree Street two days prior to his death,

would be of limited value to the defense's case.[43]

To ascertain whether this evidence was material within the meaning of

Brady and its progeny, the Court must consider the evidence actually presented

at trial tending to show Petitioner's guilt.  As is discussed above, that evidence

was overwhelming.  In light of the overwhelming evidence of Petitioner's guilt,

the cumulative effect of the suppressed evidence is simply not sufficient to

undermine confidence in the outcome of the trial.  Accordingly, the Court

concludes that Petitioner has failed to establish that the suppressed evidence

was material, and as such, he is not entitled to relief under Brady.

**D.      Jury instructions impermissibly shifted burden to Defendant**

---

[43] Moreover, insofar as Petitioner contends that, had the receipts been produced, defense counsel would have been able to go to the area and prove that, in fact, the car had been on Peachtree Street as Petitioner testified, this is sheer speculation.  Petitioner has produced no evidence to show that such an investigation would have yielded results positive for the defense.  What is more, the likelihood of such results is significantly reduced when considered in light of the fact that the other facet of Petitioner's alibi—that he and Jordan had been drinking beer and eating pizza at the Lighthouse Inn prior to stealing the car—was thoroughly investigated and that investigation failed to discover a single person who could offer support for Petitioner's story.

Petitioner contends that the trial court erred in its instruction to the jury concerning intent.[44]  The trial court instructed the jury:

> [T]he acts of a person of sound mind and discretion are presumed to be the product of the persons (sic) will.  But, this a presumption which maybe (sic) rebutted. And, I charge you that a person of sound mind and discretion is presumed to intend the natural and probable consequences of his act, but that is a presumption which maybe (sic) rebutted. A person will not be presumed to act with criminal intention, but the trier of facts, and that is you the jury, may find such intention upon consideration of the words, conduct, demeanor, motive and all other circumstances, connected with the act, for which the accused is prosecuted.

(R. Ex. 7 at 474.)

The above instruction was struck down by the Supreme Court during a later challenge to this instruction in a case originating in Georgia.  <u>Francis v. Franklin</u>, 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985).  The Supreme Court subsequently stated that <u>Franklin</u> was "merely an application of the principle that governed our decision in <u>Sandstrom v. Montana</u>, [442 U.S. 510,  99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)], which had been decided before

---

[44] While listed in his initial petition for a writ of habeas corpus, this ground for relief is not developed in Petitioner's supporting brief.

193

petitioner's trial took place." Yates v. Aiken, 484 U.S. 211, 216-17, 108 S. Ct. 534, 98 L. Ed. 2d 546 (1988).  The principle in Sandstrom was that " 'the Due Process Clause of the Fourteenth Amendment prohibits the State from making use of jury instructions that have the effect of relieving the State of the burden of proof.' "  Id. at 217 (quoting Sandstrom, 442 U.S. at 521).

The Supreme Court found that Franklin was not a new rule of law and should be applied retroactively to criminal cases decided subsequent to Sandstrom.  Yates, 484 U.S. at 217.  However, Petitioner's convictions became final in 1975, which is four years prior to Sandstrom.  Thus, Petitioner's claim that the trial court's charge on intent violated his due process rights is Teague-barred.

Respondents also contend that even if the claim was not barred by Teague, it does not survive "harmless error" analysis, as Petitioner relied on an alibi defense.  See Brecht, 507 U.S. at 632 n.7.  Petitioner does not dispute this contention, and this Court agrees that any error was harmless.  Accordingly, this Court finds, in the alternative, that the jury instruction in question did not prejudice Petitioner.

194

**E.      Cumulative Error**

Finally, the Court considers whether the cumulative effect of all error occurring during Petitioner's trial entitles him to relief.  The Court concludes that it does not.  To be sure, errors occurred.  In an ideal world, no defendant's criminal trial would be tainted—even in the slightest way—with constitutional error.  But, while we aspire to provide all defendants with a perfect trial, the standard for granting a writ of habeas corpus is quite different, and that difference is fatal to Petitioner's claims for relief.

In this case, when the prejudicial effect of each and every error is considered against the overwhelming evidence of Petitioner's guilt, no error, either individually or in combination with the others, is sufficient to undermine this Court's confidence in the outcome of Petitioner's trial.  Accordingly, Petitioner is not entitled to relief.

AO 72A
(Rev.8/82)

**Conclusion**

For the foregoing reasons, Petitioner's Petition for Writ of Habeas

Corpus [1] is hereby **DENIED**.


**SO ORDERED** this   27th   day of November, 2006.



_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE